James P. Baker (State Bar No. 96302)
jpbaker@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104-1500
Telephone:    415.626.3939
Facsimile:    415.875.5700

Attorneys for Plaintiff
NYLES LAWAYNE WATSON

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NYLES LAWAYNE WATSON,<br><br>Plaintiff,<br><br>v.<br><br>DENNIS K. SISTO, ALVARO C. TRAQUINA, M.D., RICHARD TAN, M.D., JASON ROHRER, M.D., ALFREDO NORIEGA, M.D., BINOYE NAKU M.D., CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, CALIFORNIA STATE PRISON – SOLANO, AND DOES 1-5<br><br>Defendant. | **Case No. CIV S-07-1871 LKK GGH P**<br><br>**FIRST AMENDED COMPLAINT** |

Plaintiff Nyles Lawayne Watson complains and alleges against defendants as follows:

## PRELIMINARY STATEMENT

1.    Plaintiff Nyles Lawayne Watson ("Watson") is a prisoner at CALIFORNIA STATE PRISON - SOLANO ("CSP-SOLANO"), located in Vacaville, California. This action arises from defendants' deliberate indifference to Watson's serious medical needs in violation of the cruel and unusual punishment clause of the Eighth Amendment to the United States Constitution. Watson brings this civil rights action because the CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION ("CDCR") does not properly care for and treat

the prisoners in its custody. These unconstitutional conditions have caused widespread harm, including severe and unnecessary pain and injury to Watson. The CDCR and the other defendants know that Watson and other prisoners live under conditions creating an unreasonable risk of future harm.

2.    Plaintiff Watson is an "individual with a disability," as the term is defined in section 504 of the Rehabilitation Act, and a "qualified individual with a disability," as that term is defined in the Americans with Disabilities Act ("ADA"), and has been denied access to the programs, services and activities of the CDCR because of defendants' failures to adequately treat and/or monitor his serious medical condition, in violation of the ADA and section 504.

3.    After Watson commenced this action, defendants retaliated against Watson in violation of the First Amendment to the United States Constitution.

4.    Because defendants know that Watson has been living under conditions creating an unreasonable risk of future harm but have not responded reasonably to this intolerable situation, and defendants have retaliated against Watson for engaging in protected speech, Mr. Watson seeks damages and an injunction compelling defendants to immediately furnish him with constitutionally adequate medical care and reasonable accommodations.

## JURISDICTION AND VENUE

5.    The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, and directly under the United States Constitution. Watson seeks declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201 and 2202, 29 U.S.C. § 794a, 42 U.S.C. §§ 1983 and 12101 et seq., and Rule 65 of the Federal Rules of Civil Procedure.

6.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Watson's claims occurred within the Eastern District of California.

## DEFENDANTS

7.    Defendant Dennis K. SISTO is or was at some time relevant to this complaint the Warden at CSP-SOLANO. As the warden at CSP-SOLANO, SISTO failed to adequately supervise and train custody staff and put in place procedures so that Watson could receive medically appropriate care. SISTO is sued in his individual and official capacity.

8.    Defendant Alvaro C. TRAQUINA, M.D. is or was at some time relevant to this complaint a physician and Chief Medical Officer at CSP-SOLANO. Dr. TRAQUINA received his medical degree from the University of Lisbon. Prior to becoming a staff physician at CSP-SOLANO, and then becoming the Chief Medical Officer of the prison, Dr. TRAQUINA was a hair restoration specialist in Beverly Hills for several years. As the Chief Medical Officer at CSP-SOLANO, Dr. TRAQUINA failed to adequately supervise and train custody staff and put in place procedures so that Watson could receive medically appropriate care. Dr. Traquina is sued in his individual and official capacity.

9.    Defendant Richard TAN, M.D. is or was at some time relevant to this complaint a physician at CSP-SOLANO. Dr. TAN graduated from medical school in Rangoon in 1977. He spent one year in private practice in the United States before joining the staff at CSP-SOLANO. Dr. TAN is sued in his individual capacity.

10.    Defendant Jason ROHRER, M.D. is or was at some time relevant to this complaint a physician at CSP-SOLANO. Dr. ROHRER graduated from the University of Southern California Keck School of Medicine in 1993. Dr. ROHRER is sued in his individual capacity.

11.    Defendant Alfredo NORIEGA, M.D. is or was at some time relevant to this complaint a physician and Chief Physician and Surgeon of CSP-SOLANO. Dr. NORIEGA received his medical degree from the University of Santo Tomas in Manila in 1963. Dr. NORIEGA is sued in his individual capacity.

12.    Defendant Binoye NAKU, M.D. was at some time relevant to this complaint a physician at CSP-SOLANO. Dr. NAKU received his medical degree from the University of Lagos College of Medicine in 1985. Prior to becoming a staff physician at CSP-SOLANO, Dr. NAKU was a resident in anesthesia at medical schools in Lubbock, Texas and Valhalla, New York. In the past six years, Dr. NAKU has been named a defendant in at least twenty federal lawsuits other than the present action. Dr. NAKU is sued in his individual capacity.

13.    The CDCR is the successor-in-interest to the Youth and Adult Correctional Agency ("YACA") and the departments and board within the agency, including the Department of Corrections, which were reorganized into the CDCR on July 1, 2005. Reference to the CDCR

in this complaint is intended to include predecessors to the CDCR. The CDCR is the parent agency of CSP-SOLANO and is responsible for managing the state's adult prison and parole systems with the federal and state funds it receives. Upon information and belief, each physician serving in the correctional system is employed at an individual prison and is ultimately responsible to the CDCR.

