Caroline N. Mitchell (State Bar No. 143124)
cnmitchell@jonesday.com
Matthew J. Silveira (State Bar No. 264250)
msilveira@jonesday.com
Patrick R. Delahunty (State Bar No. 257439)
pdelahunty@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104-1500
Telephone:   415.626.3939
Facsimile:   415.875.5700

Attorneys for Plaintiff
NYLES LAWAYNE WATSON

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **NYLES LAWAYNE WATSON,**<br><br>              **Plaintiff,**<br><br>       **v.**<br><br>**DENNIS K. SISTO, et al.,**<br><br>              **Defendants.** | **Case No. CIV S-07-1871 LKK KJN P**<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:           September 29, 2011<br>Time:          10:00 a.m.<br>Courtroom:   25<br>Judge:         Hon. Kendall J. Newman<br><br>Trial Date:    None<br>Action Filed:  September 10, 2007 |

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS ................................................................................. 2

      A.    The Provision of Medical Care at CSP-Solano.................................... 2

      B.    After Being Diagnosed With Degenerative Disc Disease, Watson Waited
            Two Years for an Evaluation by Spinal Specialist Dr. Farr (2002 to 2004).......... 3

      C.    Watson Notified Defendants That the Epidural Injections Recommended
            by Dr. Farr Were Unsuccessful and Sought Further Treatment (2005)................. 5

      D.    Watson Filed This Lawsuit After Defendants Denied Him Physical
            Therapy, a Discogram, or a Follow-Up Appointment with Dr. Farr (2005-
            2007) ...................................................................................................... 6

      E.    Dr. Tan Reduced Watson's Pain Medication After Watson Filed His
            Complaint (2007) ................................................................................... 7

      F.    After Watson Waited Four Years for a Follow-up Neurosurgical
            Consultation, a Second Spinal Specialist (Dr. Huffman) Prescribed Further
            Treatment and a Follow-Up Appointment (2008) ................................. 8

      G.    Dr. Traquina Revoked Watson's Chrono After Watson Filed His Motion
            for Injunctive Relief (2008) .................................................................. 8

      H.    A Third Spinal Specialist (Dr. Mummaneni) Advised Watson of His
            Surgical Options (2009-2010)................................................................ 9

      I.    Watson Was Transferred to SATF-CSP-Corcoran, Where His Medical
            Needs Remain Unmet (2011) .............................................................. 10

III.  ARGUMENT ................................................................................................... 10

      A.    Defendants' Deliberate Indifference to Watson's Severe Degenerative Disc
            Disease Violates the Eighth Amendment ............................................ 11

            1.    Watson's Severe Degenerative Disc Disease Is a Serious Medical
                  Need ........................................................................................... 12

            2.    Defendants Were Deliberately Indifferent to Watson's Condition.......... 13

            3.    Defendants' Attempts to Shift the Blame to Administrative
                  Personnel and "the System" More Generally Does Not Absolve
                  Them from Liability.................................................................... 19

            4.    Defendants' Criticism of Dr. Shefrin's Expert Opinion is
                  Unfounded.................................................................................. 21

      B.    Injunctive Relief is Necessary and Appropriate................................. 22

      C.    Drs. Traquina and Tan Retaliated Against Watson in Violation of His First
            Amendment Rights .............................................................................. 23

            1.    Defendants' Legal Authorities Address Alleged Due Process
                  Violations, Not Retaliation Claims ............................................ 24

            2.    Dr. Traquina Withdrew Watson's Chrono Because Watson Sought
                  Injunctive Relief in This Action ................................................ 25

            3.    Dr. Tan Reduced Watson's Methadone Dosage as a Result of
                  Watson's Filing of This Complaint ............................................ 26

IV.   CONCLUSION ................................................................................................ 28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Carter v. Department of Corrections-Santa Clara County*,
  2010 WL 2681905 (N.D. Cal. July 6, 2010)...................................................................... 23

*Celetox Corp. v. Catrett*,
  477 U.S. 317 (1986)............................................................................................................ 11

*Chacoan v. Rohrer*,
  2009 WL 1393076 (E.D. Cal. May 14, 2009)..................................................................... 20

*Clement v. Gomez*,
  298 F.3d 898 (9th Cir. 2002).............................................................................................. 12

*Estelle v. Gamble*,
  429 U.S. 97 (1976).............................................................................................................. 11

*Farmer v. Brennan*,
  511 U.S. 825 (1994)............................................................................................................ 11

*Ferris v. Santa Clara County*,
  891 F.2d 715 (9th Cir. 1989).............................................................................................. 23

*Francis v. Cate*,
  2011 WL 2119024 (E.D. Cal. May 26, 2011)......................................................... 12, 15, 24

*Franklin v. Dudley*,
  2011 WL 2493770 (E.D. Cal. June 22, 2011)............................................................... 12, 20

*Herrera v. Hall*,
  2010 WL 2791586 (E.D. Cal. July 14, 2010) ..................................................................... 13

*Jett v. Penner*,
  439 F.3d 1091 (9th Cir. 2006)........................................................................ 11, 12, 16, 19

*Johnson v. Schwarzenegger*,
  366 Fed. App'x 767 (9th Cir. 2010).................................................................................... 19

*Mann v. Adams*,
  855 F.2d 693 (9th Cir. 1988).............................................................................................. 24

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)...................................................................................................... 11, 27

*McGuckin v. Smith*,
  974 F.2d 1050 (9th Cir. 1992)....................................................................................... 11, 12

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Ortiz v. City of Imperial,*
   884 F.2d 1312 (9th Cir. 1989)............................................................................ 11, 12

*Ramirez v. Galaza,*
   334 F.3d 850 (9th Cir. 2003).................................................................................... 24

*Rhodes v. Robinson* (*Rhodes I*),
   408 F.3d 559 (9th Cir. 2005)....................................................................... 23, 26, 27

*Rhodes v. Robinson* (*Rhodes II*),
   621 F.3d 1002 (9th Cir. 2010).................................................................................. 24

*Taylor v. List,*
   880 F.2d 1040 (9th Cir. 1989).................................................................................. 13

*Ulrich v. City & County of San Francisco,*
   308 F.3d 968 (9th Cir. 2002).................................................................................... 26

*Williams v. Andreasen,*
   2008 WL 508073 (E.D. Cal. Feb. 22, 2008)............................................... 12, 20, 26

*WMX Technologies, Inc. v. Miller,*
   104 F.3d 1133 (9th Cir. 1997).................................................................................. 11

*Wright v. Shannon,*
   2010 WL 445203 (E.D. Cal. Feb. 2, 2010) .............................................................. 24

### CONSTITUTIONAL AMENDMENTS

U.S. Const. amend. I ......................................................................................... passim

U.S. Const. amend. XIII...................................................................................... 11

### RULES

Fed. R. Civ. P. 56(a)........................................................................................... 11

1  **I.    INTRODUCTION**

2      Since 2002, Plaintiff Nyles Watson ("Watson") has lived with excruciating pain arising

3  from lumbar degenerative disc disease.  In early 2003, Watson was referred to physical therapy

4  and a neurosurgical consultation.  Thereafter, defendant Alvaro Traquina M.D. ("Dr. Traquina")

5  became the Chief Medical Officer of California State Prison Solano ("CSP-Solano"), where

6  Watson was housed, and defendant Richard Tan, M.D. ("Dr. Tan") began treating Watson.

7  Watson repeatedly notified Drs. Traquina and Tan of his severe pain while he waited for the

8  referrals to go forward.  Yet Watson did not receive any physical therapy for fourteen months, or

9  a neurosurgical consultation—where the spinal specialist diagnosed Watson with "severe"

10  degenerative disc disease and requested a follow-up visit—for seventeen months.

11      Worse yet, Watson waited four years for the follow-up neurosurgical consultation.  In the

12  interim, Watson repeatedly was seen in clinic by Dr. Tan and defendant Jason Rohrer, M.D. ("Dr.

13  Rohrer"), and continued to notify Dr. Traquina of his severe pain and the grossly inadequate care

14  he was receiving.  On numerous occasions, however, Defendants refused to refer Watson to a

15  neurosurgical consultation.  Likewise, Watson received no additional physical therapy treatment

16  until September 2008.  Instead, Defendants prescribed Watson increasing doses of methadone in a

17  vain attempt to dull his pain while Watson's surgical risks increased, his spinal condition

18  degenerated at an unnatural rate, and his mobility decreased.  Defendants' denial, delay, apathy,

19  and interference with Watson's medical care rises to the level of deliberate indifference.

20      Defendants attempt to escape liability by aggregating the care Watson has received over

21  the past ten years, much of it after he filed this complaint, and attributing the ever-increasing

22  delays to "systemic problems" over which they claim to have no control.  But Dr. Traquina has

23  conceded his "ultimate responsibility" for medical care at CSP-Solano, and Drs. Tan and Rohrer

24  acknowledge their obligation to follow up on pending referrals.  Watson's medical records, which

25  Defendants ignore in favor of anodyne summary declarations by Drs. Traquina and Rohrer,

26  readily establish numerous issues of disputed fact regarding their liability.  Similarly, the

27  evidence establishes that Drs. Traquina and Rohrer retaliated against Watson he filed this lawsuit.

