1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   NYLES LAWAYNE WATSON,

11            Plaintiff,              No. 2:07-cv-01871 LKK KJN P

12       vs.

13   D.K. SISTO et al.,               <u>ORDER</u> and

14            Defendants.             <u>FINDINGS AND RECOMMENDATIONS</u>

15   _____/

16   I.  <u>Introduction</u>

17            Plaintiff is a state prisoner proceeding in forma pauperis, with appointed counsel,

18   in this civil rights action filed pursuant to 42 U.S.C. § 1983.  Pending is defendants' motion for

19   summary judgment, filed August 16, 2011.  Plaintiff filed an opposition, and defendants filed a

20   reply.  The motion was heard before this court on September 29, 2011.  Plaintiff was represented

21   by attorney Matthew J. Silveira; defendants were represented by Deputy Attorney General

22   Catherine Woodbridge Guess.  For the reasons set forth below, this court recommends that

23   defendants' motion for summary judgment be granted.

24   II.  <u>Background</u>

25            Plaintiff initiated this action on August 28, 2007 (Dkt. No. 1), which now

26   proceeds on plaintiff's First Amended Complaint, filed June 15, 2009 (Dkt. No. 65).  At all

1 relevant times, plaintiff was incarcerated under the authority of the California Department of

2 Corrections and Rehabilitation ("CDCR"), at California State Prison-Solano ("CSP-S").  Plaintiff

3 is presently incarcerated at the California Substance Abuse and Treatment Facility ("CSATF"), in

4 Corcoran, California, where he was transferred on April 13, 2011.

5        On March 30, 2011, this court granted in part, and denied in part, defendants'

6 motion to dismiss this action.  (Dkt. Nos. 96, 98.)  The court dismissed defendants CDCR and

7 CSP-S, and plaintiff's claims pursuant to the Americans with Disabilities Act and the

8 Rehabilitation Act.  As a result, this action proceeds on:  (1) plaintiff's Eighth Amendment

9 claims that defendant physicians Traquina, Tan and Rohrer were deliberately indifferent to

10 plaintiff's serious medical needs; (2) plaintiff's First Amendment retaliation claims against

11 defendants Tan and Traquina; and (3) plaintiff's claim for injunctive relief against all

12 defendants.[1]

13 III.  Legal Standards for Summary Judgment

14        Summary judgment is appropriate when it is demonstrated that the standard set

15 forth in Federal Rule of Civil Procedure 56(c) is met.  "The judgment sought should be rendered

16 if . . . there is no genuine issue as to any material fact, and . . . the movant is entitled to judgment

17 as a matter of law."  Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears
> the initial responsibility of informing the district court of the basis
> for its motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any," which it believes demonstrate
> the absence of a genuine issue of material fact.

---

[1]  Each of these claims proceeds against each defendant in both their individual and official capacities, with the exception of the CSP-S Warden, who proceeds only in his official capacity.  (See Dkt. No. 96 at 20.)  Although former CSP-S Warden D. K. Sisto is the named defendant, he retired in January 2008, when Gary Swarthout assumed Sisto's position.  As the court previously found, "Sisto's successor as CSP-S Warden is automatically substituted as a defendant in this action for purposes of obtaining injunctive relief.  See Fed. R. Civ. P. 25(d)(1) (successor of public officer defendant named in his official capacity is automatically substituted as a party)."  (Id.)  Thus, Warden Swarthout is substituted for defendant Sisto, and proceeds as a defendant in this action in his official capacity only.

1

2   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), quoting Federal Rule of Civil Procedure

3   56(c).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue,

4   a summary judgment motion may properly be made in reliance solely on the 'pleadings,

5   depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment

6   should be entered, after adequate time for discovery and upon motion, against a party who fails to

7   make a showing sufficient to establish the existence of an element essential to that party's case,

8   and on which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of

9   proof concerning an essential element of the nonmoving party's case necessarily renders all other

10  facts immaterial."  Id. at 323.  In such a circumstance, summary judgment should be granted, "so

11  long as whatever is before the district court demonstrates that the standard for entry of summary

12  judgment, as set forth in Rule 56(c), is satisfied."  Id.

13          If the moving party meets its initial responsibility, the burden then shifts to the

14  opposing party to establish that a genuine issue as to any material fact actually exists.  See

15  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting

16  to establish the existence of this factual dispute, the opposing party may not rely upon the

17  allegations or denials of its pleadings but is required to tender evidence of specific facts in the

18  form of affidavits, and/or admissible discovery material, in support of its contention that the

19  dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586, n.11.  The opposing party

20  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

21  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

22  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

23  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

24  return a verdict for the nonmoving party, see Anderson, 477 U.S. at 248; T.W. Elec. Serv., 809

25  F.2d at 631.

26          In the endeavor to establish the existence of a factual dispute, the opposing party

1    need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

2    claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

3    versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

4    judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

5    genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e), Advisory

6    Committee's note on 1963 amendments).

7            In resolving the summary judgment motion, the court examines the pleadings,

8    depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

9    any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed. Anderson, 477

10   U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court

11   must be drawn in favor of the opposing party. Matsushita, 475 U.S. at 587.  Nevertheless,

12   inferences are not drawn out of the air, and it is the opposing party's obligation to produce a

13   factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602

14   F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

15   demonstrate a genuine issue, the opposing party "must do more than simply show that there is

16   some metaphysical doubt as to the material facts . . .  Where the record taken as a whole could

17   not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

18   trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

19           On January 17, 2008, the court advised plaintiff of the requirements for opposing

20   a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 7.)  See Rand v.

21   Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc),  cert. denied, 527 U.S. 1035 (1999), and

22   Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

23   IV.  Evidentiary Challenges

24           In addition to contesting the parties' respective requests for judicial notice (see

25   Plaintiff's Request for Judicial Notice (Dkt. No. 110); and Defendants' Request for Judicial

26   Notice (Dkt. No. 106-2)), the parties have interposed several objections to the evidence relied

1   upon by opposing counsel (see Plaintiff's Objections to Evidence (Dkt. No. 112); Defendants'

2   Response to Plaintiff's Objections to Evidence (Dkt. No. 113-2); Defendants' Objections to

3   Plaintiff's Evidence (Dkt. No. 113-3); and Plaintiff's Responses to Defendants' Objections to

4   Plaintiff's Evidence (Dkt. No. 114)).  The court makes the following orders:

5           1.  Plaintiff's request is granted that the court take judicial notice of the following

6   documents filed in this action – the original complaint (Dkt. No. 1); plaintiff's motion for

7   preliminary injunctive relief (Dkt. No. 24); defendants' opposition thereto (Dkt. No. 26); the

8   declaration of defendant Traquina filed in support of defendants' opposition to plaintiff's motion

9   for preliminary injunctive relief (Dkt. No. 43); and the court's Amended Findings and

10  Recommendations filed February 4, 2011 (Dkt. No. 96).[2]  In addition, the court grants

11  defendants' request to take judicial notice of the court's order directing defendant Traquina to

12  file a declaration in support of defendants' opposition to plaintiff's motion for preliminary

13  injunctive relief (Dkt. No. 40) and, also requested by plaintiff, defendant Traquina's responsive

14  declaration (Dkt. No. 43).  These documents are generally noticed for their existence, but not for

15  the truth of the matters stated therein.  See MGIC Indem. Corp. v. Weisman, 803 F.2d 500, 504

16  (9th Cir. 1986); Fed. R. Evid. 201(b) (judicial notice of court records); Fed. R. Evid. 803(8)

17  (public record exception to hearsay rule).  An exception is defendant Traquina's declaration,

18  made under penalty of perjury, which is noticed as an affidavit of asserted facts pertinent to both

19  plaintiff's motion for preliminary injunctive relief and defendants' motion for summary

20  judgment.  Fed. R. Civ. P. 56(c)(4); see also Fed. R. Evid. 803(4) (medical diagnosis exception to

21  hearsay rule).  To the extent that the court has made prior relevant factual findings in these

22  noticed documents, it abides by those findings.

23          2.  Plaintiff's request that the court take judicial notice of an "Accusation" against

24  defendant Tan, made before the Medical Board of California, Department of Consumer Affairs,

25

26      [2]  However, the undersigned notes that it is not necessary to request "judicial notice" of
    pleadings filed in the same case.

1   on April 6, 2011 (see Dkt. No. 110 at 2;[3] Exh. 6), is denied.  This document requests a hearing

2   before the Medical Board to consider the proposed discipline of defendant Tan for alleged

3   negligence in providing care to seven CSP-S inmate patients during the relevant period.  None of

4   the anonymously-identified patients appears to be plaintiff, and plaintiff does not assert that he is

5   one of these patients.  The court concludes that this document has no relevance to defendant

6   Tan's role in plaintiff's care, nor to the supervision of Tan by defendant Traquina relative to

7   plaintiff's care.  See Fed. R. Civ. P. 26(b)(1) (setting forth relevance parameters).

8           3.  Defendants' objection to the admissibility of plaintiff's several administrative

9   appeals and additional communications with defendant Traquina, on the ground that the

10  statements contained therein are hearsay under Federal Rule of Evidence 802, is overruled.

11  Plaintiff's numerous appeals are admitted for the purpose of ascertaining the timing and content

12  of plaintiff's statements and requests at these various intervals, as well as defendants' awareness

13  of plaintiff's concerns, and the timing and nature of defendants' responses.  See Fed. R. Evid.

14  801(d) (prior statements of witness and party-opponents not hearsay); see also Fed. R. Evid.

15  803(3) (statement of existing mental, emotional or physical condition exception to hearsay rule),

16  803(4) (medical diagnosis and treatment exception to hearsay rule), 803(5) (recorded recollection

17  exception to hearsay rule); see also U.S. v. Chavis, 772 F.2d 100, 105 (5th Cir. 1985) (affirming

18  admission of records "to show that defendants were notified of the complaints," not for the truth

19  of the statements contained in the complaints); U.S. v. Cantu, 876 F.2d 1134, 1137 (5th Cir.

20  1989) (reversing trial court's exclusion of witness statements admitted solely for the purpose of

21  demonstrating that the statements were made, not for their truth, explaining that "[t]he statements

22  were not offered as an assertion of a fact but, rather, as the fact of an assertion").

23          4.  Defendants' objection to the admissibility of a September 14, 2005 letter to

24  plaintiff, from Dr. Renee Kanan, Director of CDCR's Division of Correctional Health Care

25

26      [3]  Citations to the record reflect the court's electronic pagination.

1   Services (Dkt. No. 109-15 at 10-11 (Pltf. Exh. N)), is overruled.  While the letter does not

2   directly reference any defendant physician, copies of the letter were sent to the CSP-S Warden

3   and the CSP-S Health Care Manager.  As with plaintiff's appeals and responses thereto, Dr.

4   Kanan's letter is probative as to the timing and content of plaintiff's stated concerns, and

5   defendants' awareness of, and responses to, those concerns.  See U.S. v. Chavis, supra, 772 F.2d

6   at 105; U.S. v. Cantu, supra, 876 F.2d at 1137.

7          5. Plaintiff's objections to the admissibility of several statements made by each of

8   the medical defendants in their respective declarations filed in support of defendants' motion for

9   summary judgment (See Dkt. No. 112), are overruled.  The opinions of each medical defendant,

10  set forth in their respective sworn statements (as well as in their deposition testimony), are

11  relevant to defendants' subjective intent, and therefore to the court's assessment of plaintiff's

12  deliberate indifference and retaliation claims.  The court may not, on a motion for summary

13  judgment, assess the credibility of these witnesses, but is instead required to accept the

14  representations of each defendant, made under penalty of perjury, that their respective affidavit is

15  "made on personal knowledge," Fed. R. Civ. P. 56(c)(4).  However, the court need not accept

16  such representations where they appear to be unsupported or inadequately addressed.  Fed. R.

17  Civ. P. 56(c)(2) and (e)(2).

18         Finally, the court notes that plaintiff's complaint, filed by appointed counsel, is

19  not verified, and therefore may not be considered as evidence for purposes of summary

20  judgment.  Cf. Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004) (allegations contained in a pro

21  se plaintiff's verified pleading must be considered as evidence on a motion for summary

22  judgment).

23  V.  Undisputed Facts

24         The following facts are either undisputed by the parties or, following the court's

25  review of the evidence, subject to the qualifications noted above, have been deemed undisputed

26  ////

1    for purposes of the pending motion.[4]

2         1.  Plaintiff was transferred to CSP-S, from CSP-Sacramento, in 2001.

3         2.  At all times relevant to this action, defendant physicians Jason Rohrer, Richard

4    Tan, and Alvaro Traquina were employed as medical doctors at CSP-S.  Defendant Traquina

5    became the Chief Medical Officer ("CMO") at CSP-S on March 12, 2003.

6         3.  At all relevant times, plaintiff had degenerative disc disease, which is an

7    arthritic process in the spine by which the vertebral discs wear down and lose fluid.  This

8    condition reduces the ability of the discs to act as shock absorbers and makes them less flexible.

9    The loss of fluid also makes the discs thinner and narrows the distance between the vertebrae.  In

10   addition, tiny tears or cracks in the outer layer (annulus or capsule) of the disc may result, and the

11   jellylike material inside the disc (nucleus) may be forced out through these tears or cracks, which

12   causes the disc to bulge, break open (rupture), or break into fragments.

13        4.  Treatment for degenerative disc disease includes pain medication, epidural

14   injections, use of a Trans Electrical Nerve Stimulation ("TENS") unit, physical therapy, and

15   surgery; surgical results for degenerative disc disease are inconsistent.

16        5.  At all times relevant to plaintiff's incarceration at CSP-S, the Medical

17   Authorization Review Committee ("MARC") was responsible for approving referrals to outside

18   medical specialists.  Referrals that met "InterQual criteria" could be approved by the Utilization

19   Management Nurse ("UM Nurse"), while referrals that did not meet "InterQual criteria" had to

20   be submitted to the MARC for approval.

21        6.  Plaintiff filed his first relevant inmate appeal[5] at CSP-S on September 24, 2002

22

23   _____

     [4]  Citations to the record are provided to the extent that the court relies on evidence that is
     supplemental to that cited, and agreed upon, by the parties.

24

25   [5]  Plaintiff's inmate appeals are referenced interchangeably as "appeals," "administrative
     grievances" and "602s" (derived from CDCR Form 602).  Additionally, the court does not
     distinguish between appeals that were initiated on a CDCR Form 602, or pursuant to a CDC
26   Form 7362 Health Services Request Form, provided the request was ultimately processed as a

8

(Log No. 02-1851), wherein he stated that he had experienced low back pain since sustaining a fall in 1998; that he had been issued a back brace that was taken away during a cell search at CSP-S; that he could not walk more than 100 feet, or sit more than 20 minutes, without pain; that he could not bend over without excruciating pain; and that the muscle relaxers and pain medication given plaintiff on September 21, 2002,  were helping "very little."  (Dkt. No. 109-8 at 17-21.)  Plaintiff requested that he:  "(1) . . . be given a back brace, (2) have a specialist prescribe the proper therapeutic treatment and/or surgery, [and] (3) be transferred to a facility that specialize[s] in treatment of lower back pain [such] as CMF [California Medical Facility]."  (Id. at 19.)  At the Informal Level Review, CSP-S physician Dr. Obedoza noted that plaintiff had been "seen on 9/23/02 [the previous day] for the same problem that you filed your 602 on," had been prescribed "proper medications," and was scheduled for a follow-up appointment in two weeks.

        7.  On October 23, 2002, defendant Traquina "partially granted" plaintiff's appeal (Log No. 02-1851) at the First Level Review, on the ground that plaintiff's medical issues had been addressed to his satisfaction by the treatment plan recommended by Dr. Traquina. Treatment notes for that date indicate that Dr. Traquina examined plaintiff's back, obtained an x-ray of plaintiff's lumbar spine that revealed "minimal degenerative changes with small osteophytes," and diagnosed low back pain due to degenerative disc disease.  Dr. Traquina prescribed a muscle relaxant, anti-inflammatory medication, and a back brace; he restricted plaintiff from work for 29 days, and referred plaintiff for an orthopedic consultation.  (Traquina Depo. at 113-15, 135-6; Exh. 53 at 4, 6; Exh. 56.)  At the Second Level Review, issued November 4, 2002, plaintiff's appeal was "partially granted" on the ground that plaintiff had obtained a referral to a specialist and been "issued a chrono for a 29-day lay-in."  Plaintiff was also provided another back brace.  (See Plaintiff's Exh. 109-8 at 17-22; Traquina Depo., Exh.

---

"602 appeal."

1    55.)  It appears that plaintiff did not further pursue this appeal.

2          8.  On November 30, 2002, pursuant to Dr. Traquina's October 23, 2002 referral,

3    plaintiff was seen by orthopedist Dr. Kofoed.  Based on plaintiff's October 2002 x-rays, Dr.

4    Kofoed diagnosed, at L5-S1, "grade 1-2 spondylolisthesis with arthritis degenerative disc

5    disease."  Dr. Kofoed referred plaintiff for a lumbar MRI and prescribed methadone to treat

6    plaintiff's pain; Dr. Kofoed was the first doctor to prescribe methadone to plaintiff.  Dr. Kofoed

7    noted that plaintiff wore a "corset."  (Traquina Depo., Exh. 53 at 7; Exh. 54 at 5; Exh. 57.)

8          9.  On January 7, 2003, Dr. Traquina again saw plaintiff, who complained of back

9    pain with radiating pain to the left leg.  Plaintiff's methadone prescription and work release

10   chrono had been renewed in December by CSP-S physician Dr. Obedoza.  On examination, Dr.

11   Traquina noted that plaintiff's lumbar range of motion was decreased from the previous exam.

12   Dr. Traquina diagnosed chronic back pain with radiculopathy on the left.  While noting that

13   plaintiff was able to "walk more than 200 yards without assistance" and "denies leg claudication

14   on distance," Dr. Traquina placed plaintiff on light duty for 90 days, and instructed plaintiff on

15   back exercises.  Dr. Traquina noted that an MRI was pending, and referred plaintiff for an

16   "EMG/NCS" [electromagnetic/nerve conduction study] and a neurology consultation.  (Traquina

17   Depo. at 116-17; Exh. 53 at 6, 8; Exh. 58.)

18         10.  On January 28, 2003, pursuant to Dr. Traquina's January 7, 2003 referral,

19   plaintiff was seen by neurologist Dr. Mitchell, who noted that plaintiff wore a corset, took

20   methadone for pain, and was awaiting an MRI ordered by Dr. Kofoed.  Dr. Mitchell diagnosed

21   "chronic LBP [low back pain] r/o [rule out] specific radiculopathy," based on plaintiff's EMG

22   results that revealed "non-specific nerve conduction abnormalities suggestive of proximal

23   sciatica vs. S1 root irritation.  However, unable to confirm specific radiculopathy on EMG. . .