14.     CSP-SOLANO is, and at all relevant times to this lawsuit was, a correctional facility that operates under the CDCR, duly organized and existing under the laws of the State of California.

## STATEMENT OF FACTS

### The History of Constitutionally Inadequate Medical Care in California Prisons

15.     The CDCR's failure to provide California prisoners with constitutionally adequate medical care is well known to the federal courts.

16.     In 2002, the CDCR entered into a stipulation for injunctive relief stemming from a class action lawsuit, *Plata v. Schwarzenegger*, No. C-01-1351 (N.D. Cal.), in which prisoners alleged that California officials were deliberately indifferent to the prisoners' serious medical needs. Under the terms of the settlement, the CDCR was required to completely overhaul its medical care policies and procedures, and to spend the resources necessary to ensure the provision of constitutionally adequate medical services to California prisoners.

17.     In May 2005, the federal district court judge overseeing the *Plata* settlement described medical treatment in California prisons as "horrifying" and "shocking." Expert reports submitted to the judge at that time also revealed widespread medical malpractice and neglect, notwithstanding the 2002 settlement agreement.

18.     In October 2005, the judge issued an order placing California's prison medical care system under the control of a court-appointed receiver. In that order, the court described the "unconscionable degree of suffering and death" caused by constitutionally deficient medical care in the prisons. A true and correct copy of the Court's October 3, 2005 Order titled: "Findings of Fact and Conclusions of Law Re Appointment of Receiver," is hereto attached as EXHIBIT A.

19.     The failure of the prison system and its employees to provide proper medical care

**FIRST AMENDED COMPLAINT**
CIV S-07-1871 LKK GGH P

- 4 -

1  continues.  From 2002 through and including the present day, Watson has received

2  constitutionally inadequate medical care.

3        **Watson's Medical Condition Prior to His Incarceration at CSP-SOLANO**

4        20.    On May 12, 1998, while at California State Prison – Sacramento ("CSP-

5  Sacramento"), Watson strained his back.  After Watson complained of pain, a physician

6  prescribed him ibuprofen and taught him leg stretches to loosen his back muscles.

7        21.    On June 25, 1998, a physician ordered x-rays of Watson's spine at the L5 disc

8  after Watson complained of persistent lower back pain.  On August 7, 1998, a physician noted

9  that Watson had re-injured his lower back, and that he had a strain at his L5 disc.

10       22.    On September 7, 1999, Watson complained of lower back pain after twisting his

11 back while getting out of bed.  Watson notified a physician that his back had been hurting for

12 years.

13       23.    On December 22, 2000, Watson again complained of chronic lower back pain.

14       24.    On October 2, 2001, Watson was transferred from CSP-Sacramento to CSP-

15 SOLANO.  During his Newly Arrived Inmate Health Interview, Watson stated that he suffered

16 from back pain.  Watson's medical records from CSP-Sacramento, which included his history of

17 back pain, were transferred to CSP-SOLANO and remain there to this day.

18        **Constitutionally Inadequate Medical Care at CSP-SOLANO**

19                **Summer 2002 – Spring 2004**

20       25.    On July 26, 2002, Watson was examined by defendant Dr. TRAQUINA, then

21 employed as a physician at CSP-SOLANO.  Dr. TRAQUINA prescribed Watson naproxen for his

22 back pain.

23       26.    On September 24, 2002, Watson filed an administrative grievance on CDC

24 form 602, complaining that he had informed a CSP-SOLANO physician that he injured his lower

25 back in 1998 and was now experiencing severe lower back pain.  He stated that he could not walk

26 more than 100 feet without pain, that it hurt to sit up for more than 20 minutes, and that the pain

27 medication he had been given was only minimally effective.  He also noted that a back brace that

28 he was issued at CSP-Sacramento had been confiscated when he arrived at CSP-SOLANO.  He

**FIRST AMENDED COMPLAINT**
CIV S-07-1871 LKK GGH P

1  requested stronger medicine, a back brace, and therapy for his pain.

2       27.    On October 23, 2002, x-rays of Watson's spine were conducted. Subsequently,

3  Dr. TRAQUINA diagnosed Watson with degenerative disc disease, and ordered that Watson

4  receive an orthopedic consultation and a back brace, and return to the clinic in four weeks. It was

5  noted in Watson's medical file that Watson had suffered back pain since 1998 or 1999, but that

6  the pain had worsened in the last two months.

7       28.    On November 7, 2002, the CSP-SOLANO Inmate Appeals Office ordered the

8  Medical Department to ensure that Watson was referred/scheduled for an orthopedic consultation.

9       29.    On November 30, 2002, Watson was examined by John Kofoed, M.D., an

10  orthopedic specialist. Dr. Kofoed prescribed methadone for Watson's back pain and ordered an

11  MRI of Watson's spine. In the following months, an MRI was not conducted, but S.O. Oredoza,

12  M.D. and various other physicians renewed Watson's methadone prescription.

13       30.    On January 7, 2003, Watson complained to Dr. TRAQUINA of pain radiating to

14  his left leg, radiculopathy, and continuing chronic back pain. Dr. TRAQUINA ordered a

15  neurology consultation for Watson and noted that the MRI that had been ordered for Watson had

16  not been conducted.

17       31.    On January 28, 2003, Watson was evaluated by Albert Mitchell, M.D., a

18  neurologist. Dr. Mitchell performed a nerve conduction study and noted that Watson was still

19  waiting for an MRI.