28  The Court should deny Defendants' motion for summary judgment.

**PL.'S OPP. TO DEFS.' MSJ**
CIV S-07-1871 LKK KJN P

1    **II.    STATEMENT OF FACTS**

2        **A.    The Provision of Medical Care at CSP-Solano.**

3        Between 2001 and 2011, Watson was housed at CSP-Solano, where Dr. Traquina has

4    served as CMO since March 2003.[1]  Ex. G (Watson Decl.) ¶ 3; Ex. C (Dr. Traquina Dep.) at

5    47:22-25.  Much of that time, a rotation policy overseen by Dr. Traquina resulted in inmates

6    rarely being seen by the same physician on consecutive visits, hindering the inmates' ability to

7    obtain consistent treatment needed to address chronic conditions.  Ex. C at 63:6-64:18.  Although

8    several primary care physicians treated Watson during his ten years at CSP-Solano, he repeatedly

9    was seen in clinic by Drs. Rohrer and Tan during the critical periods.  *See infra* Parts II.B, C, D,

10    E, F, H.  Both doctors acknowledge the responsibility of physicians to follow up on the status of

11    medical referrals for patients they see in clinic.  Ex. A (Dr. Rohrer Dep.) at 135:17-136:8; Ex. B

12    (Dr. Tan Dep.) at 68:23-69:3.  Dr. Traquina acknowledges he is "ultimately responsible for

13    making sure that a patient timely sees a medical specialist."  Ex. C at 100:2-5; *see also id.* at

14    73:21-23 ("in a nutshell," the CMO's primary responsibility is "management of medical care").

15        Despite Dr. Traquina's ultimate responsibility for the provision and management of

16    medical care at CSP-Solano, he concedes he is unable "to provide adequate medical care in a

17    timely manner."  Ex. C at 101:22-25.   He relies on several tools to track whether patients are

18    receiving timely care:  (1) an "antiquated," "inaccurate and unreliable" software system called

19    "IMSAT" (which "stands for inmate scheduling and tracking"), Ex. C at 93:12-94:2; (2) a

20    personal list of "patients that have problem cases," *id.* at 94:3-19; and (3) as of July 2006, the

21    preparation of an "aging report," *id.* at 96:19-99:13.  At deposition, Dr. Traquina explained that

22    he would never have an "individual with chronic back pain" on his personal list.  Ex. C at 94:22-

23    95:25.  Thus, for patients like Watson, Dr. Traquina relies solely on IMSAT, which has "glitches"

24    and is "deficient," Ex. C at 93:12-24, and the aging report, which only picks up individuals whose

25    referral already has been pending for longer than ninety days, Ex. C at 96:19-97:5.

26        Because of these and other "systemic problems" with the provision of care at CSP-Solano,

27    _____

28        [1] Unless otherwise identified, all exhibits referenced in this memorandum are attached to
    the Declaration of Matthew J. Silveira, filed herewith.

1    Dr. Traquina expects inmates to rely on the administrative grievance process to bring a lapse or

2    delay in medical care to his attention.  Ex. C at 78:4-15.  During his time at CSP-Solano, Watson

3    filed dozens of CDC 7362 Health Services Request Forms calling attention to his severe

4    degenerative disc disease and seeking proper care, including physical therapy and surgery.  Ex. G

5    ¶ 5; *see also* Dkt. No. 37, Ex. C.  Watson also filed repeated grievances directly related to the

6    inadequacy of the care he was receiving for his spinal condition at CSP-Solano, *see infra* Parts

7    II.B-F, and wrote numerous letters to Dr. Traquina regarding his severe pain and chronic delays

8    in the provision of his medical care, *see infra* Parts II.B-D.  Despite these efforts, Watson

9    received grossly inadequate care, routinely waiting years for medically necessary treatment.

10
11         **B.    After Being Diagnosed With Degenerative Disc Disease, Watson Waited Two
               Years for an Evaluation by Spinal Specialist Dr. Farr (2002 to 2004).**

12         Watson informed the CSP-Solano medical staff of his increasing lower back pain in 2002.

13   Ex. C at Ex. 53.  On October 23, 2002, Dr. Traquina, who was a consulting physician at the time,

14   interviewed Watson in connection with a grievance filed by Watson.  Ex. C at Ex. 55 at

15   CSP001336.  Watson sought therapeutic treatment, proper medication, and surgery if necessary.

16   Ex. C at Ex. 55 at CSP001335, CSP001337.  Dr. Traquina recorded Watson's tenderness in his

17   lower back, muscle spasms, and reduced range of motion.  Ex. C at Ex. 53 at CSP000089; Ex. C

18   at 114:16-23.  Dr. Traquina diagnosed Watson with degenerative disc disease.  Ex. C at Ex. 53 at

19   CSP000087; *see also* Ex. C at Ex. 56 (radiology report noting "minimal degenerative changes" in

20   Watson's lumbar spine); Ex. C at 137:2-7 (Dr. Traquina acknowledging that Watson's

21   degenerative disc disease "was not terribly advanced" at this time).  Dr. Traquina referred Watson

22   to an orthopedist (Dr. Kofoed), who prescribed Watson a low dose of methadone and ordered an

23   MRI of his lumbar spine.  Ex. C at Ex. 54 at CSP000009, CSP000011; Ex. C at Ex. 57.

24         When Dr. Traquina reevaluated Watson on January 7, 2003, he observed that Watson's

25   pain had worsened.  Ex. C at Ex. 53 at CSP000085.  Where Watson had previously only been

26   experiencing back pain, he was now experiencing pain radiating down his left leg.  *Id.*  Watson

27   received a referral for physical therapy on February 6, 2003.  Ex. H at CSP000006.  An MRI

28   taken of Watson's lumbar spine on February 24, 2003 showed minimal disc dessication at many

of his lumbar discs, and marked disc dessication at the L5-S1 disc.  Ex. C at Ex. 59.  Shortly after the MRI, Watson received a referral for a neurosurgery consultation.  Ex. C at Ex. 64.

In March 2003, Dr. Traquina became the Chief Medical Officer and Health Care Manager for CSP-Solano.[2]  Ex. C at 37:22-23, 50:23-25.  On April 27, 2003, Watson notified Dr. Traquina by letter that he was still waiting for the neurosurgical consultation.  Ex. K.  Dr. Traquina responded a month later, assuring Watson that all preliminary steps had been taken and that the consultation was ready to proceed.  *Id.*  Yet nearly five months passed without a consultation, and on October 17, 2003 outpatient services notified Dr. Traquina that the consultation could not proceed because Watson's MRI was now outdated.  Ex. L (document from Dr. Traquina's files noting the delay).  On October 19, 2003, Watson wrote another letter to Dr. Traquina addressing numerous concerns, including his long wait to see a spinal specialist.  Ex. C at Ex. 60 at CSP00074.  Although Dr. Traquina addressed some of Watson's concerns, he ignored Watson's complaint about the delay, despite his awareness that Watson's neurosurgical referral could not go forward until a new MRI was taken.  Ex. C at Ex. 60 at CSP000072-73.   In fact, nothing was done about the delayed consult or outdated MRI until Watson requested to be seen in clinic in late November, right around the time Dr. Tan first became involved in Watson's care.

On November 24, 2003, Dr. Tan saw Watson in clinic.  Ex. B at Exs. 30, 42; Ex. B at 61:15-64:4.  Watson reported he was "[u]nable to sit, squat, very painful," and Dr. Tan observed that Watson sat "up and down very slowly."  Ex. B at 62:15-21.  Dr. Tan renewed Watson's methadone (then just 10 milligrams per day), noted that Watson needed a new MRI because the previous MRI was outdated, and requested that Watson return to the clinic in one week.  Ex. B at 63:14-19, 96:1-15; Ex. B at Ex. 42 (notation for "RTC 1 wk").  Two days later, Dr. Tan resubmitted Watson's pending referrals for an MRI and a neurosurgery consultation and sought expedition of those referrals. Ex. B at Exs. 31, 32.  Nonetheless, Watson was not returned to the clinic to see Dr. Tan (or any other doctor) a week later, and there is no evidence that Dr. Tan did anything to follow up on his "expedited" request for MRI and neurosurgery referrals, even though he contends that "there is no assigned person to follow those things."  Ex. B at 68:23-69:9.

---

[2] Dr. Traquina was CSP-Solano's Health Care Manager until 2007.  Ex. C at 50:23-25.

1    When Watson still had not received a new MRI or the physical therapy that had been

2    ordered more than a year earlier, he filed a grievance on February 19, 2004.  Ex. C at Ex. 62 at

3    CSP001636.  As the grievance worked its way through the appeals process, a new MRI of

4    Watson's spine was finally taken on April 7, 2004.  Ex. C at Ex. 66.  When Watson's grievance

5    reached the second level of appeal on May 20, 2004, Dr. Traquina partially granted the appeal on

6    the basis that Watson was scheduled to see a physical therapist on May 24, 2004.  Ex. C at Ex. 62

7    at CSP001635.  After more than a year of delay, Watson finally received a physical therapy

8    evaluation and three sessions of therapeutic treatment.  Ex. H at CSP000136-37.

9    Watson's neurosurgical consultation remained delayed.  On July 19, 2004, Dr. Rohrer

10   evaluated Watson for the first time.  Ex. A at Ex. 2; Ex. A at 78:10-80:13.  Dr. Rohrer noted

11   Watson's chronic lower back pain and his pending referral to a spinal specialist (Dr. Farr).  Ex. A

12   at 79:1-10.  By the time Watson finally saw Dr. Farr on August 16, 2004, a full year-and-a-half

13   after that referral was originated, and almost a year after he personally brought the delay to Dr.

14   Traquina's attention, his condition had deteriorated.  Rather than having "minimal degenerative

15   changes" in his spine, Watson was now diagnosed as having "severe" degenerative disc disease.

16   Ex. C at Ex. 67 at pp. 4, 9; Ex. C at 180:1-5.  Dr. Farr prescribed epidural injections, and if they

17   were not successful, a discogram (a procedure used to evaluate the source of intervertebral disc

18   pain when considering surgical intervention) and a follow-up visit.  Ex. C at Ex. 67 at p. 9.