24   lumbar MRI pending."  (Traquina Depo. at 139-41; Exh. 58 at 1-2.)

25         11.  Pursuant to Dr. Kofoed's November 30, 2002 referral, plaintiff obtained a

26   lumbar MRI on February 24, 2003, which revealed the following (Traquina Depo., Exh. 59 at 2;

Exh. 67 at 6):

1. Mild spondylitic changes primarily at L5-S1 and minimally at L4-5.
2. Small posterior central annular tear at L4-5.
3. Small left neural foraminal/paracentral disk protrusion at L4-5.
4. Moderate-sized, broad-based, predominately posterior central/left paracentral disk protrusion at L5-S1 with narrowing of the lateral recess on the left.

12. On March 12, 2003, Dr. Traquina became the CMO at CSP-S.

13. On March 15, 2003, plaintiff again saw orthopedist Dr. Kofoed, who referred plaintiff for a neurosurgical evaluation "to see if pt. is surgical candidate." (Traquina Depo., Exh. 64.) The referral was authorized by the MU Nurse on August 12, 2003. (Id.)

14. On April 27, 2003, plaintiff completed an "Inmate Request for Interview," requesting an interview with CMO Traquina, in which he stated that "I am bring[ing] to your attention an issue that may reach your office by a 602 appeal. I've had an MRI and found that my back pain is do (sic) because of a bulge and tear in two different disks in my spine!" (Dkt. No. 109-15 at 1 (Pltf. Exh. K).) Plaintiff stated that his "light duty chrono" had not accompanied his transfer to a new yard and, as a result, "doctors on this yard . . . will not medically unassign me, for 30 to 60 days so I can be seen by the spine specialist in hopes of getting back surgery!" (Id. at 2.) Plaintiff requested that Dr. Traquina "notify one of the doctors on this yard to give me the proper documentation . . . so [my counselor] can medically unassign me until I've been seen by the spine specialist and/or until after the back surgery!" (Id.)

15. On May 28, 2003, Dr. Traquina responded as follows to plaintiff's April 27, 2003 "Request for Interview" (Dkt. No. 109-15 at 1):

Mr. Watson: So far you got evaluations by orthopedist, neurologist, and primary care physician. You need to be seen by a neurosurgeon and Dr. Toppenberg will make the referral today. All the necessary [tests] (MRI, nerve conduction studies and x-rays) are done.

16. On October 22 and 23, 2003, in response to an October 19, 2003 letter from

11

1  plaintiff requesting that he be given a "no get down chrono" (because his "mobility vest" was not

2  sufficient to deter "get down" orders by correctional officers), CMO Dr. Traquina asked Dr.

3  Toppenberg to review plaintiff's medical history and issue any appropriate chronos.  (Traquina

4  Depo, Exh. 60.)  Dr. Toppenberg issued the requested "no get down chrono," signed by Dr. Tan,

5  who added that the chrono was to remain in effect for plaintiff's "[l]ength of stay at CSP-Solano

6  until surgical correction done."  (Id., Exh. 61; Tan Depo. at 59-60, Exh. 29.)  Dr. Traquina

7  approved the chrono on November 6, 2003.  (Id.)

8          17.  Plaintiff also stated in his October 19, 2003 letter to CMO Traquina that he

9  had been waiting four months to see a spine specialist, pursuant to Dr. Kofoed's referral.

10  (Traquina Depo., Exh. 60, at 3.)

11          18.  On November 24, 2003, plaintiff saw Dr. Tan, apparently for the first time,

12  for complaints, inter alia, of chronic low back pain.  Dr. Tan noted that plaintiff had been referred

13  for a surgical consultation by Dr. Kofoed on March 15, 2003 (authorized on August 12, 2003),

14  and that plaintiff's most recent lumbar MRI had been conducted in February 2003.  Dr. Tan

15  continued plaintiff on methadone, and thereafter called the UM Nurse, who stated that a new

16  MRI would need to be conducted before the consultation proceeded, which she would arrange as

17  soon as possible.  Dr. Tan requested the new MRI, and that the consultation be expedited.  (Tan

18  Depo. at 61-73; Exhs. 30, 31.)  UM records indicate that expedition of plaintiff's neurosurgical

19  consultation was requested on November 26, 2003, and a new MRI ordered on the same date; the

20  referral was reprocessed and re-authorized on December 1, 2003.[6]  (Traquina Depo., Exhs. 64,

21  65; Tan Depo, Exhs. 31, 32.)

22

23          [6] Plaintiff argues that he had to wait more than a year to obtain the MRI that Dr. Kofoed
    ordered on November 30, 2002.  (See e.g. Tan Depo. at 68.)  However, while Dr. Kofoed's

24  November 2002 request served as a basis for obtaining plaintiff's April 2004 MRI (see e.g. Tan
    Depo., Exh. 31; Traquina Depo., Exh. 57), plaintiff obtained another MRI in the interim, on

25  February 24, 2003, also pursuant to Dr. Kofoed's November 2002 request (Tan Depo., Exh. 32;
    Traquina Depo., Exh. 59 at 2; Exh. 67 at 6.)  The year-long delay was not in obtaining an MRI,

26  but in obtaining a neurosurgical consultation supported by a recent MRI.

19.  On April 7, 2004, plaintiff obtained a second MRI, with the following results (Tan Depo., Exh. 32; Traquina Depo., Exh. 66 at 1-2):

1.  Spondylitic changes primarily at L5-S1.
2.  Broad-based posterior central disc protrusion at L5-S1.
3.  Bilateral neural foraminal narrowing at L4-5 and L5-S1.
4.  Additional small bilateral neural foraminal disc protrusions at L4-5.
5.  Facet joint arthropathy at L4-5 and L5-S1.

20.  Plaintiff had four sessions of physical therapy in May and June 2004.  (Dkt. No. 109-14 at 3-4 (Pltf. Exh. H).)  Pursuant to plaintiff's initial evaluation, the therapist established goals of reduced pain and implementation of a home exercise program; he opined that plaintiff had "good" motivation and that his rehabilitative prospects were "good."  (Id. at 4.) The physical therapist met with plaintiff three more times, and discharged him with a notation that plaintiff was doing "well," that his range of motion was increasing "to near normal," and that he was "encouraged to continue back exercises" as directed.  (Id. at 3.)  Plaintiff reported his pain level, both at the commencement of physical therapy, and at its conclusion, as "3 out of 10" (on an ascending scale, with "0" being "no pain").  (Id.)

21.  On August 16, 2004, more than one year after Dr. Kofoed's March 15, 2003 referral of plaintiff to a neurosurgeon,[7] and utilizing the results of plaintiff's February 2003 MRI (not his more recent April 2004 MRI), plaintiff was evaluated by Dr. Farr, a spinal surgeon at Manteca Hospital, who diagnosed degenerative disc disease at L4-5 (degenerative disc with "a bulge") and at L5-S1 ("severe degenerative changes with edema at the end plate").  Dr. Farr opined as follows:

> At this point, I feel we should start with the pain management, consider epidural injection.  If he still continues to have pain without any improvement from lumbar epidural injection, I will

---

[7]  Plaintiff argues that the operative referral to Dr. Farr was made by Dr. Kofoed on November 2002.  (Traquina Depo. at 174-5, 183-4.)  However, Dr. Kofoed referred plaintiff for an MRI in November 2002 (Traquina Depo., Exh. 57), and for a neurosurgical consultation in March 2003 (id., Exh. 64; Tan Depo., Exh. 32).

consider getting a discogram at L3-4, L4-5, and L5-S1 level.  I also
feel that patient should start wearing good supportive shoes.  I will
see him back after he has his lumbar epidural injection and
discogram if he is not getting better.

(Dkt. No. 109-10 at 8 (Aug. 16, 2004 report of Dr. Farr); see also Traquina Depo., Exh. 67 at 7;

Tan Depo. at 79-80, Exh. 34 at 7.)

22.   During the period between plaintiff's November 2003 appointment with Dr.

Tan, and his August 2004 consultation with Dr. Farr (during which plaintiff had his second MRI

and four sessions of physical therapy), plaintiff filed two more inmate appeals.  In the first of

these appeals (plaintiff's second relevant appeal), filed February 19, 2004 (Log No. 04-0830),

plaintiff stated that he was "pending spinal surgery," was in constant pain, his equilibrium was

unstable and he had nearly fallen three times.  (Pltf. Exh. 109-9 at 12-19.)  Plaintiff sought the

following relief:  "(1) to be issued a walking cane, (2) given the opportunity to be interview[ed]

by the therapist who will be giving me lower back therapy, [and] (3) because of Dr. Chen's lack

of proper treatment to be allowed to be seen by Dr. Solomon."  (Id. at 13.)  At the Informal Level

Review, Dr. Chen granted plaintiff's requests for a cane and physical therapy, but denied

plaintiff's request to be seen by Dr. Solomon, because he worked at a satellite clinic.  (Id.)  At the

First Level Review, issued April 1, 2004, Dr. Noriega "partially granted" the appeal on the

ground that plaintiff had been found disabled ("permanently mobility impaired"), and hence, "[a]

cane chrono was issued on March 8, 2004, and you received your walking cane on March 24,

2004.  [¶ ]  You have been referred to physical therapy and sessions will start in the very near

future."  (Id. at 18.)  At the Second Level Review, issued May 20, 2004, CMO Traquina

"partially granted" plaintiff's appeal, noting in pertinent part that "you will be seen by the

Physical Therapist on May 24, 2004."  (Id. at 12.)  It appears that plaintiff did not further pursue

this administrative appeal.

23.   In his third relevant appeal, filed April 28, 2004 (Log No. 04-1511), plaintiff

complained that his medical condition had been ignored by medical staff for more than eight

14

months.  (Traquina Depo., Exh. 63, at 3.)  Plaintiff sought physical therapy; a "proper modern back brace;" a "therapeutic pillow and full mattress with therapeutic cones;" to be accorded "schedul[ing] on an urgent and routine basis;" and compensation.  (Id.)  The grievance was "partially granted" at the First Level Review, because plaintiff had already been provided back and wrist braces, he was prescribed methadone and also took naprosyn, and he was scheduled for a neurological consultation.  (Id. at 9.)  Plaintiff's request for a therapeutic mattress was denied on the ground that such mattresses are issued only to "inmate/patients with grade 1 or higher level pressure sores, complications from pressure sores or other related conditions;"[8] his request for a therapeutic pillow was denied as unnecessary.  (Id.)  At the Second Level Review, issued July 9, 2004, CMO Traquina "partially granted" this appeal, for the reasons previously stated, and because plaintiff had received physical therapy during the period May 24, 2004, to June 28, 2004, with a discharge statement by the physical therapist that plaintiff's range of motion had improved and plaintiff had been advised to continue his back exercises.  (Id. at 2.)  It appears that plaintiff did not administratively exhaust this appeal.

24.  On September 17, 2004, plaintiff was seen by defendant Rohrer, apparently for the first time.  Dr. Rohrer made a "routine" referral for plaintiff to obtain epidural injections, based on Dr. Farr's August 2004 recommendation.  (Rohrer Depo., Exh. 6 (Dkt. No. 109-2 at 13).)  Dr. Rohrer also noted Dr. Farr's recommendation that if plaintiff showed "no improvement [then] consider discogram."  (Id. at 12.)  On November 3, 2004, noting "worsening of [plaintiff's] low back pain for two months," CSP-S physician Dr. Chen made an "urgent" referral for plaintiff to obtain epidural injections.  (Dkt. No. 109-14 at 7.)

25.  On January 13, 2005, Dr. Tan again saw plaintiff.  Dr. Tan noted that plaintiff was continuing on methadone, and waiting for epidural injections; Dr. Tan advised plaintiff to

---

[8]  Dr. Traquina later noted in his deposition that such a mattress "is not the answer for treatment of back pain.  It is proven . . . . that back pain . . . do[es] better in (sic) a hard mattress rather than a soft mattress."  (Traquina Depo. at 169.)

continue doing his physical therapy exercises.  (Tan Depo. at 97-8; Exh. 43.)

26.  On January 14, 2005, Dr. Jabar administered a lumbar epidural injection. However, plaintiff reported on January 31, 2005, that the injection "made him worse."  (Dkt. No. 109-14 at 6 (Pltf. Exh. H).)

27.  In May 2005, plaintiff obtained another nerve conduction study.[9]  (Dkt. No. 109-10 at 20.)

28.  On July 15, 2005, in response to a letter from plaintiff dated July 5, 2005, Dr. Traquina informed plaintiff that "[y]our case is under reevaluation and your medication will be maintained until such time your reevaluation is completed."  (Dkt. Nos.109-10 at 10; 109-15 at 8.)

29.  On August 7, 2005, plaintiff filed a fourth administrative grievance (Log. No. 05-2351).  (Dkt. No. 109-10 at 11-15, 18-20.)  Plaintiff alleged that "ongoing delays, denials, and/or ignoring my serious medical needs has caused me continued pain and suffering;" that he was "an ADA inmate with a chronic condition which has caused my lower disk to degenerate completely leaving my vertebra at the base of my spine to be closed shut;" that Dr. Chen had reduced plaintiff's pain medication; and that his "medical condition is one that require[s] surgery and the doctor[s] have only delayed the process causing me to endure ongoing pain which could have been alleviated months ago!"  (Id. at 14-15.)  Plaintiff sought the following:  "(1) immediate consultation with the Head Surgeon[,] (2) to find out why the ordered MRI had not been given[,] (3) to personally speak with a Head CMO to discuss my surgery and medication prescription, [and] (4) to speak with a Surgeon who specialize[s] in spinal surgery."  (Id. at 14.)

30.  On August 16, 2005, plaintiff underwent a third lumbar MRI, which identified the following (Traquina Depo., Exh. 72 at 2):

1.    Disc dessication, disc bulges, and facet join

---

[9]  It appears that no party has recounted the results of plaintiff's May 2005 nerve conduction study, or provided a copy of the results.

arthropathy primarily at L5-S1 but also at
L4-5.
2.      Bilateral neural foraminal disc protrusions
and neural foraminal narrowing L4-5, left
more than right.
3.      Bilateral neural foraminal and posterior central disc
protrusions at L5-S1.

31.  On September 14, 2005,  Dr. Renee Kanan, Director of CDCR's Division of

Correctional Health Care Services ("DCHCS"), responded in writing to a July 25, 2005 letter

from plaintiff.  (Dkt. No. 109-15 at 10-11 (Pltf. Exh. N))  Although Dr. Kanan's letter does not

reference any defendant, copies of the letter were sent to the CSP-S Warden and the CSP-S

Health Care Manager.  Dr. Kanan's letter provided in pertinent part (id. at 10):

> In your correspondence you state that you are concerned about your
> health, as you were diagnosed with degenerated disc disease two
> years ago.  You state that you were receiving epidural injections for
> pain management and that those injections began to cause you pain
> in other areas of your body.  You state that you have now been
> prescribed Methadone for pain management.  You are requesting
> spinal surgery.

> DCHCs contacted medical staff at SOL and your Unit Health
> Record (UHR) was reviewed.  You have submitted an appeal
> requesting spinal surgery and a prescription of Methadone.  On
> August 5, 2005, a spinal MRI was obtained.  Once medical staff
> receive the results of the MRI, an appointment will be scheduled to
> discuss these results with you.  Your request for spinal surgery will
> depend on the results of the MRI.  You are currently receiving
> Methadone twice daily (30 mg) and Baclofen [a muscle relaxant]
> for pain management.  A response to your appeal is anticipated to
> be returned to you prior to October 12, 2005.

Plaintiff was "encouraged to address your issues through the inmate appeals process."  (Id.)

32.  At the First Level Review, issued October 25, 2005, plaintiff's pending

appeal (Log. No. 05-2351) was "partially granted" because plaintiff's third MRI had been

conducted on August 16, 2005, and plaintiff had stated "that his concerns regarding . . .

medication had been resolved through written correspondence with [CMO Traquina];"

additionally, it was noted that a nerve conduction study had been conducted in May 2005, and

plaintiff was "pending evaluation with the neurosurgeon to occur at the first available moment."

17

1   (Dkt. No. 109-10 at 20.)   CMO Traquina "partially granted" the appeal at the Second Level

2   Review, on December 6, 2005, on the grounds that "the previously ordered MRI has been

3   conducted" (noting that the August MRI was originally scheduled for July but had to be

4   rescheduled at an open MRI facility); plaintiff's medication concerns had been resolved; plaintiff

5   had been evaluated by a neurologist and obtained a nerve conduction study in May 2005; "[o]n

6   September 17, 2005, Dr. Rohrer initiated a request for you to begin receiving lumbar epidural

7   steroid injections, as recommended by Dr. Farr, Neurosurgeon;" and "you are scheduled for a

8   follow-up medical appointment within the next two weeks." (Id. at 12.)  CMO Traquina denied

9   plaintiff's request to speak directly with Traquina, on the ground that plaintiff was being

10   provided "written correspondence from the CMO. . . ." (Id.)   It appears that plaintiff did not

11   further pursue this appeal.

12          33.  On August 4, 2006, plaintiff filed a fifth administrative appeal (Log. No. 06-

13   2687). (Dkt. No. 109-11 at 2-19.)  Plaintiff alleged therein that his lower disk had "deteriorated

14   to the point whereas my vertebra's (sic) are completely closed shut leaving me in ongoing pain

15   and discomfort," and that Neurontin wasn't providing adequate pain relief.  Plaintiff sought the

16   following:  "(1) to have surgery so that my lower vertebra can have a 'titanium disk' placed

17   between the vertebra's (sic), (2) to have my medication upgraded to 40 mg from the 30 mg I am

18   now taking, (3) to be placed on the list for spinal injections, (4) and also to be given physical

19   therapy sessions at least 2 to 3 times a week, (5) if it is found that the Medical Staff has wait[ed]

20   to[o] long for me to have correct[a]ble surgery[,] and for the on-going pain and suffering[,] to

21   receive monetary (sic) award for:  deliberate indifference." (Id. at 18; see also id. at 11, 14.)  At

22   the First Level Review, plaintiff's appeal was "partially granted in that you agreed to postpone

23   surgery for now and you have been referred for epidural steroid injections instead.  You are also

24   on a list to begin physical therapy again.  The medication Neurontin was also added [800 mg.

25   twice daily] to your pain regime." (Id. at 17.)