20       32.    On February 24, 2003, three months after Dr. Kofoed's order, an MRI was

21  conducted on Watson's spine. The MRI was conducted in an open unit, because Watson is

22  claustrophobic. The radiology report accompanying the MRI noted that Watson had marked disc

23  desiccation, disc space narrowing, and disc bulging at his L5-S1 disc, and minimal disc

24  desiccation and bulging at his L4-5 disc. Upon information and belief, the MRI also showed that

25  Watson had Modic Type 1 changes at his L5-S1 disc. Upon information and belief, Modic

26  Type 1 changes are associated with acute changes to vertebral bodies. Upon information and

27  belief, surgery to repair Modic Type 1 changes is less risky and has a higher likelihood of success

28  than surgery to repair Modic Type 2 and 3 changes.

33.     On February 26, 2003, Watson was referred to physical therapy.  Yet no physical therapy was conducted.

34.     On March 15, 2003, Dr. Kofoed referred Watson to a neurosurgeon to evaluate whether Watson was a surgical candidate.  Dr. Kofoed also noted that Watson had severe lower back pain with pain down his left leg and noted that the MRI of Watson's spine showed a large disc protrusion.

35.     On March 24, 2003, Watson filed a 602 complaining that he was in constant pain and waiting to see a surgeon.  He also requested to be medically unassigned and granted ADA status.  The associate warden partially granted this appeal on June 4, 2003, explaining that Watson had been medically unassigned.  On April 19, 2003, Watson was granted ADA status, and it was noted that Watson was not capable of prolonged standing, walking, or sitting for longer than 30 minutes.

36.     On April 10, 2003, Dr. Toppenberg noted that Watson was awaiting a physical therapy evaluation and an appointment with a neurosurgeon.

37.     On April 14, 2003, Watson informed a physician that he had twisted his back at work and that he was awaiting an evaluation of his spine.

38.     On May 13, 2003, Watson filed a reasonable modification or accommodation request on CDC form 1824, requesting a transfer to Vacaville's California Medical Facility so that he could receive appropriate therapy and surgery.

39.     On May 14, 2003, medical staff noted that Watson was still waiting to be seen by a neurosurgeon.

40.     On May 28, 2003, Dr. Toppenberg recorded that Dr. TRAQUINA called and noted that Watson was to be seen by a neurosurgeon.  Yet on July 11, 2003, a physician noted that Watson was still waiting to be seen by a neurosurgeon.

41.     In October 2003, six months after Dr. Kofoed's order and four months after Dr. TRAQUINA noted that Watson was awaiting a neurosurgery consultation, outpatient services attempted to schedule Watson for that consultation, but learned that the consultation could not go forward because Watson's February 24, 2003 MRI was now outdated.

42.    On October 19, 2003, Watson wrote a letter to the Chief Medical Officer (upon information and belief, Dr. TRAQUINA), complaining that correctional officers were refusing to respect his chronos. Watson also noted that he was still waiting to be seen by a neurosurgeon. This grievance was ultimately denied at the Director's Level of review on January 6, 2004.

43.    On October 24, 2003, Dr. Toppenberg noted that the Chief Medical Officer (upon information and belief, Dr. TRAQUINA) had requested that someone look into Watson's chronos. Dr. Toppenberg also noted that the MRI was outdated. On October 31, 2003, Dr. Toppenberg again noted the outdated MRI. Nonetheless, a new MRI was not scheduled or conducted.

44.    On November 6, 2003, defendant Dr. TAN signed a chrono stating that Watson was mobility impaired and should be allowed to not get down in situations of alarm. The chrono also included a handwritten note initialed by Dr. TAN, indicating that the chrono was to remain in effect "until surgical correction done." This chrono was also signed by Dr. TRAQUINA, as Chief Medical Officer.

45.    On November 17, 2003, Dr. TRAQUINA, as Chief Medical Officer, signed a chrono stating that Watson was not to be subjected to prolonged standing, walking, or sitting for longer than 30 minutes at a time.

46.    On November 24, 2003, after examining Watson, Dr. TAN noted that it was difficult for Watson to sit or squat because it was very painful, that Watson was on methadone, and that he had talked to the Utilization Management Nurse to order a new MRI.

47.    On November 26, 2003, Dr. TAN ordered that Watson undergo another MRI so that Watson could be evaluated by a neurosurgeon, and expedited Watson's consult for a neurosurgery referral. In the following four months, despite the expedited request, neither referral was carried out.

48.    On February 19, 2004, Watson filed a 602 complaining that his condition was worsening, his equilibrium was unstable, and he was still waiting for physical therapy. His appeal was granted by defendant Dr. NORIEGA on April 1, 2004. Dr. NORIEGA stated that physical therapy sessions would start in the "very near future." On March 8, 2004, Dr. Chen also

1   requested that Watson receive a physical therapy evaluation to improve his mobility.  Yet again

2   Watson did not receive physical therapy during March or April.

3       49.     On March 23, 2004, Watson filed a 602 complaining that the CSP-SOLANO

4   medical staff was withholding his pain medication.  Watson directly addressed his appeal to

5   Dr. TRAQUINA.

6       50.     On April 8, 2004, four months after Dr. TAN's order, a second MRI was

7   conducted on Watson's spine in an open MRI unit.  Upon information and belief, this MRI

8   showed that in the 14 months since Watson's previous MRI, his spine had deteriorated to such an

9   extent that Watson now had Modic Type 2 changes at his L5-S1 disc.  Upon information and

10  belief, Modic Type 2 changes are associated with chronic vertebral body changes.  Upon

11  information and belief, surgery carries a higher degree of risk and a lower likelihood of success

12  once a patient's condition has deteriorated from Modic Type 1 changes to Modic Type 2 changes.