19           **C.    Watson Notified Defendants That the Epidural Injections Recommended by
                     Dr. Farr Were Unsuccessful and Sought Further Treatment (2005).**
20

21   Dr. Rohrer reviewed Dr. Farr's notes from the August 16, 2004 evaluation of Watson.  Ex.

22   A at Exs. 4, 5; Ex. A at 89:3-90:7.  He filled out a referral for the epidural injections prescribed

23   by Dr. Farr, but categorized the referral as "routine," rather than "urgent" or "emergent," despite

24   the fact that Watson had been in severe pain for nearly two years while he waited for a specialist

25   to diagnose his condition and recommend treatment.  Ex. A at Ex. 6.

26   Watson did not receive the injections for another five months, and only after another

27   doctor followed up on Dr. Rohrer's recommendation with an "urgent" referral.  Ex. H at

28   CSP000969.  As Dr. Farr had contemplated, the injections were not entirely successful.  Although

1   Watson received some relief in his lower back, the injections diverted the pain to Watson's legs.

2   Ex. D (Watson Dep.) at 39:24-40:7; Ex. H at CSP000903 (Dr. Solomon noting that the epidural

3   injections "make [Watson] worse").  Neither a discogram nor follow-up appointment with Dr.

4   Farr were scheduled; in fact, a discogram was never scheduled.  Ex. G ¶ 15.  Watson

5   subsequently notified Dr. Traquina by letter that he continued to be in severe pain and that the

6   epidural injections did not help him.  Ex. M.  On July 15, 2005, Traquina responded, telling

7   Watson that his case was under "reevaluation" and that Watson's medication (i.e., methadone)

8   would be maintained in the meantime.  Ex. C at Ex. 68.

9   
      **D.      Watson Filed This Lawsuit After Defendants Denied Him Physical Therapy, a**
      **Discogram, or a Follow-Up Appointment with Dr. Farr (2005-2007).**
10

11          On August 7, 2005, Watson filed another grievance.  Ex. C at Ex. 69 at CSP001253.  He

12  asked "to personally speak with [the] C.M.O. to discuss my surgery and medication prescription"

13  and "to speak with a Surgeon who specializes in spinal surgery."  *Id.*  The first level review noted

14  Watson was "pending evaluation with the neurosurgeon to occur at the first available moment."

15  *Id.* at CSP001259.  Yet when the appeal reached the CMO at the second level, Dr. Traquina

16  mistakenly concluded that Dr. Rohrer ordered lumbar epidural injections for Watson in

17  September 2005 (when the records show that those injections were ordered in September 2004),

18  *id.* at CSP001251, ignoring that Watson had already alerted him a few months earlier that the

19  injections were unsuccessful, and that Dr. Farr had requested a discogram and a follow-up

20  appointment with Watson under those circumstances.  Moreover, because Dr. Traquina declined

21  to meet Watson personally and concluded that Watson's concerns had been adequately addressed

22  through written correspondence, he forfeited any opportunity to correct his mistake.  *Id.*

23          A new MRI of Watson's spine was taken on August 16, 2005.  Ex. C at Ex. 72.  A short

24  time later, Renee Kanaan, the Director of the CDCR's Division of Correctional Health Services,

25  responded to a letter Watson had sent earlier that summer.  Ex. N.  In it, Kanaan acknowledged

26  that Watson had recently obtained an MRI, and that the results of Watson's request for spinal

27  surgery would "depend on the results of the MRI."  *Id.*  Kanaan noted that the CDCR sought "to

28  resolve these issues at the local level if at all possible," and copied Dr. Traquina (who was Health

1    Care Manager at the time) on her response. *Id.* (Dr. Traquina acknowledging his receipt of the

2    letter on September 30, 2005).

3    　　　　Despite Dr. Traquina's awareness that the CDCR expected Watson's request for spinal

4    surgery to be addressed by CSP-Solano, nearly a year passed (and another MRI became outdated)

5    without a neurosurgery consultation.  On August 4, 2006, Watson filed yet another grievance.

6    Ex. C at Ex. 75 at CSP001169.  After the first level review by Dr. Rohrer on August 24, 2006,

7    Watson was provided with a referral for physical therapy (which resulted in an evaluation, but no

8    therapy) and epidural injections (which diverted Watson's pain), but Dr. Rohrer did not schedule

9    him for a follow-up consultation with a spinal specialist.  Ex. A at Exs. 9, 10, 11, 13; Ex. C at Ex.

10   76.  Dissatisfied, Watson requested a consultation with a spinal specialist to discuss his surgical

11   options.  Ex. C at Ex. 75 at CSP001162; Ex. G ¶ 11.  Nonetheless, when the appeal reached the

12   CMO, Dr. Traquina denied it, falsely stating that Watson had "decided to postpone surgery for

13   now, negating the need for a referral to a surgeon."  Ex. C at Ex. 75 at CSP001158.  Dr. Traquina

14   did not speak to Watson personally to ascertain the truth of this statement.  Ex. G ¶ 9.

15   　　　　Watson filed another grievance on November 14, 2006, noting that he was still "pending

16   surgery" for his condition, Ex. C at Ex. 77 at CSP001130, and a new neurosurgery referral was

17   finally submitted by Dr. Tan in December 2006, Ex. B at Exs. 35, 36.  But that referral did not

18   take place before Watson's August 2005 MRI became outdated, and because an updated MRI was

19   not obtained before an appointment scheduled for May 2007, the appointment could not go

20   forward.  Ex. A at Ex. 18; *accord* Ex. B at 84:4-6 ("So every time Dr. Farr wanted new MRI, so

21   his appointment is coming in May, so we requested the MRI in March."); Ex. L (cancelling prior

22   appointment due to outdated MRI).  Watson filed suit on August 28, 2007.  RJN Ex. 1 at p. 5.[3]

23   　　　　**E.    Dr. Tan Reduced Watson's Pain Medication After Watson Filed His**

24   　　　　　　　　**Complaint (2007).**

25   　　　　When Watson filed his complaint, his prescription for methadone was set at 30

26   milligrams.  *See, e.g.*, Ex. B at Exs. 44 ("10 mg – 3 tabs"), 47.  On September 5, 2007, a week

27

28   　　　　[3] All references to "RJN Ex." refer to exhibits attached to Plaintiff's Request for Judicial
     Notice, filed herewith.

**PL.'S OPP. TO DEFS.' MSJ**
CIV S-07-1871 LKK KJN P

1  after Watson had filed his complaint, Dr. Tan lowered the dosage of Watson's methadone

2  prescription to 20 milligrams, and noted that the prescription would not be renewed without

3  further review.  Ex. B at Exs. 48, 51 at CSP001082.  After Watson filed a grievance, Ex. B at Ex.

4  51 at CSP001076, Dr. Tan restored his prescription to a 30 milligram dosage, Ex. B at Exs. 39, 51

5  at CSP001083.  For the month before the dosage was restored to 30 milligrams, however, Watson

6  suffered with inadequate pain relief, and no explanation for the decrease in his medication.

7

8

      **F.**    **After Watson Waited Four Years for a Follow-up Neurosurgical Consultation, a Second Spinal Specialist (Dr. Huffman) Prescribed Further Treatment and a Follow-Up Appointment (2008).**

9        Although nearly four years earlier Dr. Farr had recommended that Watson return for

10  further evaluation if epidural injections were unsuccessful, and by January 2005 Watson's

11  medical record reflected that those injections had failed to alleviate his pain, Watson was not seen

12  for a follow-up by a spinal specialist (Dr. Huffman) until May 2008.  Ex. A at Ex. 24.  By the

13  time Dr. Huffman evaluated Watson, more than five years after Watson was first referred for a

14  neurosurgical consult, Dr. Huffman opined that surgery would be a risky procedure.  *Id.*

15  Moreover, Dr. Huffman explained that he would first recommend conservative treatment, and

16  only consider surgery upon reevaluating Watson after that course of treatment.  *Id.*;  Ex. E

17  (Huffman Dep.) at 50:15-25.  Noting that Watson had not received significant physical therapy

18  during the previous five years (in fact, Watson had only been evaluated twice and received three

19  sessions in 2004), Dr. Huffman prescribed a course of physical therapy and a follow-up

20  appointment in three months.  Ex. A at Ex. 24.  Watson was not seen by a physical therapist until

21  September 2008, a month later than Dr. Huffman had asked to see him again.  Ex. A at Ex. 12.

22

23

      **G.**    **Dr. Traquina Revoked Watson's Chrono After Watson Filed His Motion for Injunctive Relief (2008).**

24        Starting in 2003, Watson had regularly been issued a chrono stating that he should not be

25  subjected to "[p]rolonged standing/walking/sitting longer than 30 minutes at a time."[4]  *See, e.g.*,

26  Ex. C at Ex. 69 at CSP001255.  This chrono was renewed throughout his time at CSP-Solano,

27        [4] According to Dr. Traquina, a "chrono" is an "official paper that provides information to

28  the custody and to the medical [staff] that that individual requires something to be accommodated in [the] institution."  Ex. C at 76:9-12.

1    including on June 25, 2008.  Ex. C at Ex. 82.  Moreover, because Watson had been experiencing

2    forty to sixty minute waits for his methadone (during which time he was forced to either stand or

3    sit when seating was available), the chrono specifically noted that Watson was permitted to "[g]et

4    narcotic after his insulin."  *Id.*  Despite these provisions, CSP-Solano medical staff continued to

5    require Watson to wait up to an hour for his medication, and refused to dispense his methadone

6    after he received his finger-stick test or insulin.[5]  RJN Ex. 2.

7        On August 4, 2008, Watson asked this Court to prohibit the CSP-Solano medical staff

8    from requiring him to wait longer than 30 minutes for his pain medication, in contravention of the

9    June 25, 2008 chrono.  RJN Ex. 2.  On September 26, 2008, the Court ordered Defendants to

10   supplement their opposition to Watson's motion by filing "a declaration by defendant Dr.