26          34.  On August 25, 2006, Dr. Rohrer added the medication gabapentin to treat

1  plaintiff's pain, with plans to increase it from an initial dose of 400 milligrams twice a day, to

2  800 milligrams twice a day.  (Dkt. No. 109-2 at 16-7 (Rohrer Depo., Exhs. 9, 10).)

3          35.  Meanwhile, on September 12, 2006, plaintiff was again evaluated for physical

4  therapy.  Instructions included "[g]ait with cane to be alternated between left and right hands to

5  equalize tone [in the] lumbar region."  (Traquina Depo., Exh. 76 (Dkt. No. 109-12 at 2-3).)  No

6  further sessions were scheduled; the physical therapist noted that "[p]atient demonstrated

7  adequate techniques and understanding of the above instruction. No f/u indicated w/o new PCP

8  referral."  (Id.)  "A cane was prescribed in December 2006 and [plaintiff] was issued a cane on

9  February 16, 2007."  (Dkt. No. 109-12 at 4 (Traquina Depo., Exh. 77).)

10         36.  On September 30, 2006, CMO Traquina "partially granted" plaintiff's

11  pending appeal (Log No. 06-2687) at the Second Level Review, on the following grounds (Dkt.

12  No. 109-11 at 7):

13         [Y]ou were interviewed by Dr. Rohrer on August 25, 2006.  Dr.
           Rohrer indicated you underwent an MRI of your lumbosacral spine
14         on August 16, 2005, which revealed degenerative disc disease and
           facet arthropathy.  Your health records reflect you had some
15         improvement after having lumbar epidural injections twice a day,
           which was ordered by Dr. Mitchell, Neurologist.  You also have
16         been seen previously in physical therapy for treatment.

17         You have a Disability Evaluation CDCR Form 1845 on file that
           states you are mobility impaired and you have been provided
18         appropriate chronos for a light duty assignment, a lower bunk,
           cane, back support, and left wrist support.
19
           After discussion of your condition with the doctor, you decided to
20         postpone surgery for now, negating the need for a referral to a
           surgeon.  Alternatively, a new referral for epidural injections has
21         been submitted on your behalf.  Your medication profile indicates
           you currently are receiving Gabapentin [generic name Neurontin]
22         twice a day for pain, as a well as Methadone 30 mg twice a day.

23         There has been a lengthy waiting list for physical therapy services.
           CSP-Solano had one part time physical therapist contracted for
24         services and personal issues required her to take several months off
           work.  Historically, CSP-Solano has not been able to find
25         additional service providers until recently.  Our new physical
           therapist has been working hard to evaluate all pending referrals
26         and determine patient needs for service.  The prior therapist also

may be returning to work in the near further, which will further enhance the availability of services. Furthermore, we are working with the Division of Health Care Services and the Federal Receiver to address space issues and insufficient resources which preclude us from providing the quality (and quantity of) health care services we strive and desire to provide.

. . . You are encouraged to continue to work with your providers to adequately develop your treatment plan to address your pain. [¶] There is no documentation which substantiates your claim of indifferent treatment.

37.  Pursuant to an October 6, 2006 examination of plaintiff, Dr. Rohrer noted, inter alia, plaintiff's complaints of chronic low back pain secondary to degenerative disc disease, constipation secondary to opiates, and that plaintiff was now taking 800 milligrams twice a day of gabapentin, as well as methadone, 30 milligrams twice a day.  Dr. Rohrer noted that plaintiff had been seen by the physical therapist on September 12, 2006, and confirmed that epidural injections had been scheduled and were pending.  (Rohrer Depo. at 111-14, Exh. 14; see also Dkt. No. 109-3 at 6.)

38.  On November 14, 2006, plaintiff's pending appeal (Log No. 06-2687) was denied and exhausted at the Director's Level.[10]  (Dkt. No. 109-11 at 2-3.)  On the same date, plaintiff filed his sixth relevant administrative grievance (Log. No. 06-3732), in which he alleged generally that he was being provided inadequate medical care and sought an investigation by the

_____

[10]  Responding to plaintiff's allegations that his medical care failed to meet Eighth Amendment standards, Inmate Appeals Chief Grannis responded as follows (Dkt. No. 109-11 at 2):

[T]he appellant cannot dictate what type of health care and what prescriptions he should be provided.  From all documentation included in this appeal the appellant has received numerous medical appointments, diagnostic tests, and receives ongoing medical care.  The institution shall only provide medical services for inmates which are based on medical necessity and supported by outcome data as effective medical care.  The appellant is advised that each practitioner determines, at the time of treatment, the extent of treatment for the health care problem.  The appellant has not provided a compelling argument to warrant modification of the decision reached by the institution.

1  CMO.[11]  (Dkt. No. 109-12 at 4-17.)

2         39.  On December 6, 2006, Dr. Tan interviewed plaintiff pursuant to plaintiff's

3  recently filed appeal (Log No. 06-3732).  Dr. Tan issued plaintiff a cane and a "no triple/lower

4  bunk chrono," noted that plaintiff's prescriptions had already been renewed, and referred plaintiff

5  for a further neurosurgical evaluation.  (Tan Depo. at 80-2; Exhs. 35, 36, 46.)  Dr. Noriega, who

6  issued the First Level Review decision, explained that automatic prescription renewals were not

7  permitted at CSP-S, stating that, "We apologize for any delays with your medication renewals.

8  Please know that medical staff are making every effort to ensure medications are renewed in a

9  timely manner."  (Dkt. No. 109-12 at 13.)  Based on these actions, plaintiff's grievance was

10  "partially granted" at the First Level Review, on December 8, 2006.  (Dkt. No. 109-12 at 12-13.)

11         40.  On March 5, 2007, anticipating that plaintiff would be evaluated in May 2007

12  by Dr. Farr, Dr. Tan requested that another MRI be taken.  (Tan Depo at 82-4; Exh. 37.)

13         41.  On March 20, 2007, CMO Traquina "partially granted" plaintiff's pending

14  appeal (Log No. 06-3732) at the Second Level Review, on the following grounds (Dkt. No. 109-

15  12 at 9):

16

17  [11]  Plaintiff alleged that he was being denied timely treatment, resulting in unnecessary pain and progression of his condition, in violation of his Eighth Amendment rights.  As framed
18  by plaintiff (Dkt. No. 109-12 at 16-7) (legal citations omitted):

19         The procedure of using the triage scheduling me (sic) to be called
           into the clinic only prolong[s] the time it takes to be seen by the
20         clinic Doctor, this delay leaves me in ongoing pain. . . . My spinal
           condition is such that failure to treat and care for my serious
21         medical needs, can result in further significant injury or the
           unnecessary and wanton infliction of pain.  My degenerative spinal
22         condition, which causes great pain and difficulty walking, standing
           and sitting, several doctors is (sic) aware of my condition, but I've
23         been treated with deliberate indifference intentionally, it [has] been
           negligent on the part of the Primary Clinic Doctors who have
24         refused and/or denied me proper follow-up treatments and access
           to appropriate physical therapy.  Their acts and actions are grossly
25         inadequate . . . the delay[s] have made my condition worse,
           resulting in at most a life-long handicap and/or permanent loss in
26         appropriate movement of my lower spine.

> Your multiple requests have been adequately reviewed and each
> request has been appropriately addressed.  They include the
> following:  to have be seen (sic) by a competent doctor or
> specialist; to have your medications renewed every 30 days; to
> receive an issued cane; to receive a chrono which would preclude
> your placement into a triple bunk; for you not to wait for 45-60
> days to be seen by a doctor; and lastly, for an investigation to be
> instituted by the Head CMO because of [alleged] inadequate care.

42.  On May 3, 2007, plaintiff's pending appeal (Log No. 06-3732) was denied

and exhausted at the Director's Level.[12]  (Dkt. No. 109-12 at 4-5.)

43.  Plaintiff did not make his May 2007 appointment for a second consultation

with Dr. Farr, although the reasons remain unclear.  (Tan Depo at 84-5.)

44.  On August 2, 2007, plaintiff had his fourth lumbar MRI which revealed the

following (Exh. 38 at 1-2; see also Tan Depo. at 84-6):

1. Mild changes of spondylosis with variable
   disc bulges and an equivocal superimpose
   thin central and left intraforaminal
   protrusion at L4-5.
2. There is, however, no significant central
   stenosis.
3. Variable foraminal narrowings are detailed above[,]
   notably L4-5 bilaterally and on the left at L5-S1.
4. Since the previous study of 08/16/05, changes of

---

[12]   Responding to plaintiff's assertion that "medical staff are using deliberate indifference
towards him in retaliation because he has a pending lawsuit . . . causing him pain and suffering,"
the Director's Level Review decision provided in pertinent part (Dkt. No. 109-12 at 4):

> From all documents included in this appeal, it is apparent the
> appellant is receiving necessary medical care and reasonable
> accommodation for his mobility impairment at SOL [CSP-S].
> While the appellant might disagree with the medical opinions of
> the doctors and specialists at SOL who have examined him and
> reviewed his Unit Health Record, he must realize that medical
> diagnosis and treatment recommendations can vary between
> facilities, specialists, and physicians throughout the CDCR.  The
> appellant cannot dictate what prescriptions and what type of health
> care he should be provided.  He is advised that each practitioner
> determines, at the time of treatment, the extent of treatment for the
> health care problem.  The appellant has not provided a compelling
> argument to warrant modification of the decision reached by the
> institution.

1        spondylosis and the degrees of foraminal
encroachment are similar.  The suspected small
2        protrusion at L4-5 was probably present before and
not appreciably changed.

3

4        45.  On August 21, 2007, plaintiff initiated this civil rights action by signing his

5  original complaint and submitting it to prison authorities for filing.  (Dkt. No. 1 at 5.)

6        46.  Through August 2007 (commencing August 2005), plaintiff's prescription for

7  methadone was 30 milligrams, twice a day.  (Traquina Depo., Exh. 69 (Dkt. No. 109-10 at 12);

8  Tan Depo., Exh. 47 (Dkt. No. 109-6 at 5).)

9        47.  Dr. Tan's treatment notes for September 5, 2007, indicate that he renewed

10  plaintiff's prescription for methadone at 30 milligrams twice a day, for a period of 30 days, with

11  a notation that the prescription not be renewed until plaintiff received an "MD assessment for

12  need.  Will ducat [inmate] for add-on MD line next week."  (Tan Depo., Exhs. 48, 49, 51.)

13  However, plaintiff's pharmacy record indicates that his methadone prescription was reduced on

14  September 5, 2007, to 20 milligrams twice a day.  (Id. at Exh. 51 (Dkt. No. 109-6 at 16).)

15        48.  On October 2, 2007, plaintiff filed his seventh, and last, relevant

16  administrative grievance of record (Log No. 07-3469 (Dkt. No. 109-6 at 8-15)), in which plaintiff

17  stated that he was "a chronic care inmate pending spinal surgery for a degenerated disk that has

18  left my lower vertebra closed completely shut," and that Dr. Traquina had "placed a

19  memorandum in my medical file which states my pain medication isn't to be reduced nor

20  decreased until after I've had surgery to correct my spine!"  (Id. at 10.)  Plaintiff complained that,

21  "for some reason," his methadone had been decreased from 30 milligrams to 20 milligrams.

22  Plaintiff sought "(1) for the physician who renewed my pain meds to review my medical file, to

23  be sure this doesn't happen again; (2) to prescribe the 30 mg. of methadone twice a day until

24  after surgery. . . .;" (3) an investigation into the reduction; (4) identity of the physician

25  responsible for the reduction; (5) "if necessary, compensation awarded," (6) to be evaluated by a

26  diabetes specialist; and (7) due to shortness of breath, "can I please be placed on the breathing

1  machine." (Id. at 10, 12-3.)

2         49.   On October 4, 2007, pursuant to informal review of plaintiff's pending appeal

3  (Log No. 07-3469), Dr. Tan noted that "[t]here is no memorandum from Dr. Traquina to give you

4  30 mg methadone until surgery done.  Your requirement of pain medication will be evaluated as

5  needed." (Dkt. No. 109-6 at 10.)   In addition, Dr. Tan noted that plaintiff's "pain medications

6  were not reduced until today" (sic), and plaintiff was "still on 30 mg of methadone as of today."

7  (Id.)

8         50.   Also on October 4, 2007, Dr. Tan renewed plaintiff's prescription for

9  neurontin, noted that plaintiff continued to take naprosyn, and again referred plaintiff to a

10 neurosurgeon.  Dr. Tan noted that he had referred plaintiff for a neurological consultation eight

11 months before, on December 6, 2006,  but that plaintiff had "refused" the consultation scheduled

12 for May 15, 2007.  (Tan Depo. at 86-95; Exhs. 39, 40.)

13        51.   On October 23, 2007, plaintiff sought formal review of his pending appeal

14 (Log No. 07-3469), asserting that his methadone had indeed been reduced, and that plaintiff was

15 required "to miss my spinal injection at Vacaville (CMF) because of [the] appointment with Dr.

16 Tan who then corrected his mistake, yet he stopped my blood sugar test which needs to be

17 reinstated." (Pltf. Exh. 109-6 at 10.)  Plaintiff asked to be evaluated by a diabetic specialist, that

18 his blood sugar tests be reinstated, and that he be placed on "the breathing machine" due to

19 shortness of breath that "many times . . . . prevents me from walking." (Id. at 13.)

20        52.   On December 6, 2007, Dr. Rallos "partially granted" plaintiff's pending

21 appeal at the First Level Review, based on a finding that Dr. Tan's alleged error in reducing

22 plaintiff's medication had been corrected.  (Pltf. Exh. 109-6 at 14-5.)  The remainder of

23 plaintiff's requests were denied on the following grounds:  "Your request for finger test sticking

24 has already been granted and future diabetic testing has been ordered.  At this time, there is no

25 clinical need to refer you to a diabetic specialist.  Also, your oxygen saturation and peak flow are

26 all good and therefore, you do not need to be placed on a breathing machine." (Id. at 15.)

1        53.  On January 7, 2008, CMO Dr. Traquina "partially granted" plaintiff's appeal

2  (Log No. 07-3469) at the Second Level Review, on the ground that the error in plaintiff's

3  methadone prescription had been corrected.  Dr. Traquina agreed with the First Level Review

4  findings that "your request for finger stick testing has already been granted and future diabetic

5  testing has been ordered," "there is no clinical need to refer you to a diabetic specialist," and

6  "your oxygen saturation and peak flow are all good.  Therefore, you do not require a breathing

7  machine."  (Pltf. Exh. 109-6 at 9-10.)  It appears that plaintiff did not administratively exhaust

8  this grievance.

9        54.  On May 12, 2008, plaintiff was seen by Dr. Jason Huffman for a spinal

10  surgery consultation.  Dr. Huffman is the Medical Director of Spine Surgery at Queen of the

11  Valley Hospital; he is Board Certified in Orthopedic Surgery and specializes in spine surgery; he

12  has performed over 1000 spinal surgeries.  Dr. Huffman diagnosed plaintiff with "lumbar

13  degenerative disc disease," and noted that plaintiff's imaging studies revealed "severe disc space

14  collapsed at L5-S1,[and] moderate collapse at L4-5."  (Dkt. No. 109-3 at 17 (Pltf. Exh. A-2) (May

15  12, 2008 report of Dr. Huffman).)  Dr. Huffman recommended that plaintiff continue his current

16  medications (including methadone) and receive a new course of physical therapy; Dr. Huffman

17  stated that he would like to see plaintiff again in three months, and that, "[s]hould the patient fail

18  to respond to physical therapy and feels that his pain is severe enough, surgery would be

19  considered."  (Id.)

20        55.  Plaintiff had three physical therapy sessions in September and October 2008.

21  (Rohrer Depo. at 107-8; Exh. 12 at 1-2.)  Pursuant to plaintiff's initial evaluation on September

22  17, 2008, the therapist found plaintiff's neurological signs "intact," but identified decreased

23  strength and stability; the therapist identified a short-term goal to "improve [plaintiff's] postural

24  and body mechanic awareness," and long-term goal of decreasing plaintiff's chronic low back

25  pain.  (Id. at 1.)  The therapist opined that plaintiff's rehabilitation potential and motivation were

26  "good."  (Id.)  Follow-up sessions were conducted on September 18, 2008, and October 8, 2008.

1   At plaintiff's last session, the therapist noted plaintiff's report that the home exercise program

2   "help[s] a little," and that plaintiff noted relief with proper posture and body mechanics, but that

3   plaintiff wasn't regularly performing his exercises.  (Id. at 2.)  The therapist concluded that

4   plaintiff needed increased awareness, with a follow-up in three weeks.  (Id.)

5           56.  On June 25, 2008, CSP-S physician Dr. Chen completed a medical chrono

6   limiting plaintiff to no more than 30 minutes prolonged walking, standing and sitting, and

7   directed that plaintiff "get narcotic after his insulin." (Traquina Depo., Exh. 82 (Dkt. No. 109-12

8   at 20).)

9           57.  On September 26, 2008, this court directed defendants to support their

10  opposition to plaintiff's then-pending motion for preliminary injunctive relief with a declaration

11  prepared and filed by defendant Traquina.  (Dkt. No. 40.)  Plaintiff had alleged in his motion that

12  he was being "forc[ed] . . . to wait from 40 minutes to an hour . . . even-though I've been [given]

13  written medical chrono's (sic) that state[] I am to get my narcotics/meds after the line of inmate

14  insulin injections has been completed." ( Dkt. No. 24 at 2.)  Defendant Traquina filed his

15  responsive declaration on October 16, 2008, explaining that plaintiff would need to wait until the

16  third portion of the medical clinic (a wait of 40 to 60 minutes) to receive his narcotic medication,

17  and that plaintiff was physically capable of sitting up to 60 minutes without excessive pain.

18  (Dkt. No. 43.) Dr. Traquina explained that the CSP-S medical clinic is triaged to provide

19  medications first to Type I (insulin-dependent) diabetics, second to cancer patients, and third to

20  inmates requiring narcotic medications.  Moreover, Dr. Traquina stated, plaintiff is a Type 2

21  diabetic in satisfactory condition, taking Metformin, not insulin, without need for finger stick

22  blood testing.  Dr. Traquina noted that plaintiff's chrono had been "updated to reflect that there is

23  no medical reason that plaintiff cannot sit for in excess of 60 minutes," and opined that "the 40-

24  60 minute delay is not medically harmful to plaintiff."   (Id. at 3.)  Review of the changes Dr.

25  Traquina made to Dr. Chen's chrono, on October 9, 2008, include the notation that plaintiff has

26  "mild degenerative disc disease at L5-S1 and has received epidural in the past and is currently

26

1   taking methadone 30 mg BID [twice a day].  He was seen by PT on 9/17 and 9/18/08 and f/u on

2   10/8/08."  (Traquina Depo., Exh. 82 (Dkt. No. 109-12 at 21)).