13      51.     On April 28, 2004, Watson filed a 602 complaining about his pain and the fact that

14  he had not received physical therapy.

15      52.     On May 20, 2004, Dr. TRAQUINA responded to Watson's grievance.

16  Dr. TRAQUINA granted Watson's request for physical therapy, nearly fifteen months after that

17  treatment was first ordered.  Thus, on May 24, 2004, Watson received his first physical therapy

18  evaluation and then received three additional sessions, with his final session on June 28, 2004.

19  Upon information and belief, by the time Watson received this treatment, his back condition had

20  deteriorated to a point that physical therapy was less effective and surgery was a much riskier

21  option.

22      53.     As Chief Medical Officer at CSP-SOLANO, defendant Dr. TRAQUINA failed to

23  adequately supervise and train custody staff and to implement procedures so that Watson would

24  be properly and timely scheduled for and/or transported to medical appointments in order to

25  receive appropriate medical care.

26  ## Constitutionally Inadequate Care at CSP-SOLANO

27  ## Spring 2004 – Winter 2006

28      54.     On June 16, 2004, Watson was evaluated by Morteza M. Farr, D.O., at Doctor's

1  Hospital of Manteca. A doctor had first ordered this consultation fifteen months earlier. During

2  the intervening period, Watson's vertebral bodies underwent irreversible changes. Although

3  defendants and Watson's medical records refer to Dr. Farr as a neurosurgeon, upon information

4  and belief Dr. Farr is an orthopedist who specializes in spinal surgery. Dr. Farr diagnosed

5  Watson with severe lumbar degenerative disc disease at his L5-S1 disc and recommended pain

6  management and lumbar epidural injections. Dr. Farr also recommended a discogram if Watson

7  did not improve.

8       55.    On July 9, 2004, Dr. NORIEGA examined Watson, and on July 19 Watson was

9  examined by Dr. ROHRER. Neither physician commented on Dr. Farr's evaluation or acted upon

10  Dr. Farr's recommendations that Watson receive epidural injections. Finally, on August 19,

11  2004, two months after Watson's consultation, Dr. ROHRER noted that the medical staff needed

12  to pull the chart from Watson's visit to Doctor's Hospital of Manteca.

13       56.    On September 2, 2004, Watson filed a 602 complaining that medical personnel

14  had been aware of his condition since February 24, 2003, but that he did not see a specialist until

15  June 2004. Watson also complained that two-and-a-half months after his evaluation by Dr. Farr,

16  he had not received the recommended lumbar epidural injections. Watson explicitly addressed

17  Dr. TRAQUINA in his letter and asked Dr. TRAQUINA to help him obtain care for his

18  condition. Watson also noted that Dr. Farr had told him that surgery only had a 70% likelihood

19  of success.

20       57.    On September 17, 2004, Dr. ROHRER ordered that Watson receive lumbar

21  epidural steroid injections. On November 3, 2004, Dr. Chen submitted another request for

22  Watson to receive epidural injections. During this visit, Dr. Chen noted that Watson had been

23  diagnosed as having "severe" degenerative disc disease.

24       58.    On November 8, 2004, Dr. NORIEGA signed a First Level Appeal Response to

25  the 602 Watson filed on September 2, 2004. Dr. NORIEGA stated that Watson's complaints had

26  been addressed because of the "urgent referral" submitted by Dr. Chen on November 3, 2004 (a

27  full five months after Dr. Farr had originally recommended the injections).

28       59.    On November 12, 2004, the Inmate Appeals Office ordered the Medical

**FIRST AMENDED COMPLAINT**
CIV S-07-1871 LKK GGH P

1    Department to ensure that Watson received epidural injections for his back pain by December 10,

2    2004. Yet on December 14, 2004, Dr. Solomon noted that Watson was still waiting for epidural

3    injections. When Dr. TAN evaluated Watson for his lower back pain on January 13, 2005, he

4    noted that Watson had still not received epidural injections. Dr. TAN also provided Watson with

5    a new physical therapy referral during this visit.

6        60.    On January 14, 2005, Anita Mitchell, M.D., the Chief Medical Officer of the

7    Health Care Services Division in Sacramento, responded to a letter from Watson seeking

8    intervention because of the trouble he was experiencing with CSP-SOLANO medical staff.

9    Dr. Mitchell declined to intervene.

10       61.    On January 14 and 15, 2005, Watson received his first epidural injections, seven

11   months after they were recommended by Dr. Farr and almost two years after the first MRI was

12   conducted on Watson's spine. Watson notified his treating physicians that the injections provided

13   only minimal relief for his back pain and that the injections diverted the pain to his legs, resulting

14   in severe cramping.

15       62.    On January 31, 2005, Dr. Solomon requested that Watson be scheduled for a new

16   MRI so that Watson, whose condition had not improved, could be re-evaluated by a

17   neurosurgeon.

18       63.    On March 14, 2005, an administrative grievance filed by Watson was denied.

19   Daniel E. Thor, M.D. noted that that Watson had eventually received epidural injections, which

20   he did not find helpful, and that he would be referred to a neurosurgeon to discuss surgical

21   options.