11   Traquina indicating whether or not plaintiff is indeed subjected to a 40-minute delay when

12   awaiting his prescribed pain relief, and if he is, whether such a delay is warranted in light of

13   plaintiff's claims of unnecessarily suffering excruciating pain because of the delay."  RJN Ex. 3.

14       Dr. Traquina responded with a declaration on October 16, 2008.  RJN Ex. 4.  He asserted

15   that he "updated plaintiff's medical file," including his chrono, to remove the prohibition on

16   sitting for more than 30 minutes and to delete the instruction for Watson to get his narcotics after

17   his insulin.  *Id.* at 1-2.  To justify his revision of Watson's chrono, Dr. Traquina placed a note in

18   Watson's file on October 9, 2010 stating that Watson had "mild" degenerative disc disease, Ex. C

19   at Ex. 83, which contradicted both spinal specialists' diagnoses that Watson had "severe"

20   degenerative changes and Dr. Traquina's own previous recognition that Watson had "severe

21   degenerative disc disease," Ex. C at Ex. 67 at 9; Ex. C at 180:1-5; Ex. A at Ex. 24 at CSP000780;

22   Ex. C at Ex. 74.  As usual, Dr. Traquina did not talk to Watson to evaluate his pain.  Ex. G ¶ 9.

23       **H.    A Third Spinal Specialist (Dr. Mummaneni) Advised Watson of His Surgical
             Options (2009-2010).**

24

25       By the time Defendants got around to scheduling Watson for a follow-up surgical

26   _____

27       [5] As Watson explained during his deposition, he did not receive an insulin injection every
     day; rather, he had a finger-stick test every day to check his blood sugar levels, at which time it
     would be determined whether an insulin injection was required.  Ex. D at 71:17-72:8, 97:5-

28   100:11; *see also* Ex. P (approved health services request form renewing Watson's finger-stick).

evaluation in December 2009, Dr. Huffman was no longer seeing patients from CDCR.  Ex. E at

61:6-9.  Accordingly, Watson was seen by a third spinal specialist, Dr. Mummaneni of the

University of California, San Francisco Medical Center ("UCSF").  Ex. I at WAT000010-11.  Dr.

Mummaneni offered the first concrete recommendations for surgical options available to Watson,

and asked Watson to consider his options and return for a follow-up visit.  *Id.*  Dr. Mummaneni

noted that Watson's L5-S1 disc was collapsed, that Watson had a herniated disc, and that Watson

could "not sit for longer than 10-15 minutes."  Ex. R.  During his return visit on March 9, 2010,

Watson advised Dr. Mummaneni that he needed further time to consider undergoing an invasive

surgical procedure in light of the risks, and that he wanted to pursue conservative modalities and

minimally invasive procedures, such as a surgery for his pinched nerve (*i.e.*, a laminectomy or

foraminotomy).  Ex. J; Ex. G ¶ 13.

Shortly after his second appointment with Dr. Mummaneni, Watson was seen by a

physical therapist and prescribed a TENS Unit.  Ex. Q.  With the TENS Unit, Watson

experienced moderate pain relief in his lower back and legs.  Ex. G ¶ 14.  On April 7, 2010

Watson advised Dr. Rohrer that he sought a transfer to CMF so that he could receive appropriate

medical treatment, and that he wished to pursue pinched nerve surgery.  Ex. O.

## I.    Watson Was Transferred to SATF-CSP-Corcoran, Where His Medical Needs Remain Unmet (2011)

In April 2011, two months after this Court ordered that Watson's injunctive relief claims

could proceed, RN Ex. 5 at 13:9-13, Watson was transferred out of CSP-Solano, *See* Defs.'

Separate Statement of Undisputed Facts in Support of Mot. for Summ. Judgment Ex. F ("Lewis

Decl.") ¶ 3.  Despite Watson's request to be transferred to CMF or another prison with

appropriate medical facilities, Ex. O, he was ultimately transferred to SATF-CSP-Corcoran.

Lewis Decl. ¶ 4.  Since being transferred to SATF-CSP-Corcoran, Watson has not received

physical therapy, surgery, or any treatment other than methadone.  Ex. G ¶ 16.

## III.    ARGUMENT

Summary judgment may only be granted if Defendants meet their burden to demonstrate

that "there is no genuine dispute as to any material fact and that [they are] entitled to judgment as

1  a matter of law." Fed. R. Civ. P. 56(a).  Only if Defendants can establish the absence of essential

2  evidence supporting any given element of Watson's causes of action must Watson "make a

3  showing sufficient to establish the existence" of a disputed issue of fact concerning that element.

4  *Celetox Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  All inferences to be drawn from the evidence

5  must be viewed in the light most favorable to Watson.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

6  *Radio Corp.*, 475 U.S. 574, 587 (1986).

7          **A.**        **Defendants' Deliberate Indifference to Watson's Severe Degenerative Disc**

8                      **Disease Violates the Eighth Amendment.**

9         Watson's Eighth Amendment claim is based on Defendants' "'deliberate indifference to

10  [his] serious medical needs.'"  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting

11  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  The deliberate indifference standard "is less

12  stringent in cases involving a prisoner's medical needs than in other cases involving harm to

13  incarcerated individuals because 'the State's responsibility to provide inmates with medical care

14  ordinarily does not conflict with competing administrative concerns.'"  *McGuckin v. Smith*, 974

15  F.2d 1050, 1060 (9th Cir. 1992) (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)), *overruled*

16  *on other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).  The claim

17  is established by a two-part test requiring proof (1) of a "serious medical need," *i.e.*, that the

18  "failure to treat [the plaintiff's] condition could result in further significant injury or the

19  unnecessary and wanton infliction of pain;" and (2) that "the defendant's response to the need

20  was deliberately indifferent."  *Jett*, 439 F.3d at 1096 (internal citations omitted).  The second

21  prong "is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or

22  possible medical need and (b) harm caused by the indifference."  *Id.*  "Indifference 'may appear

23  when prison officials deny, delay or intentionally interfere with medical treatment, or it may be

24  shown by the way in which prison physicians provide medical care.'"  *Id.* (citations omitted).

25         Defendants are liable if they knew Watson faced "a substantial risk of serious harm and

26  disregard[ed] that risk by failing to take reasonable measures to abate it."  *Farmer v. Brennan*,

27  511 U.S. 825, 847 (1994).  However, Watson "need not prove complete failure to treat" his

28  condition.  *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989).  "A failure to

1    competently treat a serious medical condition, even if some treatment is prescribed, may

2    constitute deliberate indifference in a particular case." *Franklin v. Dudley*, No. 2:07-cv-2259

3    KJM KJN P, 2011 WL 2493770, at *3 (E.D. Cal. June 22, 2011) (citing *Ortiz*, 884 F.3d at 1314).

4    And, Watson "need not show his harm was substantial;" a showing of substantial harm merely

5    "provide[s] additional support for [his] claim that the defendant was deliberately indifferent to his

6    needs." *Jett*, 439 F.3d at 1096. "The needless suffering of pain may be sufficient to demonstrate

7    further harm." *Francis v. Cate*, No. 2:09-cv-0640 JAM KJN P, 2011 WL 2119024, at *8 (E.D.

8    Cal. May 26, 2011) (citing *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002)).

9              **1.    Watson's Severe Degenerative Disc Disease Is a Serious Medical Need.**

10            This Court has recognized that "chronic, severe back pain, . . . is a serious medical

11    condition that requires treatment." *Francis*, 2011 WL 2119024, at *10; *see also McGuckin*, 974

12    F.2d at 1059-60 ("The existence of an injury that a reasonable doctor or patient would find

13    important and worthy of comment or treatment; the presence of a medical condition that

14    significantly affects an individual's daily activities; or the existence of chronic and substantial

15    pain are examples of indications that a prisoner has a 'serious' need for medical treatment.").

16    Defendants do not dispute that the chronic lower back pain and shooting leg pains Watson

17    experienced in connection with his severe degenerative disc disease establish a serious medical

18    need. In fact, their own statements and actions (including their referral of Watson to spinal

19    specialists and prescription of methadone and epidural injections), *see, e.g.*, Ex. C at 127:11-15,

20    142:3-143:2; Ex. A at 120:13-121:21; Ex. B at 87:9-14, reinforce Dr. Shefrin's expert opinion,

21    Ex. F (Shefrin Dep.) at 35:10-22 (Watson experienced "worsening pain, progression in his

22    degenerative changes in the lumbar spine, and more limited mobility"), and Watson's subjective

23    complaints of near-constant excruciating pain for almost ten years, Ex. G ¶ 4; Ex. D at 29:21-

24    30:23. *Cf. Williams v. Andreasen*, No. CIV S-04-2515 FCD EFB P, 2008 WL 508073, at *12

25    (E.D. Cal. Feb. 22, 2008) (plaintiff who suffered severe pain from degenerative disc disease for

26    six years "obviously had a 'serious' need for medical treatment").

27

28

1        **2.        Defendants Were Deliberately Indifferent to Watson's Condition.**

2            **(a)        Dr. Traquina.**

3            While serving as CMO of CSP-Solano, Dr. Traquina was aware of Watson's perpetually

4    delayed medical care and took no meaningful steps to remedy it or prevent further delay, resulting

5    in unnecessary suffering, hastened progression of Watson's degenerative disc disease, and

6    limitations of Watson's mobility and functioning.  Dr. Traquina was deliberately indifferent to

7    Watson's needs.  *See Herrera v. Hall*, No. 1:08-CV-01882-LJO-SKO PC, 2010 WL 2791586, at

8    *4 (E.D. Cal. July 14, 2010) (citing *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)) (Where

9    an inmate alleges "an ongoing constitutional violation and the appeals coordinator had the

10   authority and opportunity to prevent the ongoing violation, a plaintiff may be able to establish

11   liability by alleging that the appeals coordinator knew about an impending violation and failed to

12   prevent it.").