3           58.  On December 23, 2008, after appointing plaintiff counsel in this action, the

4   court vacated plaintiff's motion for preliminary injunctive relief without prejudice to its renewal

5   by counsel.  (Dkt. No. 48.)  The motion was not renewed.

6           59.  In 2009, Dr. Rohrer referred plaintiff to a spine surgeon; he did not refer

7   plaintiff to Dr. Huffman because, as of November 2009, Dr. Huffman was no longer contracting

8   with the State of California.

9           60.  On November 4, 2009, plaintiff again received a chrono authorizing finger-

10  stick blood sugar testing; the record does not appear to indicate whether this chrono had any

11  impact on the sequencing of plaintiff's medications at CSP-S's daily medical clinics.

12          61.  Plaintiff had a fifth lumbar MRI on December 1, 2009 (the results are noted

13  below).

14          62.  On December 8, 2009, plaintiff was seen by Dr. Mummaneni, a neurosurgeon

15  at University of California at San Francisco ("UCSF"), together with Fellow Cheerag Dipak

16  Upadhyaya.  Dr. Mummaneni noted that plaintiff's 2007 MRI revealed "degenerative changes at

17  the L5-S1 level predominately[,] with early degenerative changes at the L4-L5 level [and] . . .

18  foraminal narrowing at the L5-S1 level."  (Dkt. No. 109-14 at 16 (Pltf. Exh. I) (Dec. 8, 2009

19  report of Dr. Mummaneni).)  Dr. Mummaneni noted that he did not have access to plaintiff's

20  most recent MRI.  (Id. at 16, 17.)  Despite taking 40 milligrams of methadone twice a day,

21  plaintiff stated that he had back pain nearly always, and intermittent left leg pain.  On physical

22  examination, Dr. Mummaneni noted "full strength" of plaintiff's lower extremities, but

23  "symmetrical stocking numbness up to his ankles," and an inability to perform tandem gait due to

24  pain.  (Id. at 16.)  Dr. Mummaneni informed plaintiff that his treatment options included

25  continued conservative treatment, including epidural injections; a "very focal laminectomy with

26  foraminotomy to alleviate his left leg pain;" or a "fusion operation" to decompress his foraminal

narrowing.  (Id.)  Dr. Mummaneni recommended that plaintiff undergo a "L5-S1 left discectomy and one level posterior TLIF fusion [at L5-S1].  Plaintiff will consider surgery and let us know."  (Pltf. Exh. R at 1.)  Dr. Mummaneni stated that plaintiff would consider his options while Dr. Mummaneni obtained a copy of plaintiff's most recent MRI, and obtained a CT scan of plaintiff's lumbar spine.  (Id.; Dkt. No. 109-14 at 17.)

63.  Plaintiff was seen again by Dr. Mummaneni on March 9, 2010.  Dr. Mummaneni noted that plaintiff's December 2009 MRI "revealed evidence of degenerative disc disease at L5-S1 and to a lesser degree at L4-5 with foraminal narrowing."  (Dkt. No. 109-14 at 23 (Pltf. Exh. J) (Mar. 9, 2010 report of Dr. Mummaneni).)  Dr. Mummaneni noted "no major changes in plaintiff's symptoms."  (Id.)  Dr. Mummaneni noted that plaintiff "wishes to pursue conservative modalities at this time," with "steroid injections initially."  (Id.)  Dr. Mummaneni stated that he would refer plaintiff to "Dr. Cynthia Chin here at UCSF to undergo a CT-guided, left L5-S1 epidural steroid injection."  (Id.)

64.  Plaintiff states, in his declaration signed September 9, 2011, that he told Dr. Mummaneni at his second appointment, on March 9, 2010, "that I was interested in pursuing conservative treatment and minimally invasive surgical procedures, including pinched nerve surgery, while I continued to consider more invasive surgical procedures."  (Dkt. No. 109-13 at 55 (Pltf. Exh. G).)

65.  In March 2010, plaintiff had three sessions of physical therapy.  (Pltf. Exh. Q.)  On March 3, 2010, plaintiff stated that he was in too much pain to participate.  On March 15, 2010, plaintiff was given a TENS unit and instructed on its use.  On March 25, 2010, plaintiff stated that he was "trying to stop walking with the cane.  Pt wants to start doing stretches next week.  Pt willing to ride the bike."  (Id. at 1.)  Plaintiff rode a bike for three-and-a-half minutes, and received instructions for pain-free exercises, with plans to resume them the following week.  (Id.)

66.  On April 7, 2010, plaintiff told Dr. Rohrer that he was "willing to have spinal

1    surgery for pinched nerve" after his anticipated transfer to California Medical Facility.  (Pltf.

2    Exh. O (Dkt. No. 109-15 at 13).)

3              67.  On April 13, 2011, plaintiff was transferred to CSATF.

4    VI.  Deposition Testimony of Plaintiff's Medical Expert

5              Plaintiff's medical expert, neurologist Dr. Sandra Lynne Shefrin, is a consulting

6    neurologist at Marin General Hospital.  (Shefrin Depo. at p. 24.)  While familiar with degenerative

7    disc disease, Dr. Shefrin has neither taught nor authored any publications on the disease.  (Id. at

8    23.)  In preparation for her deposition, taken on July 13, 2011, Dr. Shefrin reviewed plaintiff's

9    medical records, but did not examine plaintiff; nor did Dr. Shefrin review the declarations or

10   depositions of any of plaintiff's treating physicians.  Significantly, Dr. Shefrin did not opine

11   whether any specific defendant "acted inappropriately or did not follow up," because she "had

12   trouble reading the signatures [in the medical records].  So I would read doctors' notes, but I was

13   not always able to identify whose note it was. . . . So I could not attach a name to any specific

14   recommendation."  (Id. at 48, 77.)

15             Dr. Shefrin opined generally that plaintiff's overall care was "untimely and

16   inconsistent," "result[ing] in worsening ['increasing and more prolonged'] pain, progression in his

17   degenerative changes in the lumbar spine, and more limited mobility."  (Id. at 35, 49-50, 68.)  Dr.

18   Shefrin testified that "the physical therapy was provided in a very untimely and inconsistent

19   fashion;" "[t]here was some delay in receiving epidural injections;" "[t]here was a delay on being

20   referred to a neurosurgeon;" and "the medication he was given was suboptimal."  (Id. at 36.)

21             With respect to plaintiff's medication, Dr. Shefrin opined that "it started off

22   reasonably well, when he was given Ibuprofen and Naprosyn [a]nd . . . some muscle relaxants."

23   (Id.)  However, Dr. Shefrin disagreed with the decision of Dr. Kofoed to place plaintiff on

24   methadone as "the first-line opioid therapy," opining that less potent, shorter-acting opioids

25   should have been tried first, in combination with other pain relievers, to reduce potential side

26   effects, including drug tolerance, changes in cardiac conduction, and constipation.  (Id. at 37-41,

29

62-3, 83-4.)   Dr. Shefrin noted that plaintiff was, in July 2011, taking 80 milligrams of methadone a day, "a high dose," for which plaintiff "seems to have developed some tolerance. . . (Id. at 62, 63.)  Dr. Shefrin noted that "for a long time, [plaintiff] was just kept on the methadone and nothing else.  And there were no other interventions of any kind.  No physical therapy.  He did have epidurals at one point.  No anti-inflammatory medications."  (Id. at 39.)  "I think it was medically unacceptable just to put him on the methadone and then not do anything else therapeutically, which is I believe essentially what happened for much of the time."  (Id. at 40.) "[T]here was really nothing being done to try to prevent his condition from progressing or to improve it in any way other than to be  managing his pain."  (Id. at 39, 68.)  "[B]asically he was on methadone, 'cosmetically' . . . , treating his pain."  (Id. at 69.)  However, Dr. Shefrin stated that she was not aware of any  medical literature which states that methadone is contraindicated as an initial pain treatment.  (Id. at 83.)

Dr. Shefrin noted that plaintiff was not provided epidural injections until January 2005.  She noted that such injections "can relieve some of the inflammation in the area and some of the pain," but that the injections did not appear to help plaintiff  (Id. at 54-55.)  On the other hand, plaintiff did appear to respond favorably to use of a TENS unit.  (Id. at 67, 80-1.)

With respect to plaintiff's physical therapy, Dr. Shefrin opined that, although plaintiff "initially complained of back pain in September 2002," "[h]e did not have a physical therapy evaluation until May 2004" (when there was an apparent scheduling conflict because he was also scheduled for an epidural injection, which he needed to cancel).  (Id. at 43.)   Then, "the next physical therapy did not take place until September 2006."  (Id.)  Moreover, Dr. Shefrin opined, when plaintiff received physical therapy in September 2006, it "really was . . . not carried on consistently either.  He was given a home exercise program, but there was no monitoring [by the physical therapist] to see if he was in fact doing the exercises properly."  (Id. at 46.)  "Because if he is doing the exercises improperly, he can also be doing more damage than good."  (Id.) Subsequently, although Dr. Huffman recommended a three-month course of physical therapy in

1  May 2008, it was not commenced until September 2008.  (Id. at 47.)  Dr. Shefrin stated that

2  plaintiff "didn't get any regular kind of physical therapy for six years, from 2002 to 2008.  Even

3  Dr. Huffman, when he saw him in May 2008, commented that there had really been no significant

4  physical therapy."  (Id. at 69.)  Dr. Shefrin concluded that, had plaintiff been provided consistent

5  physical therapy, "there might have been less progression of the degenerative changes" as a result

6  of applying learned body mechanics that relieve pressure on the spine.  (Id. at 43-4, 73.)  Dr.

7  Shefrin stated that the "goal[] of physical therapy is to teach people proper posture and to

8  strengthen . . . the core muscles so that the spine is more erect" (id. at 43), thus reducing "wea-

9  and-tear" on the discs and bones, and "prevent[ing] further damage" (id. at 73).

10           With respect to plaintiff's surgical options, Dr. Shefrin opined that "the possibility

11  of surgery could have been addressed at an earlier time."  (Id. at 41, 56.)  Noting that "surgery was

12  ultimately offered . . . about six or seven years after [plaintiff] initially complained of his pain,"

13  Dr. Shefrin opined that, "at that point, he had developed some intercurrent medical problems

14  which made him a greater surgical risk; whereas, if it had been done earlier, those things would

15  have not existed or would have been less of an issue."  (Id. at 42; 60 ("if surgery had been offered

16  earlier, he would not be at as great a risk as he is currently"); 69 ("[h]e saw an orthopedist six

17  years later [after 2002]; [h]e saw the neurosurgeon seven years later").)  Dr. Shefrin noted that, in

18  plaintiff's imaging studies, " you could see the progression of the degenerative changes in his

19  spine over time.  So there were x-rays of his lumbar spine when he initially complained in 2002.

20  And you could see how that progressed over time.  And by 2008, at some levels, it was severe.  So

21  that is not a natural course of events."  (Id. at 44.)  Dr. Shefrin opined that it would have been

22  reasonable to refer plaintiff for surgical consultation after a year of chronic back pain

23  unresponsive to other treatment.  (Id. at 66.)  Asked "[I]f Mr. Watson has elected not to proceed

24  with surgery, what type of treatment would you recommend?," Dr. Shefrin responded, "I would

25  recommend . . . intensive physical therapy [and] that he see a pain specialist."  (Id. at 60, 61.)

26  Other options might include a spine stimulator (not a TENS unit); or rhozotomy ("sort of oblation

1   procedure targeted at the nerves that can cause the pain").  (Id. at 61.)

2          Dr. Shefrin testified that she had never performed surgery, and would rely on a

3   surgeon's expertise to determine if a patient is a surgical candidate.  (Id. at 57.)

4   VII.  Discussion

5          A.  Deliberate Indifference

6          Plaintiff claims that defendant physicians Tan, Rohrer and Traquina, individually

7   and collectively, were deliberately indifferent to plaintiff's serious medical needs caused by his

8   degenerative disc disease.  Defendants move for summary judgment pursuant to their contention

9   that plaintiff has failed to produce any factual predicate upon which to draw a reasonable

10  inference that these defendants, either separately or collectively, were deliberately indifferent to

11  plaintiff's serious medical needs.

12              1.  Prior Rulings

13         This court previously held that plaintiff may pursue his Eighth Amendment claims

14  against defendant Traquina both as a direct provider of medical services, and as CMO.  The court

15  ruled that plaintiff's distant claims against Dr. Traquina, when he was providing medical services

16  directly to plaintiff in 2002 and 2003, were not barred by the statute of limitations, by application

17  of the continuing violations doctrine.  ( Dkt. No. 96 at 14-18; Dkt. No. 98.)  The court notes,

18  however, that plaintiff's claims against Dr. Traquina are limited to his tenure as CMO.  (Dkt. No.

19  108 (Opposition) at 17-20.)

20              2.  Legal Standards for Eighth Amendment Deliberate Indifference Claim

21         In order to state a § 1983 claim for violation of the Eighth Amendment based on

22  inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence

23  deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106 (1976).

24  To prevail on the claim, plaintiff must show:  (1) that his medical needs were objectively serious;

25  and (2) that defendants possessed a sufficiently culpable state of mind.  Wilson v. Seiter, 501 U.S.

26  294, 299 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir. 1992) (on remand from Supreme

1   Court).  The requisite state of mind is "deliberate indifference."  Hudson v. McMillian, 503 U.S.
2   1, 4 (1992).

3            A serious medical need exists if the failure to treat a prisoner's condition could
4   result in further significant injury or the unnecessary and wanton infliction of pain.  Indications
5   that a prisoner has a serious need for medical treatment are the following:  the existence of an
6   injury that a reasonable doctor or patient would find important and worthy of comment or
7   treatment; the presence of a medical condition that significantly affects an individual's daily
8   activities; or the existence of chronic and substantial pain.  See, e.g. Wood v. Housewright, 900 F.
9   2d 1332, 1337-41 (9th Cir. 1990) (citing cases); McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th
10  Cir. 1992), overruled in part on other grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th
11  Cir. 1997) (en banc).

12           In Farmer v. Brennan, 511 U.S. 825 (1994), the Supreme Court defined a very
13  strict standard which a plaintiff must meet in order to establish "deliberate indifference."
14  Negligence is insufficient.  Farmer, 511 U.S. at 835.  Even civil recklessness (failure to act in the
15  face of an unjustifiably high risk of harm which is so obvious that it should be known) is
16  insufficient.  Id. at 836-37.  Similarly, it is not sufficient to establish that a reasonable person
17  would have known of the risk, or that a defendant should have known of the risk, in the absence
18  of treatment.  Id. at 842.

19           It is nothing less than recklessness in the criminal sense that is required, that is,
20  disregard of a risk of harm of which the actor is actually aware.  Id. at 838-42.  "[T]he official
21  must both be aware of facts from which the inference could be drawn that a substantial risk of
22  serious harm exists, and he must also draw the inference."  Id. at 837.  Thus, a defendant is liable
23  if he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by
24  failing to take reasonable measures to abate it."  Id. at 847.  "[I]t is enough that the official acted
25  or failed to act despite his knowledge of a substantial risk of serious harm."  Id. at 842.  If the risk
26  was obvious, the trier of fact may infer that a defendant knew of the risk.  Id. at 840-42.  However,

33

1  obviousness per se will not impart knowledge as a matter of law.  Nevertheless, a physician need

2  not fail to treat an inmate altogether in order to violate the inmate's Eighth Amendment rights.

3  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).  A failure competently to treat a

4  serious medical condition, even if some treatment is prescribed, may constitute deliberate

5  indifference in a particular case.  Id.

6          Additionally, mere delay in medical treatment without more is insufficient to state

7  a claim of deliberate medical indifference.  Shapley v. Nevada Bd. of State Prison Com'rs, 766

8  F.2d 404, 408 (9th Cir. 1985).  Of note, although the delay in medical treatment must be harmful,

9  there is no requirement that the delay cause "substantial" harm.  McGuckin, 974 F.2d at 1060,

10  citing Wood v. Housewright, 900 F.2d 1332, 1339-40 (9th Cir. 1990), and Hudson, 503 U.S. at 4-

11  6.  A finding that an inmate was seriously harmed by the defendant's action or inaction tends to

12  provide additional support for a claim of deliberate indifference; however, it does not end the

13  inquiry.  McGuckin, 974 F.2d at 1060.  In summary, "the more serious the medical needs of the

14  prisoner, and the more unwarranted the defendant's actions in light of those needs, the more likely

15  it is that a plaintiff has established deliberate indifference on the part of the defendant."  Id. at

16  1061.

17          Superimposed on these Eighth Amendment standards is the fact that in cases

18  involving complex medical issues where plaintiff contests the type of treatment he received, or

19  lack thereof, expert opinion will almost always be necessary to establish the necessary level of

20  deliberate indifference.  Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988).  Thus,

21  although there may be subsidiary issues of fact in dispute, unless plaintiff can provide expert

22  evidence that the treatment he received equated with deliberate indifference, thereby creating a

23  material issue of fact, summary judgment should be entered for the defendant.  The dispositive

24  question on this summary judgment motion is ultimately not what was the most appropriate

25  course of treatment for plaintiff, but whether the failure to timely give a certain type of treatment

26  was, in essence, criminally reckless.

34

1    Also significant to the analysis is the well-established principle that mere

2   differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth

3   Amendment violation.  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Franklin v.

4   Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

5    In order to defeat defendants' motion for summary judgment, plaintiff must

6   "produce at least some significant probative evidence tending to [show]," T.W. Elec. Serv., 809

7   F.2d at 630, that defendants' actions, or failures to act, were "in conscious disregard of an

8   excessive risk to plaintiff's health," Jackson, 90 F.3d at 332 (citing Farmer, 511 U.S. at 837).

9    3.  Preface

10    The parties do not dispute that plaintiff's degenerative disc disease is a "serious

11   medical need" subject to Eighth Amendment protections.  Rather, defendants contend that

12   plaintiff has failed to produce any evidence upon which a trier of fact could reasonably infer that

13   any defendant, acting individually or in concert, was deliberately indifferent to plaintiff's serious

14   medical needs.  The court first addresses plaintiff's individual claims against each defendant, and

15   then addresses plaintiff's more general challenge to his overall care at CSP-S.[13]

16    Several initial observations are warranted.  A significant factor in the court's

17   analysis is the failure of plaintiff's medical expert, Dr. Shefrin, to opine that any of the individual

18   medical defendants performed inadequately.  (Shefrin Depo. at 48, 77 ("I could not attach a name

19   to any specific recommendation").)[14]  Rather, Dr. Shefrin opined that there were inadequacies in

20   ────────────────────

21    [13]  As discussed at the hearing, plaintiff's legal claims are framed only generally in his
     First Amended Complaint.  (Dkt. No. 65 at 18-9.)  These claims do not specify what conduct
22   plaintiff challenges, nor identify particular defendants; thus, there is no correlation of claims with
     particular defendants.  Nonetheless, the factual allegations of the complaint are detailed, and the
23   court has deferred to counsel's characterization of plaintiff's legal claims as set forth in
     plaintiff's opposition to the motion for summary judgment.  (See Dkt. No. 108 at 17-23.)