22       64.    On June 1 and June 31, 2005, Watson filed health care services requests on CDC

23   form 7362, requesting that he be rescheduled for an MRI. On July 5, 2005, Dr. Rallos submitted

24   a physician request for Watson to be scheduled for an MRI. Each of these requests explicitly

25   noted that Watson needed an open MRI due to his claustrophobia. Nonetheless, an MRI

26   scheduled for July 15, 2005 had to be rescheduled because Watson's claustrophobia was not

27   taken into account. On that day, Dr. TRAQUINA sent Watson a letter in which he acknowledged

28   Watson's condition.

1    65.    In August 2005, Watson filed a 602 describing the continued pain and suffering

2    caused by his back condition and defendants' failure to properly treat that condition.  Watson

3    sought a consultation with a spinal surgeon, information about his long-delayed MRI, and an

4    opportunity to discuss his treatment with the Chief Medical Officer, Dr. TRAQUINA.

5    Dr. TRAQUINA responded with written correspondence acknowledging Watson's concerns, but

6    declined to meet with him personally.

7    66.    On August 16, 2005, eight months after receiving a referral, Watson underwent a

8    third MRI.  This procedure was also performed on an open MRI unit.  The MRI confirmed disc

9    desiccation and disc bulges in Watson's L5-S1 disc.  It also noted disc desiccation in the L4-5

10    disc.  Upon information and belief, the MRI also confirmed that Watson now suffered from

11    Modic Type 2 changes at his L5-S1 disc.

12    67.    On August 23, 2005, Tessie Rallos, M.D. noted that Watson needed to be referred

13    to a neurosurgeon.  Dr. Rallos also noted that the Chief Medical Officer was aware of Watson's

14    situation.

15    68.    On October 19, 2005, Watson received a chrono indicating that he was incapable

16    of prolonged standing, walking, or sitting for more than 30 minutes at a time.

17    69.    On September 29 and December 15, 2005 Dr. NORIEGA evaluated Watson and

18    renewed Watson's methadone prescription.  During the latter visit, Dr. NORIEGA noted

19    Watson's recent MRI.  Dr. NORIEGA took no action on Watson's outstanding referrals for a

20    neurosurgery consultation and physical therapy.

21    70.    On November 18, 2005, Watson was evaluated by Dr. NAKU for "low back pain

22    radiating to the left lower extremity."  Dr. NAKU noted that Watson had lumbar radiculopathy,

23    and administered a Demerol shot.  On January 13, February 10, March 10, and March 14, 2006,

24    Dr. NAKU evaluated Watson.   On the last of these occasions Watson received a chrono, signed

25    by Dr. NAKU and Dr. TRAQUINA, stating that Watson had "severe" degenerative disc disease

26    in his lumbar spine and noting the he was not to be subjected to prolonged walking, standing, or

27    sitting for more than 30 minutes.

28    71.    On April 10, April 18, May 9, and June 19, 2006, Watson was seen by Dr. NAKU

**FIRST AMENDED COMPLAINT**
CIV S-07-1871 LKK GGH P

for continued care regarding his lower back pain. On May 16, 2006, Dr. TAN examined Watson. And on July 3 and August 2, 2006, Dr. ROHRER evaluated Watson. On none of these occasions did any of the defendants follow up on Watson's pending referrals for a neurosurgical consultation and physical therapy.

72.    On August 25, 2006, Watson was evaluated by Dr. ROHRER. Watson requested an increase in his Methadone dosage and a titanium disc replacement. Dr. ROHRER prescribed Watson neurontin, submitted a request that Watson receive lumbar epidural steroid injections, and also submitted a second request for "ongoing physical therapy."

73.    In August 2006, Watson submitted an 1824, using the special form invoking the ADA. He described his previous consultation with a specialist, his MRI results, and his severe pain and discomfort. Watson explained that he had tried epidural injections, but that they "helped very little." Watson requested surgery, an increase in his pain medication, and physical therapy. When his request was not satisfactorily resolved, Watson filed a 602. As his complaint traveled up the hierarchy of review, Watson noted that he had not been seen by a physical until eighteen months after a referral was ordered. Dr. TRAQUINA signed the response to Watson's second level appeal, conceding the lengthy waiting list for physical therapy services, blaming the delay on "space issues and insufficient resources," and encouraging Watson to work with his health care "providers to adequately develop your treatment plan to address your pain." Watson's appeal was ultimately denied at the Director's Level on November 14, 2006. This decision also stated that Watson had exhausted all the administrative remedies available to him within the CDCR. Warden SISTO received a copy of the Director's Level Appeal Decision.

## **Constitutionally Inadequate Medical Care at CSP-SOLANO**

## **Winter 2006 to Autumn 2007**

74.    On December 6, 2006, Dr. TAN evaluated Watson and referred him to a neurosurgeon for a consultation. This referral followed up on Dr. Thor's March 14, 2005 acknowledgment that Watson need to be referred to a neurosurgeon to discuss surgical options. An evaluation with Dr. Farr was scheduled for May 15, 2007.

75.    On December 13, 2006, Watson filed a 602 requesting that he be seen by a

1  competent specialist, that his medication be renewed, that he not have to wait 45 to 60 days for a

2  doctor, and that Chief Medical Officer Dr. TRAQUINA conduct an investigation into the

3  inadequate care that Watson had received.  Watson's grievance was denied at the Director's Level

4  on May 3, 2007.  Warden SISTO received a copy of the Director's Level Appeal Decision.

5       76.    On March 5, 2007, Dr. TAN ordered an updated MRI of Watson's spine because

6  Watson needed an MRI that was conducted within 6 months of his pending neurosurgical

7  consultation.