13           Before becoming CMO, Dr. Traquina was one of the first physicians at CSP-Solano to

14   evaluate Watson's chronic lower back pain, seeing him in clinic in October 2002 and January

15   2003.  *See* Ex. C at Ex. 53 at CSP000087, CSP000085; Ex. C at Ex. 54 at CSP000011.  Dr.

16   Traquina observed Watson's worsening pain between the two evaluations, Ex. C at Ex. 53 at

17   CSP000085, and later acknowledged Watson's degenerative disc disease was "more serious than

18   an average patient's complaints about back pain," Ex. C at 127:11-14.  Shortly after Dr. Traquina

19   became CMO, Watson notified Dr. Traquina that he had been waiting for a neurosurgical

20   consultation since March 15, 2003.  Ex. C at Ex. 64; Ex. K.  Dr. Traquina assured Watson that all

21   preliminary steps had been taken and that the consultation was ready to proceed.  Ex. K.

22           Nearly five months later, however, outpatient services notified Dr. Traquina that Watson's

23   neurosurgical consultation could not proceed because the MRI was now outdated.  Ex. L.  Two

24   days after that, Watson wrote Dr. Traquina a letter raising a number of concerns, including that he

25   was still "waiting to be seen by a spine specialist."  Ex. C at Ex. 60 at CSP00074.  Despite taking

26   action on some of Watson's concerns, Dr. Traquina ignored Watson's complaint about the

27   delayed neurosurgical consultation.  *Id.* at CSP0072-73.  Nothing was done about the delayed

28   consult or outdated MRI until Watson requested to be seen in clinic in late November 2003 and

1   the referrals were resubmitted.  Ex. B at Exs. 30, 31, 32.  After Watson filed yet another

2   grievance in February 2004, Ex. C at Ex. 62 at CSP001636, he finally received a new MRI and

3   then was required to wait another six months to see a spinal specialist (Dr. Farr), Ex. C at Ex. 67.

4   In other words, Watson did not receive a neurosurgery consultation until sixteen months after he

5   first brought the delay to Dr. Traquina's attention and Dr. Traquina told Watson the consultation

6   was ready to proceed.  During this delay, Watson's condition progressed from "minimal

7   degenerative changes" in his spine, Ex. C at Ex. 56, to "severe" degenerative disc disease. Ex. C

8   at Ex. 67 at 9; Ex. C at 180:1-5.

9       Dr. Farr recommended that Watson receive epidural injections, and if they were not

10  successful, a discogram and a follow-up visit.  Ex. 67.   When Watson finally received the

11  injections five months later, he promptly told a CSP-Solano physician that the treatment made his

12  pain worse, Ex. H at CSP000903, and followed this up with a letter to Dr. Traquina notifying the

13  CMO that he continued to be in severe pain and that the injections did not help,  Ex. M.  In

14  response, Dr. Traquina told Watson that his case was under "reevaluation" and that Watson's

15  medication (i.e., methadone) would be maintained in the meantime.  Ex. C at Ex. 68.

16      When nothing happened, Watson filed yet another grievance on August 7, 2005.  Ex. C at

17  Ex. 69 at CSP001253.  He asked "to personally speak with" Dr. Traquina to discuss surgery and

18  "to speak with a Surgeon who specializes in spinal surgery." *Id.*  Watson received an updated

19  MRI on August 16, 2005, Ex. C at Ex. 72, and the first level review of Watson's grievance noted

20  that Watson was "pending evaluation with the neurosurgeon to occur *at the first available*

21  *moment*," Ex. C at Ex. 69 at CSP001259 (emphasis added).  When the appeal reached the CMO,

22  however, Dr. Traquina misrepresented that Dr. Rohrer had only recently ordered epidural

23  injections, ignored that Watson was requesting the *follow-up* appointment that Dr. Farr

24  recommended, and declined to meet with Watson, on the basis that Watson's concerns had been

25  adequately addressed through written correspondence.  *Id.* at CSP001251.

26      Another year passed without a follow-up appointment with Dr. Farr, and Watson filed

27  another grievance on August 4, 2006.  Ex. C at Ex. 75 at CSP001169.  Watson was dissatisfied

28  with the first-level review, and explicitly requested a consultation with a spinal specialist to

1    discuss his surgical options. *Id.* at CSP001162; Ex. G ¶ 11. When the appeal reached the CMO,

2    Dr. Traquina denied it. Ex. C at Ex. 75 at CSP001158. And, though he had not spoken to

3    Watson, Ex. G ¶ 9, Dr. Traquina falsely stated that Watson had "decided to postpone surgery for

4    now, negating the need for a referral to a surgeon," Ex. C at Ex. 75 at CSP001158. Giving the lie

5    to Dr. Traquina's statement, Watson again asserted that he was "pending surgery" in a grievance

6    filed on November 14, 2006. Ex. C at Ex. 77 at CSP001130. In December 2006, a new

7    neurosurgery referral was submitted, Ex. B at Exs. 35, 36, but an updated MRI was not carried

8    out before an appointment scheduled for May 2007, so the appointment could not go forward.

9    Even after Watson filed this Complaint in August 2007, RJN Ex. 1 at 5, he was not seen for a

10   follow-up by a spinal specialist until May 2008, after years of excruciating pain and further

11   deterioration of his condition, and at which point the risks of surgery had increased. Ex. G ¶ 4;

12   Ex. F at 35:10-22, 41:22-42:8.

13          Even after this litigation got underway, Dr. Traquina's deliberate indifference continued.

14   When Watson asked the Court to enjoin the medical personnel at CSP-Solano from ignoring his

15   chrono and forcing him to wait an hour for his pain medication, RJN Ex. 2, Dr. Traquina, without

16   evaluating Watson, simply modified the chrono to render Watson's complaints moot. RJN Ex. 4.

17   Dr. Traquina also misstated the severity of Watson's condition in his medical records, and

18   unilaterally cancelled the diabetic finger-stick test that was used to monitor his blood sugar levels.

19   Ex. C at Ex. 83. In his remaining years at CSP-Solano, Watson received intermittent physical

20   therapy, and was finally informed of his surgical options, but did not receive surgery and was

21   routinely required to wait excessive periods of time for his pain medication.

22          In short, Dr. Traquina failed to ensure that Watson received timely follow-up care from a

23   spinal specialist and treatment to alleviate his pain. A jury could find deliberate indifference on

24   this basis alone. *Cf. Francis*, 2011 WL 2119024, at *11 (denying summary judgment to

25   administrator; "if defendant Baca had reviewed plaintiff's medical file in connection with

26   plaintiff's appeals, defendant Baca would have noted the myriad gaps in plaintiff's pain

27   medication prescription history, as well as his difficulties in obtaining prescription refills."). But

28   Dr. Traquina did more. He routinely ignored Watson's complaints, mischaracterized the status of

1   the care Watson had received, and affirmatively interfered with the treatment recommendations of

2   Watson's physicians and spinal specialists.  Dr. Traquina is not entitled to summary judgment.

3                          **(b)      Dr. Rohrer.**

4        Dr. Rohrer was the first CSP-Solano physician to see Watson after his August 16, 2004

5   evaluation by Dr. Farr.  Ex. A at Exs. 4, 5.  Although Watson had been in severe pain for nearly

6   two years while he waited for a specialist to diagnose his condition and recommend treatment, Dr.

7   Rohrer submitted a "routine" (rather than "urgent" or "emergent") request for the epidural

8   injections recommended by Dr. Farr.  Ex. A at Ex. 6; *see Jett*, 439 F.3d at 1097-98 (decision to

9   submit a "routine" request for an already-delayed consult is evidence of deliberate indifference).

10  Unsurprisingly, Watson did not receive the injections for four months, and only after another

11  doctor followed Dr. Rohrer's "routine" referral with an "urgent" referral.  Ex. H at CSP000969.

12       In August 2006, Dr. Rohrer interviewed Watson in connection with a grievance seeking

13  spinal surgery and other treatment.  Ex. A at Ex. 9; Ex. C at Ex. 75 at CSP001170.  Although the

14  records in Watson's file showed that the epidural injections Dr. Rohrer previously had ordered

15  were unsuccessful, Ex. H at CSP000903, Dr. Rohrer ordered still further epidural injections and

16  "ongoing" physical therapy, Ex. A at Ex. 11.  *See Jett*, 439 F.3d at 1097 (plaintiff "is entitled to

17  an inference" that a reviewing doctor is aware of documents in an inmate's medical record).

18  Rohrer denied Watson's request for increased methadone while Watson waited for these other

19  treatments.  Ex. C at Ex. 75 at CSP001169; Ex. A at Ex. 9.  And, although Dr. Rohrer had

20  previously acknowledged that a discogram and follow-up with Dr. Farr was necessary if epidural

21  injections were unsuccessful, Ex. A at Ex. 5, Dr. Rohrer did not implement either

22  recommendation, Ex. A at Exs. 9, 10.  Ultimately, Dr. Farr's recommendation fell by the wayside,

23  and Watson never underwent a discogram.  Ex. G ¶ 15.

24       In a follow-up appointment on October 6, 2006, Dr. Rohrer still declined to refer Watson

25  to a spinal specialist.  Ex. A at Ex. 14.  He noted that Watson had been seen by a physical

26  therapist, but did not comment on whether Watson had actually received the "ongoing" treatment

27  that he had ordered in August.  *Id.*; Ex. A at 112:17-113:11.  In fact, Watson had not received any

28  treatment; rather, he was evaluated on September 12, 2006, and given instructions to alternate his

cane between his hands and carry out a self-exercise program. Ex. C at Ex. 76. As far as Dr.