24    [14]  The court recognizes that counsel proceeds pro bono in representing plaintiff in this
25   fact-intensive and well-briefed case, and covered the costs of retaining an expert witness on
     plaintiff's behalf.  Dr. Shefrin is an experienced neurologist who was taxed with reviewing
26   plaintiff's lengthy and often illegible medical record.  The failure of Dr. Shefrin to identify
     specific alleged instances of deliberate indifference by the individual medical defendants does

1    the "timing and consistency" of plaintiff's various treatments, that together "resulted in worsening

2    pain, progression in his degenerative changes in the lumbar spine, and more limited mobility."

3    (Shefrin Depo. at 35.)  The absence of expert testimony that a specific medical decision by a

4    specific physician was unacceptable undermines plaintiff's claims, which must instead rest on

5    plaintiff's lay opinion and the reasonable inferences to be drawn from the record.  As previously

6    noted, expert opinion is generally required to establish deliberate indifference or, at a minimum,

7    to demonstrate the existence of a material factual dispute.  Hutchinson, supra, 838 F.3d at 393,

8    394.  Even with such evidence, a difference of medical opinion, in itself, is insufficient to

9    establish deliberate indifference.  Jackson, supra, 90 F.3d at 332.

10            An additional shortcoming in plaintiff's claims, both against the individual

11   defendants and in challenging the quality of their overall care, is plaintiff's repeated decision to

12   pursue conservative pain management options rather than surgery, thus narrowing the scope of

13   harm that plaintiff may reasonably allege as a result of defendants' conduct.  Plaintiff alleges that

14   defendants' conduct caused plaintiff unnecessary pain, decreased mobility, and the progression of

15   his degenerative disc disease resulting, inter alia, in increased surgical risks and a decreased

16   potential for surgical success.  (See Dkt. No. 108 at 5, 17; see also Shefrin Depo. at 35, 42, 60.)

17   However, plaintiff concedes that he did not express any clear intent to pursue surgery until his

18   second appointment with Dr. Mummaneni in 2010.  In his declaration signed September 9, 2011,

19   plaintiff states that he told Dr. Mummaneni on March 9, 2010, that he was now "interested in

20   pursuing conservative treatment and minimally invasive surgical procedures, including pinched

21   nerve surgery," while he continued to consider "more invasive surgical procedures."[15]  (Dkt. No.

22

23        not reflect on her competency, or that of plaintiff's counsel; rather, as discussed below, it is
          consistent with the court's independent assessment of the record.  However, of note plaintiff's
24        counsel could have had Dr. Shefrin review the defendants' depositions to further develop her
          opinions regarding the care they provided, but counsel chose not to do so.
25

26        [15]  Dr. Mummaneni noted, however, only that plaintiff "wishes to pursue conservative
          modalities at this time," with "steroid injections initially."  (Dkt. No. 109-14 at 23 (Pltf. Exh. J).)

1  109-13 at 55 (Pltf. Exh. G).)  Thereafter, in April 2010, plaintiff allegedly told Dr. Rohrer that he

2  was willing to pursue surgery, but only after his anticipated transfer to CMF.  (Dkt. No. 109-15 at

3  13.)  Plaintiff was transferred a year later, in April 2011, to CSATF, not CMF.[16]  Thus, there is no

4  record evidence that plaintiff requested, or was denied, surgery while he was incarcerated at CSP-

5  S.  Moreover, as characterized in plaintiff's current briefing, he seeks no more than "sufficient

6  medication, adequate physical therapy, reasonable accommodations in performing institutional

7  tasks, a current surgical assessment, and surgery (as recommended)."  (Opposition (Dkt. No. 108)

8  at 27.)

9          Additionally, only Dr. Shefrin's qualified opinion supports plaintiff's claim that the

10 passage of time rendered plaintiff a less suitable surgical candidate.  Dr. Shefrin testified that "the

11 possibility of surgery could have been addressed at an earlier time . . . [rather than] six or seven

12 years after he initially complained of his pain.  At that point, he had developed some intercurrent

13 medical problems which made him a greater surgical risk; whereas, if it had been done earlier,

14 those things would have not existed or would have been less an issue."  (Shefrin Depo. at 41-2).

15 In addition, Dr. Shefrin answered "correct" to the statement, "[Y]ou indicated that if surgery had

16 been offered earlier, he would not be at as great a risk as he is currently."  (Id. at 60.)  However,

17 Dr. Shefrin did not identify plaintiff's "intercurrent medical problems," and testified that she was

18 not a surgeon, had never performed surgery, and would rely on a surgeon's expertise to determine

19 whether a patient was a surgical candidate.  (Id. at 57.)  No surgeon opined that plaintiff was no

20 longer a surgical candidate, or that he had developed greater risks for surgery.  Plaintiff's treating

21 neurosurgeon, Dr. Huffman, expressly rejected plaintiff's claim (no longer pursued) that his

22 degenerative disc disease had progressed over the course of the relevant period from "Modic Type

23 1" changes, to "Modic Type 2" and/or "Modic Type 3" changes, thus rendering him a greater

24

25          [16]  Absent proof of medical necessity, plaintiff is not entitled to obtain medical treatment
   at the institution of his choice, see e.g. Martel v. California Dept. of Corrections, 2007 WL
26 2288316, *5 (E.D. Cal. 2007), and cases cited therein.  Plaintiff does not contend otherwise.

1  surgical risk.[17]  In addition, Dr. Huffman stated that, in 2008, he had "explained to Mr. Watson

2  that the success rate of surgery is about 70% and this involves several months of recovery time

3  and even with a successful procedure, I do not expect him to be pain-free."  (Huffman Decl., Dkt.

4  No. 107-6 at 7.)  The opinion of Dr. Huffman, not Dr. Shefrin, is reflected in the parties'

5  agreement that, in general, "[s]urgical results for degenerative disc disease are inconsistent."

6  (Defendants' Undisputed Fact No. 26.)

7           It is reasonable to infer that plaintiff, together with his treating neurosurgeons, Dr.

8  Farr, Dr. Huffman and Dr. Mummaneni, weighed these factors each time plaintiff chose to pursue

9  a nonsurgical treatment alternative.  However, this exercise of discretion undermines plaintiff's

10 allegation that he was harmed by defendants' failure to timely refer plaintiff for neurosurgical

11 evaluations, or to obtain current MRIs in support of those referrals.

12          The nonsurgical treatments that plaintiff obtained, but which he alleges were

13 inadequate, include pain medications, physical therapy and epidural injections; in addition,

14 plaintiff claims that he was denied a discogram.  Other than pain medication, physical therapy was

15 the treatment most often requested by plaintiff, recommended by his treating specialists, and

16 endorsed by his medical expert; physical therapy was also endorsed by defendant physicians.  Dr.

17 Shefrin opined that the progression of plaintiff's degenerative disc disease was "not a natural

18 course of events" (Shefrin Depo. at 44); that physical therapy can stop the progression of

19 degenerative disc disease "to some extent" (id. at 43); that, if plaintiff had been provided regular

20 physical therapy and/or if a physical therapist had monitored plaintiff's home exercise program,

21 _____

22 [17]  Dr. Huffman stated in his declaration (Huffman Decl.,Dkt. No. 107-6 at 8-9) that:

23        Medical literature does not support a claim that Modic changes in
        the spine are indicative of the need for spinal surgery.  Similarly,
24       medical literature does not support a claim that surgery carries a
        higher degree of risk and lower likelihood of success based on
25       Modic changes.  Specifically, there is no medical evidence which
        shows that surgery to repair Modic Type 1 changes is less risky and
26       has a higher likelihood of success than surgery to repair Modic
        Type 2 or 3 changes.

1  "there might have been less progression of [his] degenerative changes" by application of body

2  mechanics that relieve pressure on the spine (id. at 43-4, 46, 73); and that the "goal[] of physical

3  therapy is to teach people proper posture and to strengthen . . . the core muscles so that the spine is

4  more erect" (id. at 43), thus reducing "wear-and-tear" on the discs and bones, and "prevent[ing]

5  further damage" (id. at 73).

6          Consistently, Dr. Huffman testified that "the theory behind physical therapy is that

7  . . . strengthening the muscles and connective tissues around the spine would help stabilize the

8  spine and therefore decrease the level of symptoms caused by the degenerative disk disease."

9  (Huffman Depo. at 38.)  Dr. Huffman opined that "[t]he number one key is patient compliance.

10  Without compliance, [physical therapy] won't help at all."  (Id. at 39-40.)  However, he stated that

11  physical therapy doesn't always provide relief, even in compliant patients. (Id.)  In addition, Dr.

12  Huffman opined that "[p]hysical therapy will not stop the degenerative process. . . . At best,

13  physical therapy may have provided symptomatic relief [to plaintiff].  However, this is not

14  guaranteed." (Huffman Decl., Dkt. No. 107-6 at 8.)  Similarly, Dr. Traquina opined that physical

15  therapy "[d]efinitely . . . may reduce [plaintiff's] pain by giving him muscle strength," but "won't

16  do any good for [the] natural progression of his disease."  (Traquina Depo. at 150, 151.)  Dr.

17  Traquina opined that it was important for a patient with degenerative disc disease to remain

18  active, to do exercises that strengthen his muscles and increase his range of motion, and that there

19  is a "controversy" whether use of a brace is beneficial because it diminishes exercise of the

20  muscles.  (Id. at 143, 151.)

21          Dr. Traquina testified that CSP-S, with a population of 5800 inmates, has only one

22  physical therapist.  (Traquina Depo. at 144.)  The therapist worked only half-time at CSP-S from

23  2003 through 2005, then became full-time in 2006.  (Id. at 148.)  The therapist has many patients

24  with chronic low back pain.  (Id. at 144.)  There is, at minimum, a three-to-four month wait to

25  obtain a physical therapy appointment based on a non-emergency referral.  (Id. at 149.)  Inmates

26  on the "routine list" for physical therapy are typically evaluated and provided instructions for

1   exercises to perform on their own.  (Id. at 146.)  Returning patients with low back pain are

2   necessarily given "second priority" by the therapist, because she has to give immediate attention

3   to urgent care inmates and patients discharged from hospitals with hip, knee or shoulder

4   replacements.  (Id. at 145.)

5          Therefore, there is record evidence to support plaintiff's allegation that his pain

6   symptoms and mobility problems may (but not necessarily) have been relieved to some extent by

7   "regular" physical therapy.  There is also record evidence, albeit disputed, that "adequate"

8   physical therapy may have slowed the degenerative process in plaintiff's lumbar spine.  However,

9   the harm plaintiff allegedly experienced as a result of inadequate treatment is only one element of

10  a deliberate indifference claim.  Plaintiff must also demonstrate that defendants had "a sufficiently

11  culpable state of mind," Wilson v. Seiter, 501 U.S. 294, 297-99 (1991), that is, that defendants

12  acted or failed to act despite knowledge that their conduct created a substantial risk of harm to

13  plaintiff, see Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (requiring "a purposeful act or

14  failure to respond to a prisoner's pain or possible medical need").

15          4.  Analysis

16          With these considerations in mind, the court turns to plaintiff's specific claims

17  against defendants, first individually, then as to the overall care they provided plaintiff.

18              a.  Dr. Tan

19          Plaintiff alleges that defendant Tan was deliberately indifferent to plaintiff's

20  serious medical needs when he failed to "follow basic protocols" by not ordering a new MRI in

21  support of his December 2006 referral of plaintiff to a neurosurgeon, rendering the referral

22  "futile;" the MRI was obtained in August 2007, and plaintiff met with neurosurgeon Dr. Huffman

23  in May 2008.  (Dkt. No. 108 at 21-23.)  Plaintiff asserts that Dr. Tan's prior experience in

24  obtaining plaintiff's 2004 neurosurgical referral[18] demonstrates that Dr. Tan was fully aware of

25  _____

26      [18]  Plaintiff alleges that Dr. Tan failed to follow up on his November 24, 2003
    "expedited" request that plaintiff obtain an MRI and be referred to a neurosurgeon, resulting in a

1  plaintiff's serious medical needs, as well as the pitfalls of the referral process, and thus, in 2006

2  and 2007, acted with deliberate indifference by referring plaintiff to a neurosurgeon without

3  ordering a new MRI.  Plaintiff asserts that Dr. Tan had ample opportunity to follow through on his

4  neurosurgical referral, when he renewed plaintiff's methadone in August and September 2007,

5  and examined plaintiff in October 2007.  (Id. at 22.)

6             The record demonstrates that Dr. Tan ordered an MRI in March 2007, with the

7  intent that it would be current for plaintiff's anticipated May 2007 follow-up referral to Dr. Farr.

8  (Tan Depo. at 81-91.)  However, the May 2007 referral did not take place, and the reasons remain

9  unclear.  Dr. Tan testified that plaintiff "refused" the scheduled referral for unknown reasons (id.

10  at 91), but conceded that it was possible plaintiff refused the referral because he did not have a

11  current MRI on file (id.)  (The MRIs then on file were taken in February 2003, April 2004, and

12  August 2005.)  Plaintiff states only generally that he "never refused treatment at CSP-Solano

13  unless I was scheduled for conflicting appointments on the same day, I was overcome by

14  claustrophobia when brought to the vehicle provided for my transportation, I was in too much

15  pain to wait the required period of time for the appointment, or I had not received a current MRI

16  that was a prerequisite for my surgical consultations."  (Watson Decl., Dkt. No. 109-13 at 54, ¶ 8.)

17  Dr. Traquina testified that "another cause for delays" in plaintiff obtaining MRIs is that he

18  "refused to go into the machine tunnel" and had to be referred to an open MRI facility, which

19  "create[d] difficulty and increased more delays."  (Traquina Depo., at 177.)  All of plaintiff's

20  MRI's were conducted in open MRI facilities.  (Dfts.' Undisputed Fact No. 119.)  On October 4,

21  2007, Dr. Tan again referred plaintiff for a neurosurgical evaluation, which plaintiff obtained in

22  May 2008.  Dr. Tan testified that the additional delay may have been attributable to the "transition

23  _____

24  delay of more than four months to obtain the MRI (it was obtained in April 2004), and a delay of
    nearly nine months before plaintiff saw neurosurgeon Dr. Farr on August 16, 2004.  (Dkt. No.

25  108 at 21-22; see also Tan Depo. at 62-3.)  Plaintiff's counsel stated at the hearing that this
    allegation was less a claim than a statement of fact demonstrating Dr. Tan's awareness of

26  plaintiff's serious medical needs, the process for making referrals to outside specialists, and the
    necessity of ensuring that a timely MRI accompany Dr. Tan's 2006 referral to a neurosurgeon.

1   time" during the period when Dr. Farr ceased providing services to CSP-S, and Dr. Huffman

2   became available.  (Tan Depo. at 94.)

3          The court finds that these allegations fail to demonstrate a material factual dispute

4   concerning the quality of Dr. Tan's care.  Plaintiff fails to direct the court to any evidence of

5   record indicating that Dr. Tan disregarded plaintiff's serious medical needs by failing to ensure

6   that his December 2006 neurosurgical referral was implemented before May 2008.  Rather, Dr.

7   Tan, like the other defendants, was subject to the tiered authorization and referral process at CSP-

8   S, through the MARC and UM staff, as well as additional "multiple factors . . . from the

9   consultant site, the hospital site, and the transportation availability."  (Tan Depo. at 77-8.)  Dr.

10  Tan renewed the referrals when he saw plaintiff in October 2007 and, meanwhile, renewed

11  plaintiff's pain medications, and issued plaintiff a cane and lower bunk chrono.  (See e.g., Tan

12  Depo., Exhs. 35, 39, 46-8.)  Moreover, for the reasons previously discussed, plaintiff has not

13  demonstrated that any delay in his neurosurgical referrals (and therefore his MRIs) caused him

14  substantial harm.  The less significant the asserted medical need, the higher the threshold for

15  establishing that the failure to obtain that need constituted deliberate indifference.  McGuckin,

16  supra, 974 F.2d at 1061.

17         Accordingly, the court finds that no trier of fact could reasonably conclude that Dr.

18  Tan acted with deliberate indifference to plaintiff's serious medical needs.  Summary judgment

19  should be granted for defendants on plaintiff's deliberate indifference claim against Dr. Tan.

20                        b.  Dr. Rohrer

21         Plaintiff alleges that defendant Rohrer was deliberately indifferent to plaintiff's

22  serious medical needs in the following ways:  (1) as the first CSP-S physician to see plaintiff after

23  his first neurosurgical consultation with Dr. Farr, Dr. Rohrer failed to implement all of Dr. Farr's

24  August 2004 recommendations, specifically:  (a) on September 17, 2004, Dr. Rohrer submitted a

25  "routine" rather than "urgent" referral for epidural injections, resulting in a delay of four months

26  (plaintiff received the epidural injections "only after another doctor [Dr. Chen] followed up Dr.

1  Rohrer's 'routine' referral with an 'urgent' referral"); and (b) in August 2006, Dr. Rohrer ordered

2  further epidural injections and physical therapy, despite plaintiff's report that his January epidural

3  injections made him feel worse, and contrary to Dr. Farr's recommendation that plaintiff should

4  obtain a discogram if the epidural injections proved unsuccessful; (2) Dr. Rohrer "still declined to

5  refer Watson to a spine specialist" when he saw plaintiff on October 6, 2006, and improperly

6  concluded that plaintiff's September 12, 2006 physical therapy evaluation had "fulfilled [Dr.

7  Rohrer's] earlier referral;" (3) Dr. Rohrer submitted "routine" rather than "urgent" follow-up

8  referrals for plaintiff's August 2, 2007 MRI, and his May 12, 2008 neurosurgical consultation

9  with Dr. Huffman; and (4) Dr. Rohrer failed to refer plaintiff for "pinched nerve" surgery after

10  plaintiff's April 7, 2010 statement to Dr. Rohrer that he was willing to pursue it.  (Dkt. No. 108 at

11  20-21.)