8       77.    On May 15, 2007, Watson was scheduled to be seen by a specialist at Doctor's

9  Hospital of Manteca.  This evaluation did not take place, because the specialist had not been

10  provided with an updated MRI.

11      78.    On May 18, 2007, Dr. ROHRER examined Watson in connection with his back

12  pain, referred him for an MRI, and specifically noted that Watson needed an open MRI because

13  of his claustrophobia.  Dr. ROHRER also referred Watson for a neurosurgery evaluation for his

14  chronic lower back pain.

15      79.    On June 24, 2007, Watson filed a 7362 noting that he "needed to be seen by

16  Dr. ROHRER pending spinal surgery."  He also noted that he needed an MRI, but that he had

17  twice been forced to refuse MRIs when medical staff attempted to transport him to the MRI

18  location in a vehicle which aggravated his claustrophobia.  That same day, Dr. ROHRER

19  submitted another neurosurgical referral for Watson, noting that the neurosurgical consultant

20  needed an updated MRI.  Dr. ROHRER noted that the consultation was to follow an open MRI.

21      80.    On August 2, 2007, a fourth MRI was conducted on Watson's spine.  Upon

22  information and belief, that MRI confirmed the findings of his second and third MRIs, that is,

23  Watson had Modic Type 2 changes at his L5-S1 disc and adjacent damage at his L4-L5 disc.  The

24  procedure was once again performed on an open MRI unit.

25      81.    On August 28, 2007, Watson filed his initial complaint in this action, attaching the

26  602 which was denied at the Director's Level on November 14, 2006.

27

28

**FIRST AMENDED COMPLAINT**
CIV S-07-1871 LKK GGH P

## Retaliation and Constitutionally Inadequate Medical Care at CSP-SOLANO

## Autumn 2007 to the Present

82.     On September 27, 2007, less than a month after Watson filed his complaint,
Dr. TAN took Watson off his methadone pending an MD assessment of need.  On October 1,
2007, Watson submitted a 7362 seeking renewal of his medication and on October 2, 2007,
Watson submitted a 7362 asking why his pain medication had been reduced despite the fact that it
was "not to be reduced or decreased until after spinal surgery."  Also on October 2, 2007, Watson
filed a 602 regarding Dr. TAN's reduction of his pain medications.  His complaint was eventually
denied at the Director's Level.

83.     On October 4, 2007, Dr. TAN evaluated Watson again.  Dr. TAN noted that he
had referred Watson for a neurosurgery evaluation following an MRI.  That same day Watson
filed a 602 complaining about Dr. TAN's professionalism and bias against African-American
inmates.  Watson sought a face-to-face meeting with Dr. TRAQUINA and requested that he not
be seen or treated by Dr. TAN again.  In his Second Level Appeal Response to Watson's
grievance, Dr. TRAQUINA declined to personally meet with Watson.

84.     On November 1, 2007, Dr. Hsieh noted that Watson had been referred for a
neurosurgery evaluation on October 4.

85.     On November 10 and 11, 2007, Watson submitted 7362s noting that he was in
severe pain following a recent fall.  Watson submitted at least nine additional 7362s during the
subsequent two-and-a-half months, each time indicating that he was a chronic care inmate
pending spinal surgery.  During this period, a neurosurgical evaluation was never conducted.
Finally, on February 1, 2008, Dr. Hsieh submitted a new request for a neurosurgery evaluation for
Watson.

86.     On May 12, 2008, Watson's second neurosurgery referral was finally carried out
when he was seen by Jason Huffman, M.D. at Queen of the Valley Medical Center, in Napa,
California.  Upon information and belief, Dr. Huffman is an orthopedic surgeon specializing in
spinal surgery, not a neurosurgeon.  Dr. Huffman noted that Watson had not received significant
physical therapy, recommended a regimen of physical therapy, pain medication, and epidural

1    injections, and asked to see Watson again in three months to re-evaluate whether surgery was

2    appropriate. Dr. Huffman explained to Watson that, given the stage of his degenerative disc

3    disease, there was only a 70% chance that surgery would be successful, and that surgery would

4    not completely eliminate Watson's pain. A radiology report from his visit to the Medical Center

5    indicated that Watson had "severe degenerative changes at L5-S1." After Watson's appointment

6    with Dr. Huffman, Dr. Chen submitted a request for Watson to receive physical therapy.

7          87.     On May 27, 2008, Watson filed a 602, complaining that medical staff were making

8    him wait from forty minutes to an hour to receive his medication, violating chronos stating

9    Watson was not able to stand, sit, or walk for more than thirty minutes. He asked that medical

10   staff be required to adhere to the chronos and permit him to receive his pain medication directly

11   after diabetics received their medication. Watson's appeal was temporarily granted and a note

12   placed in his file.

13         88.     On June 2, 2008, Watson filed an 1824, complaining that he was being forced to

14   wait for his pain medication and requesting a chrono allowing him to sit on the benches outside

15   the clinic while waiting for his pain medication. Dissatisfied with the response, Watson filed a

16   602 with additional allegations. His appeal was ultimately denied at the Director's Level on

17   September 11, 2008.

18         89.     On June 18, 2008, Watson submitted a 602, complaining that his chrono had been

19   improperly revoked and requesting that he be granted an appointment with his primary care

20   physician in order to clarify that he could not stand, walk, or sit for sixty minutes.

21         90.     On June 25, 2008, Dr. Chen issued a chrono stating that Watson was to receive his

22   narcotic medication after his diabetic medication and that that he was not to be subjected to

23   prolonged walking, sitting, or standing for more than 30 minutes.