Rohrer was concerned, this single evaluation sufficiently fulfilled his earlier referral.

Throughout 2007, Dr. Rohrer continued to renew Watson's methadone without

commenting on Watson's pending MRI or neurosurgery consultation (requests for both of which

were finally submitted by another doctor in December 2006). Ex. A at Exs. 15, 16, 17. Only

after a neurosurgery consultation was cancelled in May 2007 because Watson had not first

received an updated MRI did Dr. Rohrer submit new referrals for an MRI and neurosurgery

consultation. Ex. A at Exs. 18, 19, 21, 22, 23. Dr. Rohrer classified these long-delayed referrals

as "routine," rather than "emergent" or "urgent," indifferent to the nearly three years that had

passed since Watson's first neurosurgical consultation. Ex. A at Exs. 22, 23. A week later, he

ordered a follow-up appointment with Watson for 90 days, effectively ensuring that no physician

would check on the referrals in the interim. Ex. A at Ex. 20. Watson eventually underwent an

MRI on August 2, 2007, Ex. C at Ex. 79, but did not see a spinal specialist (Dr. Huffman) until

May 12, 2008, Ex. A at Ex. 24. By then, surgical correction carried greater risks than when Dr.

Rohrer first evaluated Watson four years earlier, and Watson continued to experience severe pain

with virtually no treatment apart from methadone. Ex. G ¶ 4; Ex. F at 35:10-22, 41:22-42:8.

Dr. Rohrer continued to treat Watson after the 2008 consultation with Dr. Huffman. In

fact, after Dr. Mummaneni advised Watson of his surgical options in 2010, Watson notified Dr.

Rohrer that he wanted to pursue a pinched nerve surgery. Ex. O Dr. Rohrer noted Watson's

request in his file, but Watson still has not received that surgery. Ex. G ¶ 16. The record amply

demonstrates a disputed issue of fact as to Dr. Rohrer's deliberate indifference.

### (c)    Dr. Tan.

Dr. Tan was integrally involved in Watson's treatment between 2003 and 2007. When he

saw Watson in clinic on November 24, 2003, Dr. Tan noted that Watson reported that he was

"[u]nable to sit, squat, very painful," and observed that Watson sat "up and down slowly." Ex. B

at 62:15-21; *see also* Ex. B at Ex. 30, 42; Ex. B at 61:15-64:4. Dr. Tan renewed Watson's

methadone, noted that Watson needed a new MRI because the previous MRI was outdated, and

requested that Watson return to the clinic in one week. Ex. B at 63:14-19, 96:1-15; Ex. B at Ex.

1    42 (notation for "RTC 1 wk"). Nonetheless, Watson was not returned to the clinic to see Dr. Tan

2    (or any other doctor) a week later, and there is no evidence that Dr. Tan followed up on his

3    "expedited" request for MRI and neurosurgery referrals, despite his awareness that "there is no

4    assigned person to follow those things." Ex. B at 68:23-69:9. Watson did not receive a new MRI

5    for four months, or see a spinal specialist (Dr. Farr) until August 2004, at which point Watson's

6    condition had progressed to severe degenerative disc disease. Ex. C at Ex. 67 at 9.

7         Dr. Tan did not see Watson in clinic again until January 2005, at which time he was

8    reminded of Watson's severe condition and the glacial pace of the treatment Watson had

9    received. Ex. B at Ex. 43; Ex. B at 97:4-98:22. By then, although Watson had finally been seen

10   by a spinal specialist, he had been waiting five months for the epidural injections prescribed by

11   Dr. Farr. Ex. C at Ex. 67 at 9 (prescribing "LEI," lumbar epidural injections); Ex. B at 98:4-5. In

12   December 2006, Dr. Tan interviewed Watson in connection with a grievance, and referred him to

13   a spinal specialist. Ex. B at Ex. 46; Ex. C at Ex. 77. Although Dr. Tan knew that a neurosurgery

14   referral would not be completed without a recent MRI (indeed, he expedited the request for a new

15   MRI when Watson's prior neurosurgery referral was delayed by an outdated MRI), he failed to

16   order Watson a new MRI, Ex. B at Ex. 46, rendering the neurosurgery referral futile.

17        An MRI was eventually ordered in Dr. Tan's name in March 2007 for an appointment

18   scheduled for May 2007. Ex. B at Ex. 37; Ex. B at 83:3-84:6. Predictably, the MRI was not

19   completed in time for the scheduled appointment, Ex. B at Ex. 38 (radiologist's report from MRI

20   taken in August 2007), which could no longer go forward due to the absence of a current MRI,

21   Ex. B at 84:4-6 ("So every time Dr. Farr wanted new MRI, so his appointment is coming in May,

22   so we requested the MRI in March."); Ex. A at Ex. 18; *cf.* Ex. L. Following this aborted referral,

23   Watson did not see a spinal specialist until May 2008, Ex. A at Ex. 24, despite Dr. Tan's frequent

24   involvement with Watson's care in the intervening year, *see* Ex. B at Exs. 47 (8/8/2007 renewal

25   of methadone), 48 (9/5/2007 renewal of methadone), 39 (10/4/2007 treatment of Watson). Put

26   another way, Dr. Tan's failure to follow basic protocols of which he demonstrably was aware led

27   to an additional year-long delay in fulfilling Dr. Tan's own referral to a neurosurgeon.

28        Throughout this period, Watson continued to experience severe pain, Ex. G ¶ 4, and his

1    spinal condition continued to deteriorate, Ex. F at 35:10-22, 41:22-42:8.  Dr. Tan's delay was a

2    major component of the inconsistent and untimely treatment that led to Watson's harm.

3            **3.**      **Defendants' Attempts to Shift the Blame to Administrative Personnel and "the System" More Generally Does Not Absolve Them from Liability.**

4

5          Defendants concede that "delays in receiving medical services existed," Opp. at 16:8-9,

6    but contend they have no responsibility for those delays.  This ignores the relevant facts and

7    disregards court decisions denying summary judgment under nearly identical circumstances.

8          At deposition, Dr. Traquina made clear that he is "ultimately responsible" for the

9    provision of medical care at CSP-Solano.  Ex. C at 100:2-5; *see also id.* Ex. C at 101:22-25

10   ("[I]t's true as medical, a chief medical officer that I manage care, and my goal is to provide

11   adequate medical care in a timely manner.  That is my duty."); Ex. C at 83:9-14 (regarding UM

12   Nurse's schedule, "I like to have true control of that, and I have to have the opportunity when I

13   need to push for a patient."); Ex. C at 11:16-20 ("I recall an instance that in one of the appeals

14   there were some delays with physical therapist, and I made sure that won't happen.").  His

15   admissions create a triable issue of fact regarding his responsibility for Watson's care.  Indeed,

16   the Ninth Circuit has made clear that Dr. Traquina cannot obtain summary judgment simply by

17   filing a declaration "generally disclaim[ing] personal responsibility" for an inmate's care.

18   *Johnson v. Schwarzenegger*, 366 Fed. App'x 767, 769 (9th Cir. 2010).

19         Dr. Rohrer explained that ensuring timely referrals "is the responsibility both of the UM

20   Nurse and scheduler *and also for the physician to follow up on the referrals.* . . . Sometimes

21   referrals are lost and never received.  And this is the only mechanism that the physician has

22   available to himself to restart the process if it falls through the cracks and also to prompt them if a

23   referral for whatever reason has not been done."  Ex. A at 135:17-136:8 (emphasis added).  Dr.

24   Tan also acknowledged his responsibility to follow up on patient care.  Ex. B at 68:23-69:3 ("If

25   we saw the patient right now just like this, I found out I noted that it is not done, so I just bring to

26   attention of the other people to get it done.").  Drs. Rohrer and Tan cannot now contend they are

27   absolved of any responsibility for the years of delayed treatment.

28         Moreover, a defendant cannot justify his failure to provide medically necessary treatment

1    with non-medical considerations. *See, e.g., Jett*, 439 F.3d at 1097 (evidence that physician

2    declined "to request an orthopedic consultation merely because Mr. Jett could not go back to . . . a

3    non-contracted facility" supported deliberate indifference); *Franklin v. Dudley*, 2011 WL

4    2493770, at *6 ("decision not to prescribe narcotics . . . based on a policy rather than an

5    evaluation of plaintiff's medical needs" is more than a "mere difference of opinion" and is

6    sufficient to support a finding of deliberate indifference). Indeed, "[i]f a jury finds that failure to

7    provide necessary medical treatment was the result of tight budget constraints it could reasonably

8    rely on that to conclude that there was deliberate indifference." *Williams v. Andreasen*, No. CIV

9    S-04-2515 FCD EFB P, 2008 WL 508073, at *13 (E.D. Cal. Feb. 22, 2008) (citations omitted).

10    Defendants' testimony permits just such an inference here, with Dr. Traquina explaining, "we

11    don't have all means to deliver what we want to deliver. And those are beyond our control." Ex.

12    C at 105:2-5; *see also* Ex. C at 101:22-102:13 (explaining that he is unable "to provide adequate

13    care in a timely manner" because of "[r]esources").

14        A manager's continued reliance on processes that he knows to be defective also is

15    evidence of deliberate indifference. *See Chacoan v. Rohrer*, No. CIV S-05-2276 FCD GGH P,

16    2009 WL 1393076 (E.D. Cal. May 14, 2009). Dr. Traquina expressly acknowledged that he

17    relied on the "antiquated," "inaccurate and unreliable" IMSAT software system, and an "aging

18    report" that only identified inmates who had already been waiting 90 days for an appointment.