12        Plaintiff's first contention, that Dr. Rohrer erred in making a routine rather than

13  urgent referral for epidural injections, resulting in a four-month delay in plaintiff obtaining the

14  injections, is unsupported by any evidence that plaintiff required urgent treatment (despite Dr.

15  Chen's subsequent "urgent" referral).  Dr. Rohrer testified that plaintiff's condition did not

16  indicate a need for urgent care under CSP-S guidelines, explaining (Rohrer Depo. at 141):

17            We have a way of prioritizing referrals in terms of an emergency.  If
               somebody was facing imminent paralysis or something like that, it
18            would be emergent, and they would be sent off to the hospital, and
               that would be dealt with immediately on the same day, as soon as
19            possible sent out by ambulance.  There are referrals that are urgent
               referrals.  Management of chronic back pain would not be
20            considered urgent.  It would be considered routine. . . . . Even
               treated, somebody with chronic back pain is likely to continue to
21            have some degree of chronic back pain.  It isn't necessarily
               something that we can absolutely cure.  This is the system that we
22            have in place at CSP-Solano for referrals.

23  Therefore, Dr. Rohrer's assessment of the urgency associated with plaintiff's need for epidural

24  injections was consistent with CSP-S's reasonable policy, and based upon Dr. Rohrer's

25  independent medical judgment.

26        Plaintiff's related contention, that Dr. Rohrer ordered additional epidural injections

1    rather than a discogram,[19] is unsupported by evidence that a discogram was warranted.  Dr.

2    Shefrin did not address this matter.  Dr. Rohrer testified that he was not the only physician

3    responsible for following through on Dr. Farr's recommendations (because all the physicians

4    rotated through the clinics at that time) but, even if he were, it is important to "[k]eep in mind . . .

5    . that the epidural steroid injections are given as a set of three typically at intervals, and it requires

6    some time to see if there is an improvement."  (Rohrer Depo. at 91.)  Dr. Rohrer emphasized that

7    he relied on his own medical judgment as well as  "Dr. Farr's plan, of course, [which] was that

8    [plaintiff] receive the epidural steroid injection.  If he responded to the epidural steroid injection,

9    he did not recommend the discogram.  It was only if he failed to respond."  (Id. at 98.)  The court

10   also finds it significant that no other neurosurgeon recommended a discogram.[20]  On the other

11   hand, as recently as 2010, Dr. Mummaneni recommended that plaintiff again have epidural

12   injections, with which plaintiff apparently agreed (Dkt. No. 109-14 at 23), thus further

13   undermining plaintiff's argument.  In the absence of any medical opinion that it was necessary for

14   plaintiff to obtain a discogram in August 2006, or at any other time, the court finds no basis for

15   inferring that Dr. Rohrer was deliberately indifferent in failing to so refer plaintiff.

16          Plaintiff's second contention, that Dr. Rohrer failed to refer plaintiff to a spine

17   specialist when he saw plaintiff on October 6, 2006, and concluded that only one session of

18   physical therapy was sufficient, is not fully developed in plaintiff's briefing, nor was it developed

19   at Dr. Rohrer's deposition.  (See Rohrer Depo. at 111-13.)  Plaintiff does not assert that he

20

21          [19]  As explained by Dr. Rohrer:  "A discogram is a special test that is given where
22   sometimes they'll inject the disc with saline solution causing the disc to bulge and see if it in fact
     reproduces the pain that the patient is experiencing.  It's another way to localize whether or not
23   that disc is troublesome and responsible for the patient's symptoms.  Another way that this is
     sometimes done is through the EMG and nerve conduction velocity studies.  However, if the
24   symptoms are intermittent, for example, the discogram may be revealing even when the EMG
     and nerve conduction velocity studies are negative."  (Rohrer Depo. at 97.)

25          [20]  Moreover, CMO Traquina observed that "the discogram is very controversial.  Most of
26   what you see in literature today, they believe that the MRI with contrast is not as – is less
     invasive.  So this a point of controversy, in my opinion."  (Traquina Depo. at 183.)

1  requested, at that appointment, that Dr. Rohrer refer plaintiff to a spine specialist, and Dr. Rohrer

2  was not asked why he failed to so refer plaintiff, or whether he thought plaintiff's physical therapy

3  had been inadequate.  Dr. Rohrer did observe, however, that at this appointment he duly noted

4  plaintiff's receipt of physical therapy, and that the referral for epidural injections had been

5  "received by scheduling and pending."  (Id. at 112.)  Dr. Rohrer stated that he "contacted the

6  scheduler to see the status of it and make sure that the referral was received and in place, and it

7  was."  (Id.)  Plaintiff fails to articulate how this conduct may have constituted deliberate

8  indifference.

9         Plaintiff's third contention, that Dr. Rohrer submitted "routine" rather than

10  "urgent" follow-up referrals for plaintiff's August 2, 2007 MRI, and his May 12, 2008

11  neurosurgical consultation with Dr. Huffman, fails for the reasons previously discussed.

12         Finally, plaintiff contends that Dr. Rohrer failed to refer plaintiff for "pinched

13  nerve" surgery after plaintiff's alleged April 7, 2010 statement to Dr. Rohrer that he was willing to

14  pursue the procedure.  However, plaintiff's statement was prospective when made (plaintiff stated

15  that he intended to pursue the surgery upon his anticipated transfer to CMF), and therefore placed

16  no responsibility on Dr. Rohrer to make a contemporaneous referral or, later, to pass along

17  plaintiff's statement to medical staff at CSATF.

18         The court finds that plaintiff has presented no evidence, despite his several

19  contentions, that Dr. Rohrer acted, or failed to act, with deliberate indifference to plaintiff's

20  serious medical needs.  Accordingly, summary judgment should be granted for defendants on

21  plaintiff's deliberate indifference claims against Dr. Rohrer.

22              c.  Dr. Traquina

23         Plaintiff makes the following allegations in support of his claim that defendant

24  Traquina, in his capacity as CMO, was deliberately indifferent to plaintiff's serious medical

25  needs:  (1) after Dr. Traquina became CMO in March 2003, his actions resulted a 16-month delay

26  in plaintiff's first referral for a neurosurgical consultation (to Dr. Farr), during which time

1  plaintiff's spinal condition progressed from "minimal degenerative changes" to "severe

2  degenerative disc disease;" (2) Dr. Traquina's actions from 2005 to 2007, caused the delay in

3  plaintiff's second referral for a neurosurgical consultation, which he did not obtain until May 2008

4  (with Dr. Huffman), causing plaintiff continuing pain, further deterioration of his degenerative

5  disc disease, and rendering him at greater risk of surgery; and (3) in October 2008, Dr. Traquina

6  improperly revoked a chrono permitting plaintiff to obtain his pain medications at the beginning

7  of CSP-S's daily medical clinics.  (Dkt. No. 108 at 17-20).  The third allegation is addressed

8  separately, pursuant to plaintiff's retaliation claim against Dr. Traquina.

9            In support of his first claim, plaintiff contends that he informed Dr. Traquina on

10  April 27, 2003, that he had been waiting for a neurosurgical referral, and that Dr. Traquina

11  responded on May 28, 2003, that all necessary imaging studies had been completed, and the

12  referral would be made "today."  (Dkt. No. 109-15 at 2 (Pltf. Exh. K).)  Plaintiff asserts that

13  "[n]early five months later, however, outpatient services notified Dr. Traquina that Watson's

14  neurosurgical consultation could not proceed because the MRI was now outdated."  (Dkt. No. 108

15  at 17 (Pltf. Exh. L).)  Plaintiff alleges that the referrals were not resubmitted until November

16  2003, when he requested to be seen in clinic; that plaintiff did not obtain the April 2004 MRI until

17  he submitted a grievance in February 2004; and that he still needed to wait another six months

18  before he was seen by Dr. Farr in August 2004.  As a result, plaintiff contends, his condition

19  progressed from "minimal degenerative changes" to "severe degenerative disc disease."  (Dkt. No.

20  108 at 18.)

21            Plaintiff's alleged harm lacks support in the record.  The diagnostic change may

22  have reflected no more than the enhanced imaging of the 2004 MRI, as compared to the 2003 x-

23  ray.  (See Traquina Depo., Exh. 56 (October 2002 x-ray), and Exh. 67 (Dr. Farr's Aug. 16, 2004

24  interpretation of April 2004 MRI).)  Even plaintiff's most recent neurosurgical consultant, Dr.

25  Mummaneni, did not attach a severity level to plaintiff's degenerative disc disease in 2009 or

26  2010, noting only that plaintiff's 2007 and 2009 MRIs, respectively, revealed "degenerative

1   changes" and "degenerative disc disease." (Dkt. No. 109-14 at 16, 23.)  More importantly,

2   plaintiff presents no evidence that the alleged deterioration of his degenerative disc disease, from

3   2002 to 2004, would have slowed had plaintiff obtained an earlier consultation with Dr. Farr.

4            Plaintiff has also failed to present evidence upon which to reasonably infer that Dr.

5   Traquina was aware, or should have been aware, that the 16-month delay could cause harm to

6   plaintiff, and that Dr. Traquina disregarded this factor.  Shapley, supra, 766 F.2d at 408.  At his

7   deposition, Dr. Traquina acknowledged that the period of time plaintiff had to wait to obtain his

8   first referral to Dr. Farr was objectively unreasonable, although "we have to take and discount the

9   situation that the provider refused to see him back then earlier because the MRI was more than six

10   months [old]." (Traquina Depo. at 184.)  Dr. Traquina also testified about the delays caused by

11   plaintiff's need to obtain MRIs at an open facility (see e.g. id. at 177), limitations on the

12   availability of specialists (id. at 171), and limitations associated with the MARC/UM system (id.

13   at 82-83).  Most significantly, Dr. Traquina testified that back pain "is a very common issue" (id.

14   at 110, 119), and that, absent an emergency, degenerative disc disease does not present a "life-

15   threatening situation" requiring urgent care (id. at 84, 95, 196).  Dr. Traquina explained that "we

16   have to pay attention to the ones that are urgent, emergent.  What happens to the routines?  They

17   will be back because you have to provide immediate care to the ones that they (sic) are in need."

18   (Id. at 68.) Dr. Traquina testified that even the average two-month delay in inmates seeing primary

19   care physicians was "unacceptable," yet unavoidable, absent "an emergency."  (Id. at 59-60, 173,

20   196.)

21            Plaintiff does not contend that his degenerative disc disease is more severe than

22   that experienced by other CSP-S inmates, and thus required expedited care, which was ignored by

23   Dr. Traquina; nor does plaintiff contend that he was denied pain medications while awaiting his

24   referral to Dr. Farr.  In the absence of such allegations, the court finds that plaintiff has failed to

25   present any evidence upon which a trier of fact could reasonably infer that Dr. Traquina was

26   deliberately indifferent in failing to expedite plaintiff's 2004 referral to Dr. Farr.

1        Plaintiff's second claim is that Dr. Traquina was responsible for the delays in

2   plaintiff's care from 2005 to 2008, based on every act of Dr. Traquina that impacted plaintiff

3   during this period.  (See Dkt. No. 108 at 18-20.)  Plaintiff contends, as a result, that he

4   experienced "years of excruciating pain and further deterioration of his condition, [] at which

5   point the risks of surgery had increased."  (Dkt. No. 108 at 19.)  For the reasons previously

6   discussed, plaintiff's arguments premised on the alleged deterioration of plaintiff's degenerative

7   disc disease, and asserted increase in surgical risk, are not supported by the record.  This

8   conclusion is supported by Dr. Huffman's May 2008 recommendation, at the conclusion of this

9   period, that plaintiff continue on his current medications and receive a new course of physical

10  therapy, with a follow-up in three months, at which point, if plaintiff "fail[ed] to respond to

11  physical therapy and feels that his pain is severe enough, surgery would be considered."  (Dkt. No.

12  109-3 at 17 (Pltf. Exh. A-2) (May 12, 2008 report of Dr. Huffman).)  Plaintiff's alleged harm is

13  therefore limited to his assertion of unnecessary pain and suffering, as a result of Dr. Traquina's

14  actions from 2005 to 2008.

15       Plaintiff complains initially that "nothing happened" between his receipt of Dr.

16  Traquina's July 15, 2005 letter (Dkt. No. 109-10 at 10), responsive to plaintiff's July 5, 2005

17  letter (Dkt. No. 109-15 at 8), and August 7, 2005, when plaintiff filed his next inmate appeal

18  (Log. No. 05-2351).  (Dkt. No. 108 at 18.)  However, shortly thereafter plaintiff obtained his third

19  MRI on August 16, 2005.  (Traquina Depo., Exh. 72.)  Thereafter, on September 14, 2005, Dr.

20  Kanan, Director of CDCR's Division of Correctional Health Care Services ("DCHCS"),

21  responded in writing to plaintiff's July 25, 2005 letter, wherein she summarized plaintiff's

22  medical care based on a current review of his file, and encouraged plaintiff to "address your issues

23  through the inmate appeals process."  (Dkt. No. 109-15 at 10-11 (Pltf. Exh. N))

24       Plaintiff next alleges that when his appeal (Log No. 05-2351) reached Dr.

25  Traquina, on December 6, 2005, at the Second Level Review, Dr. Traquina declined plaintiff's

26  request to meet with him, ignored plaintiff's request that he was seeking a follow-up referral to

1    Dr. Farr, and mistakenly stated that Dr. Rohrer had only recently ordered epidural injections.

2    (Dkt. No. 108 at 18.)  However, for the reasons stated by Dr. Rohrer, a further appointment for

3    epidural injections was warranted before following up with Dr. Farr, and, as stated by CMO

4    Traquina, he addressed plaintiff's concerns in writing rather than meeting with plaintiff.  (Dkt.

5    No. 109-10 at 12.)

6           Plaintiff complains, again, that nothing happened until he filed another inmate

7    appeal on August 4, 2006 (Log No. 06-2687).  Plaintiff asserts that when the appeal reached Dr.

8    Traquina, on September 30, 2006, the CMO "denied it," "falsely stating that [plaintiff] had

9    "decided to postpone surgery for now, negating the need for a referral to a surgeon."  (Dkt. No.

10   108 at 19, citing Dkt. No. 109-11 at 7.)  Within this period, Dr. Rohrer added gabapentin to

11   plaintiff's medications on August 25, 2006 (Dkt. No. 109-2 at 16-7), and plaintiff was instructed

12   by the physical therapist on the use of a cane, on September 12, 2006 (Dkt. No. 109-12 at 2-3).

13   On September 30, 2006, Dr. Traquina "partially granted" plaintiff's appeal, based in part on Dr.

14   Rohrer's ordering of additional epidural injections, the addition of gabapentin to plaintiff's

15   medications, and the granting of plaintiff's several chronos requests.  In addition, Dr. Traquina

16   sought to explain to plaintiff the reasons for delay in obtaining further physical therapy, and

17   concluded that "[t]here is no documentation which substantiates your claim of indifferent

18   treatment."  (Dkt. No. 109-11 at 7.)  Plaintiff's assertion that Dr. Traquina "lied" when he stated

19   that plaintiff had "decided to postpone surgery for now, negating the need for a referral to a

20   surgeon" (Dkt. No. 108 at 19), is unsupported; for the reasons previously stated, the court finds

21   this statement supported by the record.

22          Plaintiff next claims that although a new neurosurgery referral was submitted for

23   plaintiff in December 2006, "an updated MRI was not carried out before an appointment

24   scheduled for May 2007, so the appointment could not go forward.  Even after [plaintiff] filed this

25   Complaint in August 2007, he was not seen for a follow-up by a spinal specialist until May 2008."

26   (Dkt. No. 108 at 19 (internal citations omitted).)  The problems with this referral have been

1   addressed pursuant to plaintiff's claims against defendant Tan.  Moreover, plaintiff's general

2   allegations against defendant Traquina – that "Dr. Traquina failed to ensure that Watson received

3   timely follow-up care from a spinal specialist and treatment to alleviate his pain. . . . He routinely

4   ignored Watson's complaints, mischaracterized the status of the care Watson had received, and

5   affirmatively interfered with the treatment recommendations of Watson's physicians and spinal

6   specialists" – lack evidentiary support.  At this juncture, on March 20, 2007, CMO Traquina

7   provided a detailed explanation to plaintiff, recounting his past and current treatment to date,

8   when Dr. Traquina "partially granted" plaintiff's next appeal (Log No. 06-3732), filed November

9   14, 2006.  (See Dkt. No. 109-12 at 6-9).  Dr. Traquina's summary includes reference to plaintiff's

10  prescriptions for methadone, gabapentin, and tylenol, and a notation that plaintiff had been issued

11  a cane on March 20, 2007.  Dr. Traquina concluded that plaintiff's request for an investigation by

12  the "Head CMO," based on alleged inadequate care, was "clearly without merit and cannot be

13  supported."  (Id. at 9.)

14          The court finds that plaintiff's general allegations fail to present any evidence on

15  which a trier of fact could reasonably find that Dr. Traquina acted, or failed to act, with deliberate

16  indifference to plaintiff's serious medical needs.  Accordingly, summary judgment should be

17  granted for defendants on plaintiff's deliberate indifference claims against Dr. Traquina.

18                      d.  Plaintiff's Overall Care at CSP-S

19          At the hearing on defendant's motion, plaintiff's counsel emphasized that, in

20  addition to plaintiff's specific allegations against each defendant, plaintiff alleges that his overall

21  medical care at CSP-S constituted deliberate indifference to plaintiff's serious medical needs,

22  particularly the numerous delays in obtaining care, including referrals to specialists, and the

23  alleged inadequacies of the treatment received.

24          As observed in Brook v. Carey, 2007 WL 2069941, *1 (E.D. Cal. 2007):

25          [M]edical or dental treatment in a prison is a process marked by the
            participation (or lack thereof) of many persons within the system.
26          Most of these cases involve incremental action, or inaction, of

1    individuals, which when combined together paint a picture of
     disputed facts about undue delay or other poor performance, but
2    when viewed from the individual perspective of each defendant,
     each incremental step often seems far less than the definition of
3    deliberate indifference would allow. This problem, when added to
     the lack of expert evidence from plaintiff's perspective, especially
4    in the area of causation, dooms almost every one of these lawsuits.

5        Perceiving these challenges of proof in the instant case, the court appointed pro

6    bono counsel for plaintiff on December 23, 2008 (Dkt. No. 48), and authorized an extended

7    period for discovery.  The initial discovery deadline of February 1, 2009 (Dkt. No. 25), was

8    extended to August 24, 2009 (Dkt. No. 59), then to September 14, 2009 (Dkt. No. 63).  Plaintiff's

9    counsel filed a First Amended Complaint on July 15, 2009, refining plaintiff's factual allegations

10   and legal claims.  (Dkt. No. 65.)  After ruling on defendants' motion to dismiss, on March 31,

11   2010 (Dkt. Nos. 96, 98), the court set a schedule for designating expert witnesses and exchanging

12   expert reports, with a deadline of July 14, 2011, for the close of expert discovery (Dkt. No. 99).