24         91.     On July 7, 2008, Watson submitted a 7362 noting that his diabetic fingerstick had

25   been cancelled and that he had not yet received the physical therapy ordered on May 12, 2008.

26         92.     On July 22, 2008, Watson submitted a 7362 asking to be scheduled for physical

27   therapy per Dr. Huffman's May 12 recommendation.

28         93.     On July 29, 2009, Dr. Chen submitted another referral for Watson to receive

**FIRST AMENDED COMPLAINT**
CIV S-07-1871 LKK GGH P

1   physical therapy.

2       94.     On August 6, 2008, Watson submitted a 7362 complaining of extreme

3   constipation, a side effect of his nearly six-year methadone treatment regimen.

4       95.     On August 28, 2008, Watson submitted a 7362 complaining that he had not been

5   seen for physical therapy per Dr. Chen's orders.  On September 8, 2008, Watson submitted yet

6   another 7362 asking "to see a doctor because [he] was never scheduled for physical therapy as

7   ordered by Dr. Huffman."

8       96.     On September 13, 2008, three months after Dr. Huffman made his

9   recommendation, Watson was seen in physical therapy.  Watson had two subsequent

10  appointments, on September 17 and October 8, 2008.  At the first of these latter two

11  appointments, the therapist noted that Watson had numbness in his left leg and that he only

12  received relief by laying on his side.  Although Watson received these three physical therapy

13  sessions, Watson never received a follow-up appointment with Dr. Huffman per his

14  recommendation.  Thus, Dr. Huffman was unable to re-eevaluate whether surgery was advisable

15  for Watson.

16      97.     On October 9, 2008, after the Court ordered defendants to supplement their

17  opposition to Watson's motion for injunctive relief, Dr. TRAQUINA issued a new chrono for

18  Watson, replacing the chrono that Dr. Chen had issued to Watson just over three months earlier.

19  Without personally evaluating Watson, Dr. TRAQUINA removed the direction allowing Watson

20  to obtain his narcotic medication after his diabetic medication and replaced the direction referring

21  to no prolonged standing, sitting, or walking for greater than 30 minutes with a direction omitting

22  the restriction on prolonged sitting.  Dr. TRAQUINA also wrote a note in Watson's medical file

23  stating that Watson has "mild" degenerative disc disease.  This characterization of Watson's

24  medical condition directly contradicts the conclusion reached by the spinal specialists that

25  evaluated Watson, Watson's primary care physicians, and Dr. TRAQUINA's previous statements

26  that Watson had "severe" degenerative disc disease.

27      98.     To this day, Watson continues to experience lower back pain and numbness in his

28  legs.  Watson has not been re-evaluated by Dr. Huffman or a competent neurosurgeon, he has not

**FIRST AMENDED COMPLAINT**
CIV S-07-1871 LKK GGH P

- 17 -

1  been provided with additional physical therapy, and he continues to have difficulty obtaining his

2  pain medication with regularity.  In short, defendants are still providing Watson with

3  constitutionally inadequate medical care, seven years after he first complained of his severe back

4  pain.  In that time he has suffered irreversible damage to his spine and persistent pain and

5  suffering.

6  <u>**EXHAUSTION OF ADMINISTRATIVE REMEDIES**</u>

7  99.    On August 4, 2006, Watson submitted an 1824, in which he requested surgery, an

8  increase in his pain medication, epidural injections, physical therapy, and damages.  This form

9  invoked the protections of the ADA.  The request was ultimately associated with a 602 grievance

10  seeking the same relief.

11  100.    On August 31, 2006, Watson's request was partially granted in the First Level

12  Appeal Response.

13  101.    On September 30, 2006, prison authorities filed the Second Level Appeal

14  Response to Watson's administrative complaint.

15  102.    On November 14, 2006, prison authorities filed the Director's Level Appeal

16  Decision, denying Watson's appeal and stating that no changes or modifications were required by

17  the institution.  The decision also stated that Watson had exhausted the administrative remedies

18  available to him within the CDCR.

19  <u>**FIRST CLAIM: EIGHTH AND FOURTEENTH AMENDMENTS PROHIBITION OF**</u>
<u>**CRUEL AND UNUSUAL PUNISHMENT VIOLATION (SECTION 1983)**</u>

20

21  (against defendants SISTO, TRAQUINA, TAN, ROHRER, NORIEGA, NAKU,
CDCR, and CSP-SOLANO)

22  103.    Watson refers to and incorporates herein by reference the allegations contained in

23  Paragraphs 1 through 102 as if fully set forth in this claim for relief.

24  104.    The actions of Defendants complained of herein are brought pursuant to 42 U.S.C.

25  § 1983 and constitute a violation of the Eighth Amendment to the United States Constitution as

26  incorporated through the Fourteenth Amendment.  Defendants' policies, practices, acts, and

27  omissions demonstrate their deliberate indifference to Watson's serious medical needs and he was

28  harmed thereby, in violation of his Eighth Amendment right to be free from cruel and unusual

1    punishment.

2        105.    Defendants knew that Watson faced a substantial risk of serious harm if he was not

3    provided adequate medical care for his severe degenerative disc disease.

4        106.    Defendants disregarded that risk by failing to take reasonable measures to address

5    Watson's serious medical needs.

6        107.    Defendants' failure to treat Watson's spinal condition could result, and has

7    resulted, in further significant injury and the unnecessary and wanton infliction of pain.

8        108.    Defendants acted under color of law.