19    Ex. C at 93:10-100:1. Dr. Traquina cannot blame "a faulty computer system" for his failure to

20    monitor and prevent Watson's delayed treatment. *Chacoan*, 2009 WL 1393076, at *11

21    ("Evidently there was no effective policy to catch the scheduling mistakes, or just plain inaction.

22    Knowing that there is an ineffective computer system does not relieve a manager of formulating

23    some policy, manual or otherwise, to deal with the problem.").

24        Similarly, as CMO of a facility with just eight doctors, Ex. C at 61:18-23, Dr. Traquina

25    would have been aware of the copious evidence of Dr. Tan's gross negligence between 2004 and

26    2006, which was recently made the basis of an action to revoke or suspend Dr. Tan's license. *See*

27    RJN Ex. 6. As the Attorney General's complaint makes clear, Dr. Tan has been accused of

28    repeatedly "fail[ing] to recognize the need[s]" of inmates, failing to obtain diagnostic testing "in a

1    timely manner," and failing to accurately document patients' conditions. *Id.* at 4:17-18, 5:10,

2    8:21-22.  Dr. Tan's failure to provide medical care for the inmate population of CSP-Solano led

3    to numerous injuries and deaths during the same period of time that he was deliberately

4    indifferent to Watson's medical needs.  *Id.*  It was Dr. Traquina's responsibility to oversee his

5    staff physicians and protect Watson and his fellow inmates from repeatedly suffering harm arising

6    from those physicians' actions.  Ex. C at 73:21-74:16.

7           **4.      Defendants' Criticism of Dr. Shefrin's Expert Opinion is Unfounded.**

8           Licensed neurologist Dr. Sandra Shefrin reviewed Watson's medical records and

9    numerous x-ray and MRI films of Watson's lumbar spine taken between 2003 and 2009.  Ex. F at

10   15:8-25, 23:1-11, 24:7-8.  Based on this comprehensive review, Dr. Shefrin opined that Watson

11   was provided "untimely and inconsistent" medical care that "resulted in worsening pain,

12   progression in his degenerative changes in the lumbar spine, and more limited mobility."  Ex. F at

13   35:10-22.  Dr. Shefrin acknowledged that degeneration can be a naturally occurring condition, but

14   opined that the severity of Watson's degenerative disc disease was "not a natural course of

15   events."  Ex. F at 44:8-24.  Dr. Shefrin opined that Watson was harmed by Defendants' failure to

16   address the possibility of surgery at an earlier time because Watson had developed "intercurrent

17   medical problems which made him a greater surgical risk."  Ex. F at 41:22-42:8.  The failure to

18   provide any physical therapy for long stretches likely resulted in more severe lower back pain and

19   further "progression of degenerative changes."  Ex. F at 43:14-16.   In short, treating Watson

20   almost exclusively with methadone and "not do[ing] anything else therapeutically . . . for much of

21   the time" was "medically unacceptable."  Ex. F at 40:9-12.

22          Defendants attempt to minimize Dr. Shefrin's unrebutted expert testimony by demanding

23   that she offer legal conclusions and contending that her opinions have no bearing on Defendants'

24   individual liability.  Neither criticism has merit.  Although Dr. Shefrin did not offer conclusions

25   about whether any particular defendant's action met a legal standard of "deliberate indifference,"

26   her opinions indisputably support that Watson had a serious medical need, that his care was

27   deficient, and that that deficiency led to unnecessary pain, an unnatural deterioration of his

28   condition, and increased surgical risk.  In other words, her opinions establish the factual

1    predicates underlying a finding of deliberate indifference.  Defendants place particular emphasis

2    on Dr. Shefrin's hesitance to render ultimate legal conclusions regarding each individual

3    defendant.  But they ignore Dr. Shefrin's straightforward explanation that she "had trouble

4    reading the signatures [in the medical records].  So I would read doctors' notes, but I was not

5    always able to indentify whose note it was. . . . So I could not attach a name to any specific

6    recommendation."  Ex. F at 48:8-13; *see also* Ex. F at 77:10-16.  Defendants, however, have

7    testified about the same medical records that Dr. Shefrin reviewed, and have established that

8    those records evidence their recommendations, deliberations, and omissions.  Dr. Shefrin need

9    not offer an opinion about each Defendants' actions when Defendants themselves have

10   authenticated the records that evidence their deliberate indifference.

11          **B.    Injunctive Relief is Necessary and Appropriate.**

12          In denying Defendants' motion to dismiss the injunctive relief claims against the official

13   capacity defendants, the Court explained that Watson's "discrete, individualized claims," such as

14   "claims that he obtain, for his individual back problems, sufficient medication, adequate physical

15   therapy, reasonable accommodations in performing institutional tasks . . ., a current surgical

16   assessment, and surgery if recommended," should proceed.  RJN Ex. 5 at 13:9-13; *accord id.* at

17   13:18-14:5.  Having failed to obtain dismissal of these claims, Defendants now contend that their

18   transfer of Watson to a different prison effectively moots his request for injunctive relief.

19   Because the change of scenery has not changed the level of care, the Court should not cut off

20   Watson's right to seek injunctive relief.

21          Since 2002, Watson had requested a transfer to CMF so that he would be able to obtain

22   appropriate medical care for his spine.  Ex. C at Ex. 55 at CSP001335.  More recently, on April 7,

23   2010, Watson advised Dr. Rohrer that he sought a transfer to CMF—the CDCR's acute care

24   hospital and correctional treatment center—so that he could receive appropriate medical

25   treatment, and that he wished to pursue pinched nerve surgery.  Ex. O.  Although his request for a

26   transfer to CMF had been denied for nine years, on February 14, 2011, this Court held that

27   Watson's injunctive relief claims could proceed.  RJN Ex. 5 at 13:9-13.  Within two months,

28   Watson was transferred, but not to CMF.  Instead, he was transferred to SATF-CSP-Corcoran in

1    approximately April 2011.  Lewis Decl. ¶¶ 3, 4.  Since being transferred to SATF-CSP-Corcoran,

2    Watson has not received physical therapy, surgery, or any treatment other than methadone.  Ex. G

3    ¶ 16.  In short, Watson still is not receiving necessary medical care.

4          Watson's injunctive relief claim seeks specific medical care and accommodation.  *See*

5    RJN Ex. 5 at 9-12.  He requests sufficient medication, adequate physical therapy, reasonable

6    accommodations in performing institutional tasks, a current surgical assessment, and surgery (as

7    recommended).  *Id.*  Defendants assert that Watson's transfer to another prison moots these

8    claims. Mot. at 14.  Because Watson still seeks, and has not received, adequate medical care and

9    accommodation, Ex. G ¶ 16, the Court should substitute the warden of SATF-CSP-Corcoran for

10   the warden of CSP-Solano as the appropriate official capacity defendant for injunctive relief.  In

11   the alternative, the Court should grant Watson leave to amend his complaint to state an injunctive

12   relief claim regarding his treatment at SATF-CSP-Corcoran.  *See Ferris v. Santa Clara County*,

13   891 F.2d 715, 718 (9th Cir. 1989) ("The trial judge has discretion to grant or deny a motion to

14   leave for amend and may even rule on such a motion following summary judgment."); *Carter v.*

15   *Department of Corrections-Santa Clara County*, No. C 09-2413, 2010 WL 2681905 (N.D. Cal.

16   July 6, 2010) (granting defendants' motion for summary judgment with leave to amend).

17         **C.    Drs. Traquina and Tan Retaliated Against Watson in Violation of His First**
             **Amendment Rights.**
18

19         There are five elements for a "viable claim of First Amendment retaliation" in the prison

20   context:  "(1) An assertion that a state actor took some adverse action against an inmate (2)

21   because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's

22   exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate

23   correctional goal."  *Rhodes v. Robinson* (*Rhodes I*), 408 F.3d 559, 567-68 (9th Cir. 2005).

24   Defendants do not dispute many of these elements, including the chilling effect of their actions or,

25   in Dr. Tan's case, the justification for the action.  Rather, they primarily contend that Watson's

26   retaliation claims arise from Dr. Traquina's and Dr. Tan's failure to give him the relief he

27   requested through the inmate grievance process, which they argue is insufficient to establish a

28   First Amendment violation.  *See* Mot. at 16:21-17:10.  Alternatively, they contend that the actions

1    taken against Watson were not adverse.  Neither argument entitles them to summary judgment.

2              **1.    Defendants' Legal Authorities Address Alleged Due Process**
3                      **Violations, Not Retaliation Claims.**

4              Defendants contend that because "[a] prisoner does not have a constitutional entitlement

5    to a specific prison grievance procedure" and his "First Amendment claim is based on Dr. Tan

6    and Traquina's failure to provide him with the relief he requested in his inmate appeals . . . his

7    First Amendment claims fails [*sic*] and summary judgment is proper."  Mot. 16:26-17:10.  The

8    legal authority they cite in support of this proposition is inapposite.  As this Court has recognized,

9    both *Ramirez v. Galaza*, 334 F.3d 850 (9th Cir. 2003), and *Mann v. Adams*, 855 F.2d 693 (9th

10   Cir. 1988), "addressed alleged *due process violations*."  *Francis*, 2011 WL 2119024, at *11

11   (emphasis added).  Those cases do not bar Watson's claims alleging violations of the First

12   Amendment right to freedom of speech.

13             *Wright v. Shannon*, No. 1:05-cv-10485-LJO-YNP, 2010 WL 445203, at *5 (E.D. Cal.

14   Feb. 2, 2010), ignores this distinction and provides no explanation for why those authorities

15   would govern a First Amendment claim.  They do not.  The analysis in both cases is predicated

16   on whether a defendant has a constitutional right to specific *procedures*,  a consideration foreign

17   to First Amendment claims.  *See Ramirez*, 334 F.3d at 860-61; *Mann* 855 F.2d at 640.  *Wright* is

18   neither mandatory nor persuasive precedent and should be ignored.