13   Plaintiff's counsel deposed each of the three medical defendants, eliciting substantial testimony by

14   each defendant concerning their challenged conduct, as well as their opinions relative to plaintiff's

15   medical needs and treatment.  In addition, plaintiff's counsel retained an expert, neurologist Dr.

16   Shefrin, who reviewed plaintiff's medical records and provided extensive expert testimony.

17   Finally, plaintiff's counsel skillfully argued plaintiff's case, both in writing and at the hearing,

18   with detailed references to the extensive factual record.  In short, plaintiff – and the court – have

19   had the benefit of a fully developed record and well-articulated briefing.

20       Moreover, as stated at the hearing, the undesigned is cognizant of the need to "see

21   the forest through the trees" in this action.  However, the court finds that the "large view" of

22   plaintiff's claims serves to underscore the court's findings as to the individual medical defendants,

23   specifically, that there is an absence of evidence demonstrating deliberate indifference.

24       Plaintiff relies on the testimony of his expert, Dr. Shefrin, that plaintiff's overall

25   care was "untimely and inconsistent."  (Shefrin Depo. at 35.)  Dr. Shefrin opined that defendants

26   "cosmetically" treated plaintiff's pain with methadone, without doing anything "to try to prevent

his condition from progressing or to improve it in any way other than to be managing his pain."
(Id. at 39, 40, 68, 69.)  Dr. Shefrin disagreed with the decision of Dr. Kofoed to place plaintiff on
methadone as "the first-line opioid therapy," opining that plaintiff had apparently built some
tolerance to methadone, and that less potent, shorter-acting opioids should have been tried first, in
combination with other pain relievers and anti-inflammatory medications.  (Id. at 37-41, 62, 83-4.)
Of particular significance to Dr. Shefrin was the fact that plaintiff "didn't get any regular kind of
physical therapy for six years, from 2002 to 2008."  (Id. at 69.)  Although plaintiff "initially
complained of back pain in September 2002," "[h]e did not have a physical therapy evaluation
until May 2004."  (Id. at 43.)  "[T]he next physical therapy did not take place until September
2006."  (Id.)  Dr. Shefrin opined that the physical therapy was inadequate because plaintiff "was
given a home exercise program, but there was no monitoring to see if he was in fact doing the
exercises properly."  (Id. at 46.)  Dr. Shefrin also noted that, after Dr. Huffman recommended
physical therapy in May 2008, it was not commenced until September 2008.[21]  (Id. at 47.)

Dr. Shefrin also noted that plaintiff was not provided epidural injections until
January 2005, but acknowledged that plaintiff found them unhelpful.  (Id. at 54-5.)  On the other
hand, plaintiff did appear to respond favorably to a TENS unit (id. at 67), but did not receive one
until March 15, 2010.  Finally, as earlier noted, Dr. Shefrin opined that "the possibility of surgery
could have been addressed at an earlier time;" that it would have been reasonable to refer plaintiff
for surgical consultation after he had experienced a year of chronic back pain that was
unresponsive to other treatment.  (Id. at 41, 56, 66.)  Asked what she would recommend if
plaintiff elected not to proceed with surgery, Dr. Shefrin responded, "intensive physical therapy
[and] that he see a pain specialist" (id. at 60, 61); she also opined that plaintiff may find some
relief from a spine stimulator (not a TENS unit), or rhozotomy (oblation of pain-causing nerves)

---

[21]  Dr. Shefrin stated incorrectly that Dr. Huffman "recommended a three-month course of
physical therapy."  (Shefrin Depo. at 47.)  Rather, Dr. Huffman noted that plaintiff had not yet
"had significant physical therapy," and recommended a "course of physical therapy" with a
follow-up appointment in three months.  (Dkt. No. 109-3 at 17.)

1   (id. at 61).

2          In addition to declining to find that any individual defendant physician provided

3   inadequate care to plaintiff, Dr. Shefrin did not opine whether plaintiff's overall treatment was

4   below the accepted standard of the medical care, only that it was "untimely and inconsistent."

5   (Shefrin Depo. at 35.)  Even if the court construes Dr. Shefrin's opinion that defendants were

6   negligent in failing to provide plaintiff with regular physical therapy and monitoring, "[m]ere

7   negligence in diagnosing or treating a medical condition, without more, does not violate a

8   prisoner's Eighth Amendment rights."  Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004).

9   At most, Dr. Shefrin's testimony demonstrates her disagreement with the pace and extent of

10  plaintiff's care.  To the extent that the court can infer Dr. Shefrin's disagreement with the actions

11  and decisions of specific defendants, a difference of medical opinion cannot support a deliberate

12  indifference claim, Toguchi, 391 F.3d at 1059-60; Sanchez v. Vild, 891 F.2d 249, 242 (9th Cir.

13  1989), absent a showing that the course of treatment "was medically unacceptable under the

14  circumstances," and that defendants "chose this course in conscious disregard of an excessive risk

15  to [plaintiff's] health," Jackson, 90 F. 3d at 332.  Dr. Shefrin's testimony does not reach this far.

16         Similarly, while there were clear delays in plaintiff's treatment, plaintiff has failed

17  to show that:  (1) any delay seriously and adversely impacted plaintiff's medical condition; and

18  (2) defendants were aware of the risk, but failed to prevent it.  Shapley, supra, 766 F.2d at 408.

19  Plaintiff relies on the holding in Hunt v. Dental Department, 865 F.2d 198 (9th Cir. 1989), that

20  prison officials' three-month delay in obtaining dental treatment for plaintiff, after they learned

21  that plaintiff had lost his dentures, raised a triable issue of fact as to whether the delay was

22  unreasonable.  Hunt "alleged that the prison officials were aware of his bleeding gums, breaking

23  teeth and his inability to eat properly, yet failed to take any action to relieve his pain or to

24  prescribe a soft food diet until new dentures could be fitted."  Id. at 200.  "Given the serious

25  dental problems which Hunt alleges he repeatedly complained about, this delay appears to have

26  been more than an isolated occurrence of neglect."  Id. at 201.  These facts in Hunt are clearly

1  distinguishable from those presented in the instant case.  Hunt's need for replacement dentures

2  should have been obvious to any reasonable person, including correctional staff.  In contrast,

3  plaintiff's degenerative disc disease and chronic low back pain, which are ubiquitous to the

4  general population, have no obvious remedy.  Nor is it clear that more frequent and routine

5  physical therapy may have slowed plaintiff's disease or provided him symptomatic relief, despite

6  the agreement of all physicians on the potential benefits of physical therapy.

7          Plaintiff also challenges CSP-S's referral procedures and systemic delays in

8  providing care to inmates, including referrals for diagnostic tests and to outside specialists.

9  For the reasons previously stated by this court in addressing defendants' motion to dismiss,

10  individual challenges to systemic policies and procedures are subsumed by the class action in

11  Plata v. Schwarzenegger, 2005 WL 2932253 (N. D. Cal. 2005).  (See Dkt. No. 96 at 7-13.)  While

12  plaintiff argues that each defendant physician conceded that, in the appropriate case, he would

13  advocate for expedited care for a patient, plaintiff has presented no evidence to demonstrate that

14  his medical needs were, on balance, extraordinary, and that he therefore warranted such advocacy.

15          Plaintiff's allegations, viewed broadly, must be weighed against the quality and

16  quantity of the overall treatment that plaintiff in fact received.  In addition to receiving treatment

17  from defendants Tan, Rohrer and Traquina, plaintiff received medical care from CSP-S physicians

18  Chen, Obedoza, Win, Hsieh, Rallos, Naku and Solomon.  (Dfts.' Undisputed Fact No. 28.)

19  Plaintiff's treatment included physical therapy (4 sessions in 2004, 1 session in 2006, 3 sessions in

20  2008, and 3 sessions in 2010), epidural injections (in January 2005, and perhaps later), a TENS

21  unit, and significant pain medication.  (Id., No. 29.)  In addition, plaintiff was prescribed anti-

22  inflammatory medications, muscle relaxants, and neurontin (gabapentin); he also received chronos

23  for a cane, back and wrist braces, a low bunk, "no get down," light duty, and support shoes.  At no

24  time was plaintiff "untreated."

25          In addition, plaintiff was referred to three neurosurgeons, Dr. Farr (whom plaintiff

26  saw in 2004), Dr. Huffman (whom plaintiff saw in 2008), and Dr. Mummaneni (whom plaintiff

1 | saw in 2009 and 2010), each of whom were spine specialists.  Plaintiff was also referred to

2 | orthopedist Dr. Kofoed and neurologist Dr. Mitchell.  (Dfts.' Undisputed Fact No. 29; Plaintiff's

3 | responses to Dfts.' Undisputed Fact Nos. 29 & 38 (Dkt. No. 111 at 7).)  Plaintiff obtained five

4 | MRIs (in 2003, 2004, 2005, 2007 and 2009), each at an open-MRI facility due to plaintiff's

5 | claustrophobia (Rohrer Decl., Dkt. No. 107-6 at 13, ¶ 24), and two nerve conduction studies (in

6 | 2003 and 2005).  While plaintiff is correct that these procedures were "diagnostic only," these

7 | tests, together with plaintiff's repeated referrals to specialists, demonstrate that CSP-S physicians,

8 | particularly defendants herein, were persistent in attempting to obtain accurate diagnoses of

9 | plaintiff's condition for the purpose of providing him with the most appropriate care.

10 |       For these many reasons, the court finds that plaintiff has failed to produce a factual

11 | predicate upon which a trier of fact could reasonably infer that defendants' overall care at CSP-S

12 | was deliberately indifferent to plaintiff's serious medical needs.  Accordingly, defendants' motion

13 | for summary judgment on plaintiff's deliberate indifference claims should be granted in its

14 | entirety.

15 |       B.  Retaliation

16 |       Plaintiff claims that defendants Tan and Traquina each retaliated against plaintiff

17 | for exercising his First Amendment rights by pursuing the instant action.  Defendants contend that

18 | plaintiff has failed to establish the essential elements of his retaliation claims against either

19 | defendant Tan or defendant Traquina.

20 |       1.  Prior Rulings

21 |       This court previously found that the operative complaint states the following

22 | potential prima facie claims of retaliation, in violation of the First Amendment:  (1) that Dr. Tan,

23 | acting in retaliation for plaintiff filing this lawsuit, reduced plaintiff's pain medication, and

24 | ordered that it not be renewed until plaintiff received a new medical assessment of need; and (2)

25 | that Dr. Traquina, acting in retaliation for plaintiff filing this lawsuit, particularly for filing a

26 | motion for preliminary injunctive relief, changed plaintiff's diagnosis from "severe" to "mild"

1  degenerative disc disease, and withdrew a chrono authorizing plaintiff to receive his pain

2  medication at the beginning, rather than the end, of the CSP-S medical clinics.  (Dkt. No. 96 at

3  20-4.)  The court found that these claims, although based in part upon conduct that occurred after

4  plaintiff initiated this action, were sufficiently related to plaintiff's initial claims to warrant their

5  inclusion in the First Amended Complaint.  Rhodes v. Robinson ("Rhodes II"), 621 F.3d 1002,

6  1006-07 (9th Cir. 2010).  (Dkt. No. 96 at 24.)

7          2.  Legal Standards for First Amendment Retaliation Claim

8       "A prisoner suing prison officials under section 1983 for retaliation must allege

9  that he was retaliated against for exercising his constitutional rights and that the retaliatory action

10 does not advance legitimate penological goals, such as preserving institutional order and

11 discipline."  Barnett v. Centoni, 31 F.3d 813, 816 (citing Rizzo v. Dawson, 778 F.2d 527, 532 (9th

12 Cir. 1985)).

13      "[A] viable claim of First Amendment retaliation entails five basic elements:  (1)

14 An assertion that a state actor took some adverse action against an inmate (2) because of (3) that

15 prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First

16 Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."

17 Rhodes v. Robinson ("Rhodes I"), 408 F.3d 559, 568 (9th Cir. 2005).  Direct and tangible harm

18 will support a First Amendment retaliation claim even without demonstration of a chilling effect

19 on the further exercise of a prisoner's First Amendment rights.  Id. at 568, n.11.  "[A] plaintiff

20 who fails to allege a chilling effect may still state a claim if he alleges he suffered some other

21 harm" as a retaliatory adverse action.  Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009),

22 citing Rhodes, 408 F.3d at 568 n.11.

23      A plaintiff must plead facts which suggest that retaliation for the exercise of

24 protected conduct was the "substantial" or "motivating" factor behind the defendant's conduct.

25 Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989).   Mere conclusions of

26 hypothetical retaliation will not suffice; rather, a prisoner must "allege specific facts showing

56

1  retaliation because of the exercise of the prisoner's constitutional rights." <u>Frazier v. Dubois</u>, 922

2  F.2d 560, 562, n.1 (10th Cir. 1990).  Retaliatory motive may be shown by the timing of the

3  allegedly retaliatory act and inconsistency with previous actions, as well as direct evidence.  <u>Bruce</u>

4  <u>v. Ylst</u>, 351 F.3d 1283, 1288-89 (9th Cir. 2003); <u>Pratt v. Rowland</u>, 65 F.3d 802, 808 (9th Cir.

5  1995) .

6          Once such a prima facie showing of retaliation is made, the burden shifts to the

7  defendant prison officials to show, by a preponderance of the evidence, that the alleged retaliatory

8  action was conduct narrowly tailored to serve a legitimate penological purpose.  <u>Schroeder v.</u>

9  <u>McDonald</u>, 55 F.3d 454, 461-62 (9th Cir. 1995).  However, "prison officials may not defeat a

10  retaliation claim on summary judgment simply by articulating a general justification for a neutral

11  process, when there is a genuine issue of material fact as to whether the action was taken in

12  retaliation for the exercise of a constitutional right." <u>Bruce</u>, 351 F.3d at 1289 (citations omitted).

13          3.  <u>Analysis</u>

14          Subject to these standards, the court addresses plaintiff's retaliation claims against

15  defendants Tan and Traquina.

16              a.  <u>Dr. Tan</u>

17          Against defendant Tan, plaintiff alleges that, on September 5, 2007,[22] less than one

18  month after plaintiff filed this suit, "Tan took Watson off his methadone pending an MD

19  assessment of need."  (FAC at ¶ 82.)  Plaintiff stated that he had been prescribed methadone for

20  pain management commencing in November 2002 (<u>id.</u> at ¶ 29); that this medication was "not to

21  be reduced or decreased until after spinal surgery" (<u>id.</u> at ¶ 82); and that Dr. Tan was aware of

22  these facts (<u>id.</u> at ¶ 46).  Plaintiff immediately challenged Dr. Tan's alleged action by submitting a

23  Form 7362 and an administrative grievance; thereafter, on October 4, 2007, after again seeing Dr.

24  Tan, plaintiff filed another appeal "complaining about Dr. Tan's professionalism and bias against

25

26  _____

[22]  The complaint misstates this date as September 27, 2007.  (FAC at ¶ 82.)

1  African-America inmates." (Id. at ¶¶ 82, 83.)

2         Plaintiff's allegations overreach. Dr. Tan did not take plaintiff "off" methadone;

3  rather, the amount was temporarily reduced, not necessarily by Dr. Tan. As set forth in the

4  undisputed facts, Dr. Tan's treatment notes do not appear to order a reduction in plaintiff's

5  methadone prescription.[23] Although plaintiff's pharmacy records indicate that the dosage was

6  reduced (from 30 milligrams twice a day, to 20 milligrams twice a day), the record contains no

7  evidence to support plaintiff's allegation that the reduction was caused by an intentional act of Dr.

8  Tan. Instead, the record supports Dr. Tan's deposition testimony that, when reviewing his

9  treatment notes, "my order is 30 milligrams twice a day. It becomes 20 milligrams twice a day.

10  Ask the question. I have no answer. Because I didn't put the [information in the] pharmacy

11  computer." (Tan Depo. at 113.) Within a month, the dosage was corrected by Dr. Tan, when he

12  saw plaintiff on October 4, 2007.

13         Moreover, in response to plaintiff's appeal on these matters (Log No. 07-3469), Dr.

14  Tan reviewed plaintiff's medical file and concluded that "[t]here is no memorandum from Dr.

15  Traquina to give you 30 mg methadone until surgery done. Your requirement of pain medication

16  will be evaluated as needed." (Dkt. No. 109-6 at 10.) Consistently, Dr. Tan had ordered that

17  plaintiff's prescription not be renewed at the next thirty-day interval absent an "MD assessment

18  for need." (Tan. Depo., Exhs. 48, 49.) This protocol is supported by physician responses to

19  plaintiff's prior appeal (Log No. 06-3732), including Dr. Noriega's explanation that automatic

20  prescription renewals were not permitted at CSP-S (Dkt. No. 109-12 at 13), and the observation of

21  Dr. Traquina that "it would be inappropriate to have your medications automatically renewed

22  without a triage and/or reassessment by clinical staff" (id. at 8).

23         For these reasons, the court finds that the record fails to support a finding that Dr.

24  Tan took any "adverse action" against plaintiff. Accordingly, summary judgment should be

25  _____

26      [23] The court does not share plaintiff's opinion that the pertinent medical record is
    "scribbled" or "open to interpretation." (Oppos. at 31.)

1  granted for defendants on plaintiff's retaliation claim against Dr. Tan.

2                    b. Dr. Traquina

3              Plaintiff alleges that defendant Traquina, in his capacity as CMO, retaliated against

4  plaintiff for pursuing the instant action, particularly by filing a motion for preliminary injunctive

5  relief on August 14, 2008, wherein plaintiff alleged that he was being "forc[ed] . . . to wait from

6  40 minutes to an hour . . . even-though I've been [given] written medical chrono's (sic) that state[]

7  I am to get my narcotics/meds after the line of inmate insulin injections has been completed."

8  (Dkt. No. 24 at 2.)  On September 26, 2008, the court directed defendant Traquina to file a

9  declaration responsive to plaintiff's motion, "indicating whether or not plaintiff is indeed

10  subjected to a 40-minute delay when awaiting his prescribed pain relief, and if he is, whether such

11  a delay is warranted in light of plaintiff's claims of unnecessarily suffering excruciating pain

12  because of the delay."  (Dkt. No. 40 at 3.)  Dr. Traquina filed his declaration on October 16, 2008.

13  (Dkt. No. 43.)