9        109.    Defendants' deliberate indifference to Watson's serious medical needs caused

10    Watson harm.

11        110.    It was clearly established at all relevant times that defendants' actions were

12    unconstitutional, and defendants were aware that their actions were unconstitutional per *Plata v.*

13    *Schwarzenegger.*

14        111.    Injunctive relief is warranted by the allegations set forth throughout this complaint.

15    **SECOND CLAIM: FIRST AND FOURTEENTH AMENDMENTS FREE SPEECH**
**RIGHTS VIOLATION (SECTION 1983)**

16

17        (against defendants TRAQUINA and TAN)

18        112.    Watson refers to and incorporates herein by reference the allegations contained in

19    Paragraphs 1 through 102 as if fully set forth in this claim for relief.

20        113.    The actions of defendants complained of herein are brought pursuant to 42 U.S.C.

21    § 1983 and constitute a violation of the First Amendment to the United States Constitution as

22    incorporated through the Fourteenth Amendment.  Defendants' policies, practices, acts, and

23    omissions comprise retaliation for Watson's constitutionally protected expression, and violated

24    Watson's right to free speech.

25        114.    Defendants had authority over Watson at all times relevant to this litigation.

26        115.    Defendants retaliated against Watson for exercising his First Amendment rights,

27    specifically by filing prison grievances and this action complaining about the inadequate medical

28    care that he received.

116.    Defendants' retaliation is manifested by defendants' refusal to provide Watson with adequate medical care and their actions reducing the level of care that he is receiving in response to Watson's filing of grievances and this complaint against them.

117.    The adverse actions taken against Watson are a direct result of Watson's protected conduct.

118.    Defendants' actions chilled Watson's exercise of his First Amendment rights.

119.    Defendants' actions did not reasonably advance a legitimate correctional goal.

120.    It was clearly established at all relevant times that adverse actions taken against a prisoner because of his protected conduct constitute a violation of the prisoner's First Amendment rights.

121.    A reasonable person in defendants' position should have known that defendants' obstruction of Watson's medical care and failure to provide Watson with chronos appropriately addressing his serious medical needs did not advance any legitimate penological goals.

122.    The above-named defendants undertook the policies, practices, actions, and omissions alleged in this complaint intentionally and with willful disregard for the rights of Watson.

123.    Injunctive relief is warranted by the allegations set forth throughout this complaint.

## THIRD CLAIM: ADA AND SECTION 504

(against defendants SISTO, TRAQUINA, TAN, ROHRER, NORIEGA, NAKU, CDCR, and CSP-SOLANO)

124.    Watson refers to and incorporates herein by reference the allegations contained in Paragraphs 1 through 102 as if fully set forth in this claim for relief.

125.    The actions of defendants, as set forth in this Complaint, constitute a violation of Watson's rights under the ADA and section 504 of the Rehabilitation Act.

126.    Watson is a qualified individual with a disability as defined in the ADA and qualified as an individual with a disability as defined in section 504.

127.    As a result of defendants' policies and practices which result in inadequate medical care, Watson has been excluded from the substance abuse programs, education, vocation,

**FIRST AMENDED COMPLAINT**
CIV S-07-1871 LKK GGH P

- 20 -

1   work furlough and work credit, recreation, dining hall and other meals, yard time, visiting,

2   classification, discipline, telephone, emergency procedures and/or other programs and services for

3   which he is otherwise qualified that defendants provided to individuals under their custody and

4   control, thereby subjecting him to discrimination in violation of the ADA and section 504.

5                                   **PRAYER FOR RELIEF**

6   WHEREFORE, Watson requests that this Court do the following:

7                (a)    Issue permanent injunctive relief restraining defendants and their officers,

8   agents, directors, successors, employees, attorneys, or representatives from further violations of

9   the First, Eighth, and Fourteenth Amendments to the United States Constitution referenced herein

10  as the subject of Watson's claims for relief, including but not limited to enjoining defendants

11  from policies, practices, actions, and omissions such as those alleged herein, requiring the

12  establishment of appropriate and effective means to prevent future such violations, and requiring

13  defendants to provide Watson with all necessary and appropriate medical care;

14               (b)    Award Watson compensatory damages from defendants SISTO,

15  TRAQUINA, TAN, ROHRER, NORIEGA, and NAKU for the harm occasioned by defendants'

16  deliberate indifference to his serious medical needs;

17               (c)    Award Watson damages from defendants SISTO, TRAQUINA, TAN,

18  ROHRER, NORIEGA, and NAKU for the pain and suffering caused by defendants' deliberate

19  indifference to his serious medical needs;

20               (d)    Award Watson punitive damages against defendants SISTO, TRAQUINA,

21  TAN, ROHRER, NORIEGA, and NAKU for a sum to be proven at trial;

22               (e)    Award Watson the costs of this suit, and reasonable attorneys' fees and

23  litigation expenses pursuant to 42 U.S.C. § 1988, 29 U.S.C. § 794a(b), and 42 U.S.C. § 12205;

24               (f)    Retain jurisdiction of this case until defendants have fully complied with

25  the orders of this Court, and there is a reasonable assurance that defendants will continue to

26  comply in the future absent continuing jurisdiction; and

27  ///

28  ///

**FIRST AMENDED COMPLAINT**
CIV S-07-1871 LKK GGH P

- 21 -

1    ///

2    ///

3    ///

4              (g)    Award such other and further relief as this Court deems just and proper.

5

6    Dated: June 15, 2009                    JONES DAY

7

8                                           By: /s/ James P. Baker
                                                James P. Baker

9                                           Attorneys for Plaintiff
10                                          NYLES LAWAYNE WATSON

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28