19             Even if *Mann* and *Ramirez* did apply to retaliation claims, Defendants could not prevail on

20   that basis because Watson's claims do not arise from a failure to provide the relief requested in an

21   inmate appeal.  Rather, Watson contends that Drs. Traquina and Tan retaliated against Watson for

22   actions taken in connection with *this litigation*.  The Court already has recognized that Watson is

23   entitled to assert these claims.  RJN Ex. 5 (Watson may maintain his claims "that each defendant

24   made retaliatory decisions against [him] *after* he initiated this action," which constitute

25   "'subsequent developments in his case'") (quoting *Rhodes v. Robinson* (*Rhodes II*), 621 F.3d

26   1002, 1106 (9th Cir. 2010)).  As explained below, there are numerous factual disputes as to

27   whether Drs. Traquina and Tan took unjustified adverse actions against Watson because of his

28   litigation activities.

1

**2.    Dr. Traquina Withdrew Watson's Chrono Because Watson Sought Injunctive Relief in This Action.**

2

3        Watson's retaliation claim against Dr. Traquina is well documented.  Although Watson

4    had long held chronos directing staff not to subject him to "[p]rolonged standing/walking/sitting

5    longer than 30 minutes at a time," *see, e.g.*, Ex. C at Ex. 69 at CSP001255 (chrono from 2003);

6    Ex. C at Ex. 82 (chrono from June 25, 2008 which also permitted him to "[g]et narcotic after his

7    insulin" to shorten his wait time for medication), the CSP-Solano medical staff continued to

8    require Watson to wait up to an hour for his medication, Ex. D at 46:20-48:1; RJN Ex. 2.  When

9    Watson moved for injunctive relief relating to these actions, the Court ordered Defendants to file

10   "a declaration by defendant Dr. Traquina indicating whether or not plaintiff is indeed subjected to

11   a 40-minute delay when awaiting his prescribed pain relief, and if he is, whether such a delay is

12   warranted in light of plaintiff's claims of unnecessarily suffering excruciating pain because of the

13   delay."  RJN Ex. 3 at 3.  Dr. Traquina responded by asserting that he "updated plaintiff's medical

14   file," including his chrono, to remove the prohibition on sitting for more than 30 minutes and to

15   delete the instruction for Watson to get his narcotics after his insulin.  RJN Ex. 4 at 1-2.  To

16   justify his downgrading of Watson's chrono, Dr. Traquina placed a note in Watson's file by

17   misstating that Watson had "mild," rather than "severe," degenerative disc disease.  *Compare* Ex.

18   C at Ex. 83, *with* Ex. C at Ex. 67 at p. 9; Ex. A at Ex. 24 at CSP000780; Ex. C at Ex. 74.

19       Defendants' argument for summary judgment on this claim boils down to assertions that

20   Dr. Traquina's revision of Watson's chrono was not a response to Watson's motion for injunctive

21   relief, and that the revision was medically appropriate.  Mot. at 17.  The first assertion completely

22   ignores the chronology of events—(1) Watson moves for injunctive relief in August, (2) the Court

23   orders Dr. Traquina to address Watson's contentions in September, (3) Dr. Traquina alters

24   Watson's chrono on October 9, and (4) Dr. Traquina files a declaration with the Court stating that

25   he altered Watson's chrono on October 16.  This sequence of events belies Dr. Traquina's bare

26   assertion that he did not review the chrono at the Court's request, particularly given that the facts

27   must be interpreted in the light most favorable to Watson as the non-moving party on this motion.

28       The second assertion—that Dr. Traquina's actions were medically appropriate—conflicts

1  with the record. As Watson explained at his deposition, he received a twice-daily finger-stick test

2  to check his blood sugar levels and, depending on those levels, often received insulin injections.

3  Ex. D at 71:17-72:8, 97:5-100:11. Defendants have not provided any evidence to dispute this.

4  Moreover, the claim that forcing Watson to wait an hour for his medication was not harmful is

5  based on Dr. Traquina's circular reasoning that sitting for 30 minutes could not have been

6  harmful to Watson because otherwise he would be in a hospital, not at CSP-Solano. Ex. C at

7  239:11-240:9. It is undisputed that Watson experienced excruciating pain if he was required to sit

8  for too long, RJN Ex. 2 at Ex. A; Ex. O (spinal surgeon Dr. Mummaneni finding that Watson

9  "cannot sit for longer than 10-15 min"), and that physicians had long noted his clear discomfort

10  while sitting and issued chronos accordingly, Ex. B at 30; Ex. B at 62:15-21; Ex. C at Ex. 82.

11      Defendants cannot establish as a matter of law that Dr. Traquina's actions were medically

12  appropriate simply because Dr. Traquina says so. *Cf. Williams*, 2008 WL 508073, at *12 ("[A]

13  federal court is not required to blindly defer to the judgment of prison doctors or administrators in

14  determining whether there has been deliberate indifference to an inmate's serious medical

15  needs."). In fact, Dr. Traquina's misrepresentation of Watson's condition as "mild" rather than

16  "severe," Ex. C at Ex. 83, is further reason to call into question Dr. Traquina's opinion as to

17  medical necessity. *See Ulrich v. City & County of San Francisco*, 308 F.3d 968, 979 (9th Cir.

18  2002) (identifying as evidence of motive "evidence that reasons proffered by the [defendant] for

19  the adverse . . . action were false and pretextual," and the "proximity in time between the

20  protected speech and the alleged retaliation") (citation omitted).

21      Finally, Defendants do not dispute that Dr. Traquina's actions chilled Watson's First

22  Amendment rights because, at a bare minimum, there is a dispute as to whether he suffered direct

23  and tangible harm (the downgrading of his medical care), which would be sufficient to establish a

24  First Amendment retaliation claim. *See Rhodes I*, 408 F.3d at 568 n.11 ("harm that is more than

25  minimal will almost always have a chilling effect"); *accord* RJN Ex. 5.

26      **3.      Dr. Tan Reduced Watson's Methadone Dosage as a Result of Watson's
                  Filing of This Complaint.**

27  To support the motion for summary judgment on the retaliation claim against Dr. Tan,

28

1    Defendants' rely on five purportedly undisputed issues of fact. All are disputed. First, Watson's

2    suit was filed on August 28, 2007, not on September 10, 2007. RJN Ex. 1 at 5. Defendants rely

3    not on the date the action was filed, but on the date the action was transferred to the Eastern

4    District from the Northern District. *See* UMF 166. The remaining four "facts" all rely on Dr.

5    Tan's disputed recollection of the events leading to the undisputed reduction in Watson's

6    methadone on September 5, 2007. *See* UMFs 167-170. It is undisputed that Watson's methadone

7    prescription was reduced to 20 milligrams twice a day on September 5. Ex. B at Ex. 51 at

8    CSP001082. And, Dr. Tan concedes that he expressly ordered that Watson's methadone was not

9    to be renewed after his 30-day renewal on September 5. Ex. B at 102:21-103:17. Dr. Tan merely

10   argues that he ordered a renewal at 30 milligrams, but that his order was mistakenly transcribed as

11   20 milligrams when it was entered into the system.

12        To support his theory, he relies exclusively on his scribbled physician's order. Defs.' Ex.

13   B at Ex. 48. But that order is far from dispositive. It is open to interpretation whether Dr. Tan

14   ordered a methadone renewal at "20 mg BID" or "30 mg BID." Dr. Tan's interpretation is further

15   thrown into doubt by the notation "30 day" immediately following that order. The "30" in that

16   phrase appears distinctly different from the number preceding "mg BID." In essence, Dr. Tan

17   asks the Court to draw all inferences that may be drawn from the evidence in favor of him. That

18   is not the rule on summary judgment. *See Matsushita*, 475 U.S. at 587 (1986).

19        Viewing the physician's order alongside the unambiguous pharmacy records (which

20   reduced Watson's prescription to twenty milligrams) and Dr. Tan's unambiguous order that

21   Watson's methadone prescription was not to be renewed after the September 5, 2007 reduction, a

22   jury could reasonably conclude that Dr. Tan took an adverse action against Watson because of his

23   recently-filed complaint. Once again, Defendants do not dispute that Dr. Tan's actions chilled

24   Watson's First Amendment rights, and the direct and tangible harm he suffered as a result of

25   being a lower dosage of methadone for a month is sufficient to establish his retaliation claim. *See*

26   *Rhodes I*, 408 F.3d at 568 n.11 ("harm that is more than minimal will almost always have a

27   chilling effect"); *accord* RJN Ex. 5 at 23:17-23.

28

**PL.'S OPP. TO DEFS.' MSJ**
CIV S-07-1871 LKK KJN P

1

**IV.    CONCLUSION**

2          For the reasons stated, the Court should deny Defendants' motion for summary judgment

3    with respect to the Eighth and First Amendment claims against Drs. Traquina, Tan, and Rohrer.

4    In addition, the Court should substitute the warden of SATF-CSP-Corcoran for the warden of

5    CSP-Solano as the official capacity defendant for the injunctive relief claim or grant Watson

6    leave to amend his complaint to replead his injunctive relief claim in light of his transfer.

7    Dated: September 15, 2011                    Respectfully submitted,

8                                                 JONES DAY

9
                                                 By:  /s/ Matthew J. Silveira
10                                                     Matthew J. Silveira

11                                               Attorneys for Plaintiff
                                                 NYLES LAWAYNE WATSON
12

13   SFI-710312v4

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PL.'S OPP. TO DEFS.' MSJ**
CIV S-07-1871 LKK KJN P