14              Plaintiff alleges that, after the court's order but before filing his declaration, Dr.

15  Traquina retaliated against plaintiff by downgrading the medical severity of his degenerative disc

16  disease to "mild;" finding that plaintiff could sit for 60 minutes; and withdrawing a chrono,

17  previously authorized by Dr. Chen, that limited plaintiff to 30 minutes sitting, and directed that

18  plaintiff "get narcotic after his insulin" at the beginning of CSP-S's daily medical  clinics.

19  (Traquina Depo., Exh. 82 (Dkt. No. 109-12 at 20).)  As framed by plaintiff (FAC at ¶ 97):

20              On October 9, 2008, after the Court ordered defendants to
              supplement their opposition to Watson's motion for injunctive
21              relief, Dr. Traquina issued a new chrono for Watson, replacing the
              [June 25, 2008] chrono that Dr. Chen had issued just over three
22              months earlier.  Without personally evaluating Watson, Dr.
              Traquina removed the direction allowing Watson to obtain his
23              narcotic medication after his diabetic medication[,] and replaced the
              direction referring to no prolonged standing, sitting, or walking for
24              greater than 30 minutes with a direction omitting the restriction on
              prolonged sitting.  Dr. Traquina also wrote a note in Watson's
25              medical file stating that Watson has "mild" degenerative disc
              disease.  This characterization of Watson's medical condition
26              directly contradicts the conclusion reached by the spinal specialists

1   who evaluated Watson, Watson's primary care physicians, and Dr.
    Traquina's previous statements that Watson had "severe"
2   degenerative disc disease.

3       In his declaration filed October 16, 2008, defendant Traquina stated that the

4   administration of medications at CSP-S's daily medical clinics is triaged based on medical

5   necessity, with insulin-dependent diabetics serviced first, cancer patients serviced second, and

6   inmates receiving narcotic medications serviced third.  As a result, inmates receiving narcotic

7   medications are typically serviced within 40 to 60 minutes after commencement of the clinic.

8   (Dkt. No. 43 at 2.)  Dr. Traquina noted that Dr. Chen had given plaintiff a "chrono allowing

9   [plaintiff] to receive a finger stick test for his diabetic condition and receive his narcotic

10  medication with his finger stick test."  (Id.)  However, in practice, the nurses "were not honoring

11  this chrono . . . as it created a logistical problem with the clinic;" instead, plaintiff was "instructed

12  by the nurses that he would have to return later to receive his narcotic medication," because

13  otherwise they "must shut down the insulin clinic in order to service a narcotic request."  (Id.)  Dr.

14  Traquina further noted that "it is clear that [plaintiff] is a Type 2 diabetic and a finger stick test is

15  not appropriate for his condition because he is not insulin-dependant."[24]  (Id.)  Observing that

16  _____

17      [24]  The parties dispute, to a limited extent, Dr. Traquina's assessment that plaintiff did
    not, in October 2008, require a finger stick test to assess his blood sugar.  (See Opposition (Dkt.
18  No. 108) at 29-30; Reply (Dkt. No. 113) at 7.)  Plaintiff relies on his August 24, 2009 deposition
    testimony that, at the time of his deposition, plaintiff stated that he obtained a finger stick test
19  twice a day, and would receive an insulin injection if his blood sugar was "higher than 160,"
    despite keeping Metformin in his cell (stating that the "pills" were given to him in "bundles" of
20  thirty), which he took on an "as needed basis."  (Watson Depo. at 71-2, 97-100 (Pltf. Exh. D).)
    However, plaintiff does not contend that the same set of factors was present in October 2008, and
21  plaintiff's expert Dr. Shefrin specifically declined to express an opinion concerning plaintiff's
    insulin medication regime (Shefrin Depo. at 63).
22
        More significantly, plaintiff testified at his deposition that, even when, in 2009, he
23  obtained an insulin injection, he had to "come back to get in line to get my methadone."  (Id. at
    98.)  Plaintiff explained (id. at 97-8):
24
        [I]t's separate.  They have a specific thing that the people that take
25      insulin injections are on a first come, first serve basis.  They got to
        get theirs regardless. . . . It used to be a specific RN that if you took
26      methadone or took narcotics, when he'd give you an injection you
        would get your pills.  But he's no longer there, so now I would

1    sitting "is a resting position for [plaintiff's] back" (id. at 2), Dr. Traquina opined that "there is

2    nothing in plaintiff's medical records that indicates that medically he cannot wait 40-60 minutes

3    to receive narcotic medication.  Moreover, sitting is available to inmates who wait.  Plaintiff's

4    chrono has been updated to reflect that there is no medical reason that plaintiff cannot sit for in

5    excess of 60 minutes.  Second, we have no medical documentation consistent with Mr. Watson's

6    claim in this lawsuit that excruciating pain is caused by the delay.  Based upon all the

7    circumstances known to me, the 40-60 minute delay is not medically harmful to plaintiff."  (Id. at

8    3.)  Dr. Traquina stated that he therefore cancelled the portions of Dr. Chen's chrono that

9    authorized plaintiff to "get narcotic after his insulin," and precluded plaintiff from sitting for more

10   than 30 minutes, "because they were not correct and not medically indicated."  (Id. at 2.)  Review

11   of Dr. Traquina's October 9, 2008 changes to Dr. Chen's chrono also indicates Dr. Traquina's

12   assessment that plaintiff has "mild degenerative disc disease at L5-S1."  (Traquina Depo., Exh. 82

13   (Dkt. No. 109-12 at 21)).

14          As earlier noted, on December 23, 2008, the court vacated, without prejudice,

15   plaintiff's motion for preliminary injunctive relief (Dkt. No. 48), after appointing counsel for

16   plaintiff; the motion was not renewed.

17          The court finds that the challenged actions of Dr. Traquina were "adverse" to

18   plaintiff.  Rhodes I, supra, 408 F.3d at 568.  The timing of these changes, and their inconsistency

19   with plaintiff's prior medical record – specifically, the functional assessment of Dr. Chen only

20   two-and-one-half months prior limiting plaintiff to 30 minutes sitting; the finding of "severe"

21   degenerative disc disease by the spinal surgeons with whom plaintiff had previously consulted

22

23   _____

                   have to wait until they finish the injections.  And then I come back
24                 to get in line to get my methadone.

25   Thus, there is no evidence of record to refute Dr. Traquina's assessment that plaintiff did not, in
     October 2008, require a finger stick test.  More importantly, even if there was disputed evidence
26   on this issue, plaintiff concedes that CSP-S's tiered administration of medication was standard
     protocol.

                                                    61

1   (see Dr. Farr's August 2004 assessment (Dkt. No. 109-10 at 8); Dr. Huffman's May 2008

2   assessment (Dkt. No. 109-3 at 17) (see also Dr. Shefrin's July 2011 opinion (Shefrin Depo. at

3   44)); and Dr. Traquina's affirmative response to the deposition question, "So, looking back at Dr.

4   Kofoed's file notations, would this indicate to you that Mr. Watson's DDD is more serious than

5   an average patient's complaints about back pain?" (Traquina Depo. at 127) – support the

6   reasonable inference that Dr. Traquina's challenged conduct was a retaliatory response to

7   plaintiff's motion for preliminary injunctive relief.[25]  Bruce, supra, 351 F.3d at 1288-89

8   (retaliatory motive inferred by timing of the allegedly retaliatory act and its inconsistency with

9   previous actions).

10           Thus, plaintiff has plead sufficient facts to reasonably infer that retaliation against

11  plaintiff for pursing this action may have been a "substantial" or "motivating" factor behind Dr.

12  Traquina's challenged conduct, Morgan, 874 F.2d at 1314, carried out "because of" plaintiff's

13  "protected conduct," Rhodes I, 408 F.3d at 568.  The resulting impact on plaintiff  – downgrading

14  of his medical diagnosis and assessment of his functional limitations, and cancellation of

15  plaintiff's authorization to receive pain medications at the beginning of the CSP-S medical clinics

16  – appear to be "direct and tangible harms" satisfying the fourth element of his First Amendment

17  retaliation claim.  Id., at 568, n.11.

18           Significantly, however, neither alleged harm appears to be significant.  The subject

19  chrono authorized by Dr. Chen was not, as a practical matter, routinely followed by the nursing

20  staff when cancelled by Dr. Traquina; and plaintiff does not contend that Dr. Traquina's

21  assessment regarding the severity and functional limitations of plaintiff's degenerative disc

22  disease had, in itself, any direct or tangible impact on plaintiff's subsequent medical care.  Even

23  ───────────────

24           [25]  These facts also raise the reasonable inference that Dr. Traquina's challenged conduct
     was a supported medical decision merely precipitated by the court's order requiring Dr. Traquina
25   to file a declaration in response to plaintiff's motion for preliminary injunctive relief; that Dr.
     Traquina would have reached the same decision if the matter had been presented to him pursuant
26   to the normal course of events at CSP-S.  The court is required, however, to draw reasonable
     inferences in favor of the opposing party.  Matsushita, supra, 475 U.S. at 587.

1    neurosurgeon Dr. Mummaneni, who twice evaluated plaintiff after this incident, noted only that

2    plaintiff had "degenerative changes" and "degenerative disc disease," without according these

3    matters a severity level.  (Dkt. No. 109-14 at 16, 23.)  Additionally, Dr. Traquina did not say that

4    plaintiff was required to sit for 60 minutes to wait for his methadone, only that he had the option.

5    Even under Dr. Chen's assessment, plaintiff could stand, walk and sit interchangeably, for a

6    period up to 30 minutes performing any one of these activities.  (Dkt. No. 109-12 at 20.)

7    Moreover, plaintiff testified that, between the insulin clinic and the clinic's provision of other

8    medications, he would "go back to chow, eat my chow, and then I would have to come and wait

9    until they completely finished all the inmates with their insulin injection.  Then I would get my

10   meds."  (Watson Depo. at 97.)

11           Nevertheless, plaintiff's prima facie showing of retaliation shifts the burden to

12   defendant Traquina to show, by a preponderance of the evidence, that his challenged conduct was

13   narrowly tailored to serve a legitimate penological purpose.  <u>Schroeder</u>, <u>supra</u>, 55 F.3d at 461-62;

14   <u>Rhodes I</u>, 408 F.3d at 568.  To determine whether a prison policy is reasonably related to

15   legitimate penological interests, the court must consider four factors:  (1) whether there is a valid,

16   rational connection between the policy and the legitimate governmental interest put forward to

17   justify it; (2) whether there are alternative means of exercising the right; (3) whether the impact of

18   accommodating the asserted constitutional right will have a significant negative impact on prison

19   guards, other inmates and the allocation of prison resources generally; and (4) whether the policy

20   is an exaggerated response to prison concerns.  <u>Turner v. Shafley</u>, 482 U.S. 78, 84, 89-90 (1987);

21   <u>Mauro v. Arpaio</u>,188 F.3d 1054, 1058-59 (9th Cir. 1999).

22           The court finds that defendant Traquina has met his burden of demonstrating that

23   his challenged conduct was narrowly tailored to serve the legitimate penological purpose of

24   maintaining CSP-S's tiered administration of medications to inmates based on need.  As

25   explained under penalty of perjury in his declaration filed October 16, 2008 (Dkt. No. 43 at 2-3):

26   ////

> Because of the overwhelming number of inmates requiring daily medications, insulin-dependant Type 1 diabetic inmates are given priority to received insulin at the medical clinic each day. . . . Following the distribution of insulin medication to these inmate patients, the cancer patients are then given priority to receive medication.  After cancer patients receive medication, the inmates requiring narcotic medications are serviced. . . . Ideally, inmates would receive all medications at once.  However, given the number of inmates who require medication, priority is given to those inmate patients based on medical condition and needs.  At this time, Mr. Watson's medical condition does not warrant a priority ducat to receive medication in the first group of patients which is currently Type 1 insulin-dependent diabetic patients.

This triaged system is a valid, rational method for meeting the medication needs of all CSP-S inmates, for which there is apparently no reasonable alternative process.  The accommodation of plaintiff's request would impair the rights of other inmates to obtain their medications in a fair and orderly manner, and would negatively impact the ability of prison staff to serve the medication needs of all inmates.  Because CSP-S's triaged system for administering medications to inmates satisfies the <u>Turner</u> factors, the court finds that Dr. Traquina has met his burden of demonstrating that his conduct was narrowly tailored to serve a legitimate penological interest.

For these several reasons, the court finds that no trier of fact could reasonably find that Dr. Traquina's challenged conduct was in retaliation against plaintiff for his exercise of First Amendment rights.  Accordingly, summary judgment should be granted for defendants on plaintiff's retaliation claim against Dr. Traquina.

C.  Injunctive Relief

In the absence of a viable substantive claim for relief, as well as plaintiff's transfer from CSP-S, plaintiff's claim for injunctive relief,[26] is moot.  <u>See</u> <u>Johnson v. Moore</u>, 948 F.2d

---

[26]  Pursuant to the First Amended Complaint, plaintiff seeks the following injunctive relief:

> Issue permanent injunctive relief restraining defendants and their officers, agents, directors, successors, employees, attorneys, or representatives from further violations of the First, Eighth, and Fourteenth Amendments to the United States Constitution referenced herein as the subject of Watson's claims for relief, including but not limited to enjoining defendants from policies,

64

517, 519 (9th Cir. 1991) (per curiam) (prisoner's claims for injunctive relief deemed moot because he was transferred to another facility).[27]  Plaintiff's request that the Court substitute the warden of CSATF, for the warden of CSP-S, as the appropriate official capacity defendant for injunctive relief, is without merit in light of the court's findings on plaintiff's substantive claims.

Plaintiff requests, alternatively, that the court grant plaintiff leave to amend his complaint to state an injunctive relief claim to expedite his treatment at CSATF.[28]  However, in

_____

practices, actions, and omissions such as those alleged herein, requiring the establishment of appropriate and effective means to prevent future such violations, and requiring defendants to provide Watson with all necessary and appropriate medical care.

(FAC at 21.)  In addition, as the court noted in its findings and recommendations responsive to defendants' motion to dismiss, "[t]he factual allegations of the complaint provide additional detail regarding the equitable relief plaintiff seeks," specifically, reevaluation by a neurosurgeon, additional physical therapy, and adequate pain medication. (Dkt. No. 96 at 8 (internal citations to FAC omitted).)

[27]  "Mootness can be characterized as the doctrine of standing set in a time frame:  The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).  Mootness is a jurisdictional issue, and federal courts have no jurisdiction to hear a case that is moot, that is, where no actual or live controversy exists.  If there is no longer a possibility that an appellant can obtain relief for his claim, that claim is moot and must be dismissed for lack of jurisdiction."  Foster v. Carson,  347 F.3d 742, 745 (9th Cir. 2003) (citations and internal quotation marks omitted).

[28]  Plaintiff argues in full (Dkt. No. 108- at 26-7 (internal citations omitted)):

Having failed to obtain dismissal of these claims, Defendants now contend that their transfer of Watson to a different prison effectively moots his request for injunctive relief.  Because the change of scenery has not changed the level of care, the Court should not cut off Watson's right to seek injunctive relief. . . . Since being transferred to SATF-CSP-Corcoran, Watson has not received physical therapy, surgery, or any treatment other than methadone.  In short, Watson still is not receiving necessary medical care.  [¶]  Watson's injunctive relief claim seeks specific medical care and accommodation.  He requests sufficient medication, adequate physical therapy, reasonable accommodations in performing institutional tasks, a current surgical assessment, and surgery (as recommended).  . . . Because Watson still seeks, and has not received, adequate medical care and accommodation, the Court should substitute the warden of SATF-CSP-Corcoran for the warden of CSP-Solano as the appropriate official capacity defendant for injunctive relief.  In the

65

1  addition to the established law noted above, it is well established that an inmate must first exhaust

2  his administrative remedies at his place of incarceration before proceeding with a civil action.  42

3  U.S.C. § 1997e(a); Booth v. Churner, 532 U.S. 731, 741 (2001); McKinney v. Carey, 311 F.3d

4  1198, 1199 (9th Cir. 2002) (per curiam); Brown v. Valoff, 422 F.3d 926, 934 (9th Cir. 2005).  The

5  Rhodes II ruling on which plaintiff relies, authorizing amendment of a complaint to add newly

6  exhausted claims based on related conduct that occurred after the filing of the original complaint,

7  does not involve the plaintiff's transfer to a new institution, Rhodes v. Robinson ("Rhodes II"),

8  supra, 621 F.3d at 1006-07.  Plaintiff cites no case that would authorize his request.  Counsel

9  stated at the hearing that he did not know whether plaintiff had filed or exhausted an inmate

10 appeal at CSATF, but noted that plaintiff had been there for only six months.  Addressing

11 counsel's concerns that plaintiff may have been transferred in retaliation for pursuing the instant

12 action, the court explained that such claim would need to be exhausted at CSATF.  In addition,

13 requests for treatment and further neurosurgical evaluation must also be pursued and exhausted at

14 CSATF.

15         Accordingly, the court concludes that summary judgment should be granted for

16 defendants on plaintiff's claims for injunctive relief.

17 VIIII.  Conclusion

18         For the foregoing reasons, IT IS HEREBY ORDERED that:

19         1.  Gary Swarthout, CSP-S Warden, is substituted for former CSP-S Warden D.K.

20 Sisto, as a defendant herein, named in his official capacity only.

21         2.  Plaintiff's request for judicial notice (Dkt. No. 110), is granted in part and

22 denied in part;

23         3.  Defendants' request for judicial notice (Dkt. No. 106-2), is granted;

24 _____

25         alternative, the Court should grant Watson leave to amend his
          complaint to state an injunctive relief claim regarding his treatment
26        at SATF-CSP-Corcoran.

1    4.  Defendants' objections to plaintiff's evidence (Dkt. No. 113-3), are sustained in

2  part and overruled in part;

3    5.  Plaintiff's objections to defendants' evidence (Dkt. No. 112), are overruled.

4    In addition, for the foregoing reasons, IT IS HEREBY RECOMMENDED that

5  defendants' motion for summary judgment (Dkt. No. 106), be GRANTED on each of plaintiff's

6  claims, and that judgment be entered for defendants.

7    These findings and recommendations are submitted to the United States District

8  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

9  after being served with these findings and recommendations, any party may file written objections

10  with the court and serve a copy on all parties.  Such a document should be captioned

11  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

12  objections shall be filed and served within 14 days after service of the objections.  The parties are

13  advised that failure to file objections within the specified time may waive the right to appeal the

14  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

15  DATED:  October 28, 2011

16

17

18    KENDALL J. NEWMAN
      UNITED STATES MAGISTRATE JUDGE

19  wats1871.msj.final

20

21

22

23

24

25